IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
October 1, 2015 Session Heard at Nashville

## STATE OF TENNESSEE v. HOWARD HAWK WILLIS

**Automatic Appeal from the Court of Criminal Appeals
Criminal Court for Washington County
No. 28343     Jon Kerry Blackwood, Judge**

_____

### No. E2012-01313-SC-DDT-DD – Filed July 6, 2016

_____

This appeal arises from the murder of two teenagers, accompanied by the dismemberment of one of them. A jury convicted the defendant, Howard Hawk Willis, of two counts of premeditated first-degree murder and one count of felony murder in the perpetration of a kidnapping. The jury sentenced the defendant to death on each conviction. The defendant appealed, and the Court of Criminal Appeals affirmed his convictions and sentences.[1] On appeal, the defendant contends, *inter alia*, that certain incriminating statements he made to his ex-wife should have been excluded because she was acting as an agent of the State at the time the statements were made. He asserts that the admission into evidence of the statements violated his right against self-incrimination under the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. For purposes of the right against self-incrimination, we hold that this is a case of "misplaced trust" in a confidant and there was no violation of the Fifth Amendment. The defendant also argues that the admission of the statements violated his right to counsel under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. The incriminating statements to the ex-wife were made during in-person meetings with her at the jail and during recorded telephone calls from jail. As to statements made to the ex-wife prior to indictment, we hold that the defendant's Sixth Amendment right to counsel had not attached, so there

---

[1] After the case was docketed in this Court, we entered an order identifying four issues for oral argument, in addition to the mandatory review Tennessee Code Annotated section 39-13-206(c)(1) (2014) requires this Court to perform. "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

was no violation regardless of whether the ex-wife was acting as an agent of the State. As to statements made in person to the ex-wife after indictment, the evidence shows only that the State willingly accepted information from a cooperating witness. We hold that, for a cooperating witness or informant to be deemed a "government agent" for purposes of the Sixth Amendment right to counsel, the defendant must show that the principal— the State, personified by law enforcement officers—manifested assent, either explicitly or implicitly, to have the cooperating witness act as a government agent, and that the State had some level of control over the witness's actions with respect to the defendant. Agency cannot be proven based solely on the actions of the alleged agent, so proof that the ex-wife repeatedly contacted law enforcement is not sufficient in and of itself to show that the State assented to have her act as its agent. Therefore, the admission into evidence of the statements made in person to the ex-wife after indictment did not violate the defendant's Sixth Amendment right to counsel. As to the incriminating statements made by telephone, we hold that, by placing the telephone calls to his ex-wife from jail with full knowledge that all calls were subject to monitoring and recording, the defendant implicitly consented to the monitoring and recording of his conversations and waived his Sixth Amendment rights.  After full review, we affirm the judgments of the trial court and the Court of Criminal Appeals upholding the defendant's two convictions of first degree murder, and we affirm the sentences of death.

## Tenn. Code Ann. § 39-13-206(a)(1) (2014); Judgment of the Court of Criminal Appeals Affirmed

HOLLY KIRBY, J., delivered the opinion of the Court, in which CORNELIA A. CLARK and JEFFREY S. BIVINS, J.J., joined.  SHARON G. LEE, C.J, filed a concurring opinion.

Hershell D. Koger, Pulaski, Tennessee (on appeal); Kathleen Morris, Nashville, Tennessee (on appeal); and Howard Hawk Willis, pro se (at trial), for the appellant, Howard Hawk Willis.

Herbert H. Slatery III, Attorney General and Reporter; Andree Sophia Blumstein, Solicitor General; James E. Gaylord, Senior Counsel (on appeal); and Dennis Brooks, Assistant District Attorney General, (at trial), for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

This case arises from the October 2002 deaths of two teenagers, seventeen-year-old Adam Chrismer (hereinafter "Adam") and his sixteen-year-old wife, Samantha

Chrismer (hereinafter "Samantha.")[2]  The defendant was indicted for the premeditated first-degree murder of Adam, the premeditated first-degree murder of Samantha, the felony murder of Samantha in the perpetration of a kidnapping, the felony murder of Adam in the perpetration of first-degree murder, two counts of abuse of the corpse of each victim, and one count of abuse of the corpse of Defendant's stepfather, Sam Thomas. The State dismissed the charge of felony murder of Adam. The trial court severed the murder counts from the abuse of a corpse counts.  After multiple changes in counsel that resulted in long delays in the proceedings, the trial court ultimately found that the defendant had implicitly waived and forfeited his right to be represented by counsel, and ordered him to proceed pro se at trial; it appointed advisory counsel to assist him. On interlocutory appeal, the Court of Criminal Appeals affirmed the trial court's order that the defendant proceed pro se.  *See State v. Willis*, 301 S.W.3d 644, 645 (Tenn. Crim. App. 2009).  On remand, the trial judge, Judge Lynn W. Brown, recused himself from the case, and Judge Jon Kerry Blackwood was designated as the trial judge.

### A.  Pretrial Motions

The defendant filed numerous pretrial motions.  Given the complexity of the case, the evidence adduced at the hearings on those motions will be summarized as it becomes relevant to a discussion of the issues below.

### B.  Guilt Phase

### 1.  State's Proof

The trial was held in June 2010, and the following evidence came before the jury. Victims Adam and Samantha married in August 2002.  Sometime earlier that year, they struck up a friendship with the defendant's daughter, Kelly Willis, (hereinafter "Kelly").[3] Through Kelly, Adam and Samantha became acquainted with the defendant.   Various witnesses testified that they saw the victims at the Johnson City home of the defendant's mother, Betty Willis (hereinafter "Betty"), on various occasions between April 2002 and September 2002.  Photos taken in an August 2002 photo session at a Chattanooga, Tennessee Olan Mills Photography studio depicted the victims with each other and with the defendant.

Vickie Rhyne was a veterinarian with the East Ridge Animal Hospital in Chattanooga.  She testified that, on September 25, 2002, a pet dog named "Doge" was

---

[2] Because so many of the parties involved in this case share the same last name, we use the parties' first names to avoid confusion.  No disrespect is intended by this practice.

[3] Ms. Willis's name is spelled at various points in the record as "Kelly" or "Kelli."  For the sake of consistency, we will use "Kelly."

-3-

checked in for boarding. Samantha Chrismer was listed as the owner of "Doge," and the defendant was listed on the check-in form as an emergency contact. No one ever came to pick up the dog. Dr. Rhyne did not know whether anyone ever tried to contact the defendant as the emergency contact. At some point, she learned that the owner was deceased. Eventually, in January or February 2003, Dr. Rhyne took the dog home to live with her.

Johnson City attorney James Robert Miller testified that he and his secretary went to Betty's house at 104 Brentwood Drive, in Johnson City, during the lunch hour on September 27, 2002, to handle a routine business matter. When he drove up, he saw the defendant standing outside. When he went inside, the kitchen, bathroom and living room areas of the house were "covered in a lot of debris." He saw two teenagers—a male and a female—inside the home playing video games on the television. Mr. Miller chatted with the teenage girl. She told him that she met the defendant at a Hardee's restaurant "a week or two before," and came up from Georgia to clean the house. Later, while he was still at Betty's house, Mr. Miller observed the teenage girl in the back yard with the defendant. She spoke on a cell phone and then handed it to the defendant, who spoke on the same phone and then handed it back to her.

Wilma Clay was Betty Willis's next-door neighbor. Ms. Clay testified that, on various occasions between April and September 2002, she observed the defendant, his daughter, Kelly, a young girl and a young man at Betty's house. She did not see the teenagers after September 2002. In the early morning hours of Saturday, October 5, 2002, Ms. Clay went outside her home to smoke a cigarette and saw the defendant, also smoking a cigarette, standing outside next to Betty's red Jeep. The Jeep appeared to be filled with personal belongings. When the defendant finished smoking his cigarette, he threw it on the ground, picked up a black plastic bag from the back of the Jeep, and threw it on the ground. The neighbor finished her own cigarette and re-entered her house. Sometime later, she came back out to get the newspaper and noticed that Betty's garage door was down but there was a light on inside the garage. She did not think that the garage light was on the first time she went outside.

At the time of the events in question, Samantha's mother, Patty Leming, lived in Chattanooga, Tennessee. She had five children, including sons, Daniel Foster and Richard Foster, and the victim, Samantha. The defendant's daughter, Kelly, initially befriended Daniel and Richard, and later befriended Samantha. Ms. Leming testified that, at one point prior to their disappearance, the victims were living with Kelly in the defendant's Rossville, Georgia trailer.[4] Ms. Leming assumed that the defendant was

---

[4] Rossville, Georgia, lies across the Tennessee/Georgia border, just south of Chattanooga, Tennessee.

living there as well. During that period, she saw Samantha weekly because the defendant brought Samantha by her house to visit. Approximately one week before the victims disappeared, they moved into their own trailer, also in Rossville, Georgia.

Ms. Leming last saw the victims on October 4, 2002, at a Chattanooga Pizza Hut. She and Samantha were waiting for a pizza when Adam arrived and said to Samantha, "Howard said [] let's go." The victims left in a red Jeep that Ms. Leming thought belonged to the defendant. Ms. Leming said it appeared to her that the defendant was driving the vehicle. After that, all of Ms. Leming's attempts to reach Samantha were fruitless.

Adam's mother, Teresa Chrismer, lived on Lookout Mountain, Georgia.[5] Adam was the youngest of her four children. Ms. Chrismer testified that when Adam met Samantha, he moved out of her house. At some point during 2002, Ms. Chrismer became acquainted with the defendant because he brought Adam and Samantha to her house to visit. The last time she talked to Adam was on October 4, 2002. Adam called her, upset and crying, and told her that he wanted to come home. Although Adam made a practice of calling her every two or three days, after October 4, all her attempts to reach him were fruitless. She called the contact number Adam had given her and when there was no answer, she left a voice message for him.

On or about October 7 or 8, 2002, Ms. Chrismer received a call from a Bradley County detective who was looking for Adam. The call prompted her to file a missing persons report on Adam. Subsequently, on the evening of October 11, 2002, Ms. Chrismer received a call from the defendant. Caller I.D. indicated that the defendant was using the same phone on which she earlier left the message for Adam. When she asked the defendant if he knew where Adam was, he told her the last time he had seen Adam was at the Rossville, Georgia trailer. While Ms. Chrismer was on the telephone with the defendant, she directed her husband to go to a neighbor's house to call the Walker County, Georgia Sheriff's office and inform them of the contact. During her conversation with the defendant, Ms. Chrismer could hear two women talking in the background; the defendant was trying to get them to "shut up." She described his demeanor on the telephone as "cool as a cucumber." On approximately October 13, 2002, someone from an East Tennessee law enforcement agency contacted Ms. Chrismer and asked her for a description of any unique physical features of Adam's head or face. Her husband told them that Adam had a BB imbedded in his cheek from a prior injury.

Patrol Officer Bill Burtt testified that, in October 2002, he was the Captain of the criminal investigations division for the Bradley County, Tennessee Sheriff's

---

[5] Lookout Mountain straddles the Tennessee-Georgia state boundary, just south of Chattanooga, Tennessee.

Department.[6]  The defendant was scheduled to come in for an interview on October 4, 2002, on another matter, but he called one of Officer Burtt's co-workers, Detective Shaunda Efaw, and told her he could not come in that day. On October 8, 2002, the defendant came in and they interviewed him at that time.  During the course of that interview, they asked the defendant if he knew the whereabouts of the victims.  He indicated that he had last seen them on October 4, 2002, and he thought they were possibly in Georgia.  Officer Burtt sent detectives into Georgia to try to find the victims, and spoke that day to Adam's mother on the phone.  He believed that Adam's mother filed a missing persons report after he spoke to her.  On October 11, 2002, Officer Burtt and two other Bradley County officers went to Johnson City, Tennessee, and served an unrelated arrest warrant on the defendant.  By this time, they suspected that the defendant was involved in the disappearance of Adam and Samantha.  At the time of his arrest, the defendant was at the home of his Aunt Marie, at 1324 Lowell Street, which was around the corner and behind his mother Betty's house.  Both a blue Jeep and a red Jeep were parked at Aunt Marie's residence at that time.  The red Jeep was towed to Bradley County.     Detective Shaunda Efaw, also of the Bradley County Sheriff's Department, testified that the defendant was supposed to meet with her on October 4, 2002, but did not show up that day.  He came in on October 8, 2002, however, and she interviewed him at that time.  When questioned as to the whereabouts of the victims, the defendant said that he had not seen them since he saw them in North Georgia on about October 4th.  He indicated that his ex-wife, Wilda Willis[7] (hereinafter "Wilda"), might better recall the date.  On October 10, 2002, Detective Efaw received from the defendant a message asking her to call him.  When she did, he reiterated that the last time he saw the victims was at their Mohawk Road trailer in Rossville, Georgia.  On October 11, 2002, Detective Efaw was in Washington County, Tennessee, searching for the victims.  She was present when the defendant was arrested on a federal warrant at the home of his Aunt Marie.  Detective Efaw also recalled that both a blue Jeep and a red Jeep were parked at Aunt Marie's house at the time, and that one of them was towed from the scene at the direction of her Bradley County supervisors.  She believed that the red Jeep was the vehicle that was towed because the defendant's ex-wife Wilda had reported that she saw the defendant in a red Jeep on October 4th.

Detective Efaw testified that Wilda came to the Washington County Sheriff's Office at about 9:00 p.m. on the evening of the defendant's arrest. She told them that she intended to go to the defendant's federal court hearing in Greeneville, Tennessee, the next day.  Detective Efaw asked Wilda to record her telephone calls with the defendant.  Wilda agreed, and Detective Efaw gave Wilda a tape recorder for that purpose.  After that, Wilda periodically brought back completed recordings of those conversations.  In

---

[6] Bradley County, Tennessee, borders both Hamilton County, Tennessee (Chattanooga), to the west and Georgia to the south.

[7] By the time of trial, Wilda's last name was Gadd.

January 2003, Detective Efaw went with Wilda to look for a chainsaw off I-75 in Bradley County and to look for a gun at another location.

On October 11, 2002, fisherman Luther Earl Whitson saw what he believed was a mask floating in Boone Lake, near a boat ramp at Winged Deer Park in Washington County, Tennessee. It turned out to be a severed human head. Mr. Whitson called 911. Over the defendant's objection to its gruesome nature, the trial court permitted the State to introduce into evidence a color photograph of the severed head.

The next day, on October 12, 2002, fisherman Edward Brownlow Baker was participating in a fishing tournament on Boone Lake. He saw a severed human hand floating in the lake and called 911. Mr. Baker retrieved the hand with a fishing net and carried it to shore near a bridge, where he met investigating officers. Over the defendant's objection, the trial court permitted the State to introduce into evidence a color photograph of the severed hand.

Later that day, Jerry Taylor, a bus driver for the Washington County Sheriff's Department's community service program, brought a crew of inmates to walk the bank of Boone Lake near the Devault Bridge. Within fifteen to twenty minutes, they found another severed human hand. Over the defendant's objection, the trial court permitted the State to introduce into evidence a color photograph of the second severed hand.

At some point during this same period, Isaac Nichols was fishing with his daughter and his nephew on the banks of Boone Lake. Mr. Nichols' daughter found a piece of human skull that measured approximately five inches in diameter. Mr. Nichols called 911 and turned the skull fragment over to the police.

Dwayne Cowan was the booking officer at the Washington County Jail when the defendant was brought in on the federal warrant on October 12, 2002. He testified that, when booking a person, the booking officer collects all personal effects and secures them, fingerprints the inmate, then assigns the inmate a classification status. Mr. Cowan identified the property receipt for the items collected from the defendant on October 12, 2002. Included on the list of items was a pair of white tennis shoes.

After the defendant's arrest, police monitored and recorded a series of telephone calls from the jail between the defendant and his mother. In one of the calls, when Betty referred to a "storage unit," the defendant quickly told her to "shut up." After hearing that exchange, police began contacting self-storage facilities in the area. They learned that, on October 10, 2002, Betty had rented Unit X47 at the 24-Hour Self Storage facility in Johnson City, Tennessee. Catherine Campbell was the manager of that storage facility. Ms. Campbell testified that, on October 10, 2002, a "middle aged to older" man called to inquire about renting a unit for his mother. When Ms. Campbell told the caller that she

would have to speak to his mother directly, a female came onto the phone and identified herself as Betty Willis. Ms. Campbell instructed the woman to fill out an application and leave it, along with a payment of fifty-five dollars, in a lockbox that was on the property for that purpose. Later that evening, Ms. Campbell went by the facility and picked up the completed paperwork and a check. Ms. Campbell identified the contract, completed in the name of "Betty H. Willis" with a reported address of 104 Brentwood Drive, in Johnson City, Tennessee. Ms. Campbell also identified a check submitted on Betty's bank account as payment. The contract listed Betty's sister, Marie Holmes, as the emergency contact. The bank returned the check four days later for "non-sufficient funds." Ms. Campbell explained that the entry code for the gate to the facility was the last four digits of the lessee's social security number. On cross-examination, she conceded that there was no video surveillance, so there was no way to know for certain who entered onto the property through the gate.

Dr. Larry Miller, a forensic document examiner for the Department of Criminal Justice at East Tennessee State University, was accepted as an expert in handwriting analysis. He examined the rental contract for the 24-Hour Self Storage facility and the check written to the facility, both purportedly signed by Betty Willis, and compared these documents to a known handwriting sample from Betty. Dr. Miller opined that the signature on both the contract and the check was written by Betty.

When law enforcement officers learned about the rented storage unit, police officers went to the unit and found it padlocked.[8] However, the smell of decay was apparent, and officers observed maggot activity at the crack where the door met the concrete. Based on the facts known at that point, police officers contacted the Tennessee Bureau of Investigation (TBI). They secured the storage unit by parking two patrol cars at the scene overnight and obtained a search warrant for the unit. They also obtained search warrants for Betty Willis's house at 104 Brentwood Drive in Johnson City, Tennessee, and Marie Holmes' house at 1324 Lowell Street in Johnson City, Tennessee.

Inside the storage unit, officers found two beige 50-gallon Rubbermaid storage containers covered with a blue tarp. Underneath the blue tarp, on top of the containers, they found a hammer, a hatchet, and a pair of scissors. The Rubbermaid containers were tied with yellow nylon rope. On top of the containers, there was a plastic bag containing five pop-top style air freshener cans. Beside the containers on the floor were two large plastic fuel cans containing kerosene. TBI forensic investigators collected fingerprint samples from several objects in the unit, including the blue tarp that covered the

---

[8] As it turned out, the Drug Task Force for the First Judicial District, which was involved in the investigation, was also leasing a unit in the storage complex, so law enforcement officers were able to gain entry onto the property through their own right of access.

containers.  A fingerprint taken from the tarp was later matched to the defendant's right thumb.

When officers looked inside the storage containers, they found two human bodies. There was a female body in one container, and a male body in the other, minus head and hands.  Both bodies were covered with layers of fabric, blankets and pieces of carpet. The male body was also covered with a black coat that had a distinctive red plaid flannel lining.[9]  Inside the container with the female body, there were live fly larvae but no pupae. Inside the container with the male body, there were only pupae.  Samples of the larvae and pupae were collected from each container at the direction and guidance of entomologist Dr. Erin Watson-Horzelski. The samples were later sent to Dr. Watson-Horzelski for examination.

Washington County Sheriff's Department Investigator Todd Davis was present during the search of the storage unit when the Rubbermaid containers with the victims' bodies were found.  He later investigated local retailers who sold this type of container. Investigator Davis found and purchased an identical container at the Johnson City Walmart near Interstate Highway 26.

Joshua Hopkins worked in store loss prevention at the Johnson City Walmart where Investigator Davis purchased the Rubbermaid storage tote.  At the request of the Washington County Sheriff's Office, he researched the sales history at that store for that particular storage container.  Store records reflected that, on October 7, 2002, at 10:29 a.m., someone purchased six (6) "pop-top" style cans of air freshener of the same type found in the storage unit.  Later that day, at 3:51 p.m., someone purchased one 50-gallon Rubbermaid container, a hatchet, and a particular brand of tennis shoes.  The tennis shoes were the same brand as those worn by the defendant on the day of his arrest.  Mr. Hopkins could not say who purchased the items and conceded that other Walmart stores could have sold the same items.

The bodies were transported inside the storage containers to forensic pathologist Dr. Mona Stephens (hereinafter "Dr. Stephens") to be autopsied.  The severed head and hands recovered at Boone Lake were also sent to Dr. Stephens.  Fingerprint analysis performed on the female body matched Samantha.  Fingerprints taken from the severed hands matched Adam.  The description given by Adam's father of the physical features of Adam's head—particularly a BB shell in his cheek from a prior injury—was determined by the medical examiner to be consistent with the human head found floating in Boone Lake.  Later DNA analysis of the male body inside the container confirmed that it was Adam.

---

[9] The defendant stipulated that jacket fibers found on the male body correlated with fibers found on Adam's head.

Dr. Stephens testified that, inside the container with Samantha's body, there were fly larvae but no pupae casings. Samples were collected and refrigerated until they could be sent to FBI Agent Rainer Drolshagen. The container in which Samantha's body was found contained layers comprised of a pillow inside a pillowcase, two small rugs, and then Samantha's body. The body was nude, and there was a gag around Samantha's mouth. Each of her hands was bound with a plastic zip tie, looped together behind her and then bound with a third zip tie. Each of her ankles was bound with a plastic zip tie as well, but those zip ties were not bound together. Discoloration of Samantha's extremities indicated that she was alive when she was bound. She sustained bruises to her right leg, to the inside of her right breast, to her right shoulder, and to her feet. The fatal wounds to Samantha were two gunshot wounds to her head. Dr. Stephens found one (1) bullet in four (4) fragments in Samantha's neck.[10] Drug screens revealed benzodiazepine in Samantha's gastric contents and in her liver.

Dr. Stephens testified that when she opened the container with Adam's body, she found fly pupae, but no larvae. As she had done with the container in which Samantha's body was found, Dr. Stephens collected samples and refrigerated them until they could be sent to F.B.I. Agent Drolshagen. The container in which Adam was found was layered with two throw rugs, a size XXL black jacket, and then Adam's body. The body was wrapped first in a blue comforter with sunflowers on it, and then a pink fleece blanket, all tied up with black nylon rope. The black jacket had damage consistent with having been cut through with a chainsaw. Fibers imbedded in the body, as well as bone fragments and tissue in the materials, suggested that the body was wrapped when it was dismembered. Once unwrapped, Adam's body, minus his head and hands, was observed to be dressed in flannel boxer briefs and cargo shorts. His legs were cut through the bones, but the connective tissue remained intact. The legs of the shorts displayed chainsaw marks, and cuts on Adam's legs were consistent with those chainsaw marks. It appeared that Adam's legs were cut in order to fold his body into the Rubbermaid container. The absence of arterial blood indicated that Adam was already dead when his body was dismembered.

Dr. Stephens testified that imbedded in Adam's severed head was the same type of polyester batting material as was found wrapped around his body in the container. The

---

[10] The Georgia Bureau of Investigation (GBI) later requested a second autopsy of Samantha's body, which was performed by Dr. Mark Koponen, then Deputy Chief Medical Examiner for the GBI laboratory in Atlanta, Georgia. He did not have Dr. Stephens' autopsy report at the time he performed his own autopsy. Nevertheless, Dr. Koponen's autopsy results were consistent with those of Dr. Stephens except in one respect: he x-rayed the body and found a bullet in Samantha's chest. After reviewing Dr. Stephen's original autopsy report, Dr. Koponen opined that the bullet was originally in the cranial vault, but had fallen down into the chest in the process of decomposition and manipulation of Samantha's body between recovery and autopsy.

head revealed a bullet entry wound beneath the chin, which traveled up through the pharynx and out through the base of the skull. Stippling around the entry wound suggested that the shot was fired within two feet of the wound. Bruising around the wound indicated that Adam was alive when it was inflicted. A piece of front left parietal skull, retrieved from the vicinity where the severed head and severed hands were found, fit with the calvarial bone of Adam's head and had fractures and separations along the cranial suture lines that were consistent with a saw mark.

Dr. Stephens testified that, because she had been present during the search of the storage unit and had unpacked the storage containers during the autopsies, she also participated in the search of the residence at 104 Brentwood Drive, to look for items in the home that might match items found in the storage unit or inside the containers. When she entered the house, Dr. Stephens said, it was in "major disarray." During the search, officers found in a bedroom dresser drawer a pillowcase identical to the pillowcase that was on the pillow inside the container with Samantha's body.

Dr. Linda Littlejohn, a forensic scientist in the microanalysis section at the TBI, testified for the State as an expert on microanalysis. She received several items of evidence to analyze in the case. Dr. Littlejohn compared "a piece of jacket from [a] body in [a] container," with a piece of fabric found on the garage floor during the search of Betty's property. Microscopic examination revealed the two fabrics to be of common origin. Dr. Littlejohn also examined debris recovered from a chainsaw. She noted numerous pieces of fabric and fiber bundles on the chain. When she compared that debris to the piece of jacket she received from Dr. Stephens, she found that they were microscopically consistent and concluded they had a common origin. Dr. Littlejohn also examined two pieces of carpet—one found inside a container and one from 104 Brentwood Drive in Johnson City. The carpet fibers were consistent and could have had a common origin. Finally, Dr. Littlejohn compared shoe prints found on the tarp that covered the two storage containers, and partial shoe prints found on the floor of the 24-Hour Self Storage unit, with shoes belonging to both Betty and the defendant. None of the shoe prints were consistent with either pair of shoes.

In October 2002, FBI Agent Drolshagen was stationed in Johnson City, Tennessee. He participated in several aspects of the investigation in this case. He was present during the autopsy of Samantha. He assisted in executing the search warrant at 104 Brentwood Drive by participating in and videotaping the search. He also collected evidence for testing from the 24-Hour Self Storage unit. Specifically, under the guidance and direction of entomologist Dr. Watson-Horzelski, Agent Drolshagen collected and stored insect evidence. Per Dr. Watson-Horzelski's instructions, he stored the insect samples two ways: some in alcohol to preserve the state in which they were found, and some in ground beef to preserve them as live samples. Those samples were sent to the TBI forensic services laboratory until they could be examined by Dr. Watson-Horzelski.

Agent Drolshagen testified that it was very cool inside the storage unit on the day in October 2002 on which they executed the search warrant. Later, in January 2003, at the direction of Dr. Watson-Horzelski, Agent Drolshagen returned to the storage unit and collected daily samples of high and low temperatures inside the unit for four consecutive days, on January 9, 10, 11 and 12, 2003. To collect those temperatures, Agent Drolshagen used a thermometer that recorded both temperature and humidity. He placed the thermometer on the floor in the vicinity where the Rubbermaid storage bins had been sitting, and checked the readings every twenty-four hours over the course of those four days. Agent Drolshagen also obtained from the National Oceanic and Atmospheric Association (NOAA), a chart depicting the high and low temperatures for that geographic area during the month of October 2002.

Dr. Watson-Horzelski testified for the State as an expert in entomology and estimation of time of death. Her focus was on the association of insects—primarily flies and beetles—with decaying animal material, and the examination of the insect development to estimate time of death. To place her findings in context, Dr. Watson-Horzelski first described in detail the life-cycle of the Blow Fly, the particular insect species she observed on the bodies of the victims. After an animal dies, she explained, flies are attracted to the decaying material, particularly any natural orifices or exposed wounds. During the first part of the cycle, the flies will mate and lay eggs. During the second part of the cycle, larvae hatch from the eggs and feed on the dead tissue. The larvae then transform into pupae during the third stage, and in the fourth and final stage, adult flies emerge from the pupae.

The rate of insect development, Dr. Watson-Horzelski said, depends on the species at issue, the microhabitat and the temperature. The warmer the temperature, the faster the rate of development. When insect specimens are collected from a dead body at a crime scene, ideally they are divided into two samples. Some are placed in isopropyl alcohol to preserve them at the particular life stage. Others are kept alive with something upon which to feed for the purpose of species identification.

Since insect species development rates are published from controlled environmental studies, Dr. Watson-Horzelski said, the first step is to identify the particular species involved. Once that is done, the examiner considers the environment where the body was found; this information helps the examiner determine how long it would have taken for the flies to land and begin laying eggs on the body. It is harder for the process to start in a new, pristine, airtight house than in a dirty environment (such as a house with rotting food present), where there are likely already insects present. At the time of her testimony, Dr. Watson-Horzelski had seen photographs of Betty's house at the time of the search; she opined that conditions inside the home were favorable for insect activity. At the storage facility where the victims' bodies were found, although the door was well-sealed, there was a rope protruding that would have made for easier access

to insects. Dr. Watson-Horzelski noted that most of the fly activity was inside the Rubbermaid storage containers, which indicated that the insect activity began before the bodies were placed inside the containers.

Dr. Watson-Horzelski explained how ambient temperature factors into the calculation of fly development. Since ambient temperatures for the storage unit were collected in January 2003, several months after the victims' bodies were discovered in the unit, Dr. Watson-Horzelski calculated what the temperatures would have been inside the storage unit in October 2002 by using (1) those recorded temperatures, (2) the temperature deviations inside the unit as compared to outside the unit at that time, and (3) the outside temperatures recorded from the Tri-Cities weather station for October 2002. Dr. Watson-Horzelski admitted on cross-examination that she was unaware that the storage unit was not rented until October 10, 2002. She agreed that if the bodies had been "in an oven" before that time, it would have made a difference in her calculations. Based on the limited fly activity inside the storage containers, however, she believed that the victims were placed inside the containers soon after their death.

Dr. Watson-Horzelski testified that her examination of the fly activity present on the victims' bodies led her to conclude that Adam was killed before Samantha. She based her conclusion on the fact that the flies on Adam's body had matured to the one to four-day-old pupae stage,[11] but the flies on Samantha's body had matured only to the larvae feeding stage; this suggested that some thirty-six hours separated the two deaths. Based on the insect activity present, Dr. Watson-Horzelski estimated that Adam died between October 5 and October 8, 2002, and that Samantha died between October 7 and October 12, 2002.

Washington County Sheriff's Investigator Todd Hull was also present at the autopsies of the victims. He testified that he transported tissue samples taken from both bodies to Dr. Arpad Vass, the State's forensic anthropologist in Oak Ridge, Tennessee. Dr. Vass testified that his analyses of tissue samples from the victims' livers and kidneys were consistent with the finding that Adam had died first, since Adam's liver, in particular, showed a more advanced stage of decomposition than did Samantha's liver. Dr. Vass estimated Adam's time of death as between October 4 and October 8, 2002, and Samantha's death as between October 6 and October 8, 2002.

Investigator Hull testified that from the time of the defendant's arrest on October 11, 2002, there was a police presence outside Betty's Johnson City house at 104 Brentwood Drive. On October 14, 2002, the night Adam's severed head was found, the first search warrants were executed on Betty's home and Aunt Marie's home. After that, there were two more searches of Betty's house, one on October 17, 2002, and another on

_____

[11] There were no empty pupae casings or newly emerged adult flies inside Adam's container.

October 23, 2002. Those searches yielded further evidence connecting the house to either the victim's bodies or the storage unit.

Investigator Hull testified that, after the defendant was taken into custody, police continued to monitor his telephone calls from the jail. In a conversation on the morning of October 12, 2002, the defendant told his mother to "do the things" he had previously instructed her to do, and to get some air freshener for "that stinking house." In response to information that police had towed his car (the blue Jeep), the defendant commented that they were wasting their time because there was nothing in that car and never had been. In a later conversation between the defendant and his Aunt Marie on October 13, 2002, Marie told the defendant that his ex-wife Wilda knew that the blue Jeep wasn't "down there" and that he was in the red Jeep. The next day, on October 14, 2002, the defendant had a conversation with his mother Betty in which she asked him what they were going to do about "moving the furniture," since "[i]t's padlocked." The defendant asked her, "because of the check?" Betty responded that she didn't have $55. In context, it appeared as though the defendant and his mother were discussing the 24-Hour Self Storage unit where the victim's bodies were found.

On October 15, 2002, the defendant and his mother discussed the police search of her home and Aunt Marie's home. Betty told him that law enforcement officers took her red Jeep and some clothing; she speculated that they took her clothing because they were looking for blood. She also indicated her belief that she would be charged as an accessory to murder. Further, she told the defendant that police had found two severed hands and a severed head that had been identified by Adam's mother as belonging to Adam. Betty said, "I've not taken anything over there to the storage shed. I haven't been back 'cause I thought we were followed." When the defendant started to respond, "Would you shut . . . ," Betty interjected, "They already know."

Finally, in a conversation on October 16, 2002, the defendant called his Aunt Marie's house; his mother Betty was there, and he spoke to her. When the defendant told Betty that he had been brought to the booking area of the jail, she told him that she understood he was being charged because they found a "big spot of blood' in the blue Jeep. Betty also told him that the police took her car because they believed that he had driven it on Friday, October 4, 2002, with the victims inside. The defendant denied doing so. Betty then proceeded to tell him that "Dick" had told her that, within a day or two, she would be charged as an accessory to the deaths of the victims on the theory that she planned the murders and the defendant carried them out. Betty complained that "they" had taken everything out of the garage during the search, including a George Foreman grill. When the defendant exclaimed, "What in the damn hell is a George Foreman grill evidence to?" Betty responded, "I don't know, Howard. We probably cooked the parts before we got rid of them, okay?"

-14-

In 2002, Perry Allen was employed at the Washington County Detention Center; he testified about the telephone system in use at that time. After his arrest, the defendant was incarcerated in a "lockdown pod," in which inmates were locked inside their cells for all but two hours a day. The telephone system in use that that time was the "Evercom System." Mr. Allen explained that although most telephone calls made from the pod were recorded, inmates could manipulate the system to avoid recording by calling an outside land-line, and then having that party make a third-party call. Although the outside land-line was recorded, sometimes either the third party's or the defendant's conversation would not be recorded. Mr. Allen opined that, at the time the defendant was incarcerated in Washington County, he may have talked to someone by telephone without the call being recorded.

Numerous law enforcement personnel from the F.B.I., the T.B.I., the Johnson City Police Department, the Washington County Sheriff's Office, and the 1st Judicial District Drug Task Force assisted in the execution of the search warrant at Betty's house. F.B.I. Agent Drolshagen testified that there was a foul odor throughout the house, and especially in the garage. Inside the house, Agent Drolshagen observed, there was an enormous amount of debris on the carpet, including white paint stains and glass fragments. Those were collected for future analysis. Flies and fly larvae were present on the living room floor. One area of the living room carpet had a large bleach spot. In the dining room and hallway, portions of the carpet were "haphazardly cut" and had been removed.

Johnson City Police Department Officer Debbie Pattillo was present during the search of Betty's house and was also present during Samantha's autopsy. During the search, Officer Pattillo found inside a dresser drawer a pillowcase with a yellow and tan floral pattern. She said that the pillowcase found in Betty's home was identical to a pillowcase found inside the container with Samantha's body.

Police found many other items of evidence during the search of Betty's house that connected with either the storage unit or the Rubbermaid containers that held the victims' bodies. Glass shards found in the carpet in Betty's home were identical to glass shards collected from carpet that was inside the container that held Samantha's body. Black nylon rope found inside the house was consistent with the texture and appearance of the rope tied around Adam's body. A swatch of fabric found beneath the garage door in Betty's home was consistent in appearance with a jacket found inside the container that held Adam's body. A pop-top air freshener found inside the house was the same type, brand, and scent as air fresheners found inside the storage unit.

Police also found a red Jeep parked behind Betty's house at the time of the search. While the inside of the house was definitely not clean, the red Jeep was extremely so. In fact, when police searched the premises, the carpeting inside the red Jeep was still damp.

-15-

Agent Drolshagen testified that, despite the Jeep's clean appearance, he smelled a foul odor inside. The red Jeep was taken to the TBI for serology testing, but authorities found nothing in the Jeep to link it to either the defendant or the victims.[12]

Behind Betty's house and near a neighbor's outbuilding, Johnson City Police Department Lt. Steve Sherfey found an unloaded Rizinay 7.655 automatic pistol lying in grass. The neighbor, Larry Hendrix, told officials that he did not own the pistol and had never seen it. There were three unfired .32 caliber bullets lying on the ground within one foot of the gun. Lt. Sherfey turned over the gun to the Washington County Sheriff's Investigator Tommy Remine.

Inside Betty's garage, Drug Task Force Lt. Thomas Eugene Smith found a box of Winchester .32 caliber ammunition in a paper bag that was sitting on top of a dresser. The bullets were copper-jacketed.

Special Agent Don Carman, a forensic scientist in the firearms identification unit of the T.B.I. laboratory, testified as an expert in the field of ballistics. Agent Carman examined the Rizinay 7.655 automatic pistol found in Betty's back yard, the box of .32 caliber ammunition found in Betty's garage, and the three bullets found near the pistol. Agent Carman noted that the pistol was a very old gun of Spanish origin, from the World War I era. Of the thirty-nine bullets in the Winchester box, thirty-seven were Winchester brand and two were Remington brand. He noted unique "bunter marks" on the three bullets found near the gun, which were identical to the bullets in the Winchester box. Ballistics comparison testing of sample bullets fired from the recovered pistol matched the bullet recovered from Samantha's body. Agent Carman concluded that the two bullets were fired from the same pistol.

Special Agent Bradley Everett worked in the Serology/DNA Unit for the T.B.I. He testified as an expert in the fields of forensic serology and forensic DNA testing. Agent Everett participated in the retrieval of evidence from both the 24-Hour Self Storage unit and Betty's property. Included in the evidence recovered were three cigarette butts found on Betty's property. Special Agent Everett examined these cigarette butts for the presence of DNA. On one cigarette butt, he found DNA consistent with a female offspring of Patty Leming, Samantha's mother. On another cigarette butt, he found a mixture of DNA from the offspring of Patty Leming and an unidentified person. And on the third cigarette butt, he found a mixture of DNA in which a major contributor was a male offspring of Teresa Chrismer, Adam's mother.

---

[12] Examination and testing of a blue Jeep later seized from the defendant's Aunt Marie's house was similarly unfruitful. The fabric of the driver's seat had blood and human DNA that matched the defendant but did not link the blue Jeep to the victims.

Special Agent Everett also examined a Sears Craftsman electric chainsaw for the presence of serological evidence. There was a lot of debris on the chainsaw, but he could not visually identify the debris as human bone or tissue. Testing of the debris indicated the presence of human blood and human DNA, but it was so degraded that Special Agent Everett could not obtain a DNA profile. He testified that the chain on the saw was rusted. He acknowledged that outside exposure to weather could have affected the test results.

The defendant's ex-wife Wilda testified that she married the defendant in 1992 and they divorced in July 2002. They remained in contact after the divorce. Wilda recalled that, on October 4, 2002, the defendant stopped by her house in Ft. Oglethorpe, Georgia, in Betty's red Jeep. Wilda saw a blonde female inside the Jeep and a young male standing outside the Jeep. The next time she saw the defendant was on October 8, 2002, when he came down to talk to officers at the Bradley County Sheriff's Office. At that time, the defendant told Wilda that he was unable to find the victims that day.

Either the day before or the day of the defendant's arrest on Friday, October 11, 2002, the defendant called Wilda and told her that "Patty [Leming]" had called to tell him that Samantha was missing and ask whether he knew of her whereabouts. When Wilda asked him where the victims were, he told her they had left Johnson City that morning. After the defendant's arrest on October 11, 2002, either Betty or Marie called Wilda and conveyed the defendant's request that she meet him the following Monday at the federal court in Jonesborough[13], Tennessee.

In the meantime, the Bradley County Sheriff's Office asked Wilda to come to Johnson City, in Washington County. On October 15, 2002, Wilda went to Washington County and met with officers from both the Johnson City Police Department and the Washington County Sheriff's Office. In that meeting, Wilda agreed to wear a wire and meet with Betty and Aunt Marie; she planned to meet with the defendant after that. Later, while Wilda was at Aunt Marie's home, the defendant called and asked her to visit him in jail; he said he had some things to tell her.

On the evening of October 15, 2002, Wilda visited the defendant at the Washington County detention center at his request. She was able to talk to him only through a Plexiglas window. Because the Plexiglas barrier made it hard to hear and communicate, the defendant asked her to come back the next day with a tape recorder, a note pad, and a pencil. When Wilda told him she thought it would be hard to get in to see him a second time, he suggested that she bring a "fifty-dollar lawyer" with her and pretend to be his assistant, so that she could get inside and meet him face-to-face. He said he would then have the attorney leave the room so he could talk to her privately. On

---

[13] The federal courthouse is actually in Greeneville, not Jonesborough

cross-examination, Wilda acknowledged that it was possible that law enforcement gave her money for a hotel room and meals for the night of October 15, 2002.

The following day, October 16, 2002, Wilda was wired again, and she paid another visit to Betty and Aunt Marie. Later, the wire was removed and she returned to the jail to meet with the defendant. Wilda did not bring an attorney with her, but she brought the tape recorder and writing materials the defendant requested. This time, they were able to meet in a private visitation room. Throughout Wilda's conversation with the defendant, he repeatedly turned the tape recorder on and off. During their meeting, the defendant confessed to Wilda that he "blew [the victims'] brains out," cut off Adam's head and hands and threw them in the "river" near the Devault Bridge, then placed the remainder of Adam's body and all of Samantha's body in a storage unit. The gist of the conversation was that he had shot both victims at the same time on Sunday, October 6, 2002, at Betty's house. He indicated that he shot Adam first because Adam was "wild on something" and went "all to pieces" and came after the defendant, and then he shot Samantha immediately afterward. This conversation was recorded from a microphone hidden inside a trash can in the visitation room.

After her conversation with the defendant on October 16, 2002, Wilda received numerous telephone calls from the defendant. The Bradley County Sheriff's office had given her a tape recorder to record her conversations with the defendant. She did so, and then passed the recordings on to both the Bradley County Sheriff's Office and the Washington County Sheriff's Office. Sometimes they provided her with blank tapes and other times she procured her own tapes. After the conversation in which the defendant admitted that he had killed both victims, he never again expressly admitted his culpability to Wilda. However, some of the subsequent statements the defendant made to her implicated him in the deaths of the victims. Wilda saw the defendant on the last Monday in October 2002, before he was transported to New York to address his federal charges. He continued to call her after he arrived in New York. His story to her about the deaths of Adam and Samantha morphed over time; at one point he told her that Betty killed the victims, at another time he said that Samantha's brother Daniel killed them, and at still another time he claimed that the "Mafia" murdered them.

On January 1, 2003, at the request of the defendant and his Aunt Marie and against the advice of the law enforcement authorities, Wilda flew to New York and visited with the defendant face-to-face in a large community room at the New York facility where the defendant was detained. She had no recording device with her during their in-person meeting and the conversation was not otherwise recorded. Wilda believed that, at the time, the defendant was unaware that she had cooperated with law enforcement officers. During their conversation, the defendant insisted that someone else had killed the victims. He asked Wilda to do several things for him when she got back to Tennessee. The first was to find a chainsaw that he claimed Betty had thrown out of a car window. The

defendant gave Wilda very specific directions on where to find the chainsaw. He told her that from Chattanooga, she was to take I-75 North, past the Ooltewah exit, and exit at a gravel pull-off for semi-tractor trailers. He instructed her to pull her car up to the guardrail, walk until she could no longer see her car, then look to her right in a ditch, where she would find the chainsaw. The defendant asked Wilda to retrieve the chainsaw, clean it with gasoline to remove any fingerprints, and then take it to the home of Samantha's brother, Daniel Foster. Once at Foster's house, she was to break inside, steal some of Daniel's clothing, wrap the chainsaw in the clothing, hide the wrapped chainsaw under the trailer, and then anonymously tip law enforcement about where it was.

When she returned to Tennessee, Wilda stopped first in Washington County to meet with Investigator Hull, and then in Bradley County to talk to Detective Shaunda Efaw. She related to them the instructions the defendant had given her for retrieving the evidence. On January 3, 2003, accompanied by Bradley County Sheriff's Office investigators, Wilda located the chainsaw by using the directions the defendant had given her during their New York meeting. During the search, Wilda received a telephone call from the defendant as he directed her to the location of the chainsaw; that conversation was recorded. In a second conversation, also recorded, he directed her to find certain other items, apparently thrown from a bridge into a river. The defendant told Wilda to take these items to Daniel's house along with the chainsaw. In the telephone calls from New York, the defendant was emphatic that Wilda secure the chainsaw before searching for the other items, that she not take the chainsaw to her own house, and that the chainsaw not be discovered by law enforcement until all the items were together. Once that was achieved, the defendant instructed Wilda, she was to "put the word out" on the street that she wanted information on Daniel.

Wilda continued to tape record her telephone conversations with the defendant after she returned to Tennessee, and she gave copies of those recordings to the Washington County Sheriff's Office and the Bradley County Sheriff's Office. The gist of one conversation was the defendant's claim that Samantha's brother, Daniel Foster, killed the victims at Betty's house the week before the defendant was arrested. According to the defendant, Betty told him about the murders and warned him that Daniel was setting him up to take the blame. The defendant said Betty never told him why Daniel killed the victims, but he understood that both victims were shot before Adam was dismembered.

In other telephone calls, the defendant asked Wilda to relay to Investigator Todd Hull various "riddles" and pictures he had drawn, supposedly in an effort to "speed things up." The defendant also related to Wilda a summation of his version of what happened in October 2002; Wilda understood that he wanted her to type it up and give it to the district attorneys, although she never did so.

-19-

On cross-examination, Wilda conceded that, during the fourteen years she and the defendant were together, Betty Willis was a constant source of trouble. In 1993, Wilda took out a warrant against Betty. In 1999, when the defendant filed for bankruptcy, Betty intervened and filed an objection to the bankruptcy. Wilda acknowledged that Betty routinely threatened other people's lives. She also conceded that the defendant told her that he had tried to record Betty talking about the case before he was arrested and put into jail. Wilda admitted that, at a hearing on November 30, 2004, she had testified that the only time the defendant ever admitted to her that he had killed anyone was in a face-to-face conversation with him. She also admitted to having e-mail correspondence with Gertrude Lark, the sister of the defendant's first wife, who had been missing for many years. In one of those e-mails, Wilda wrote that she believed that Betty was involved in the murder of the ex-wife, as well as "some of those other kids Howard was connected with in Georgia." In a later e-mail to Ms. Lark, Wilda wrote that she planned to ask the District Attorney to allow her to meet with the defendant face-to-face and "push every button I can to get Howard to tell the truth about everyone."

## 2. *Defense Proof*

The defense theory was that someone other than the defendant killed the victims. During the defendant's cross-examination of Bradley County Sheriff's Detective Shaunda Efaw, he brought out the fact that his ex-wife, Wilda, had brought to her a letter postmarked October 8, 2002, from Chattanooga, Tennessee. During the defendant's cross-examination of T.B.I. forensic scientist Bradley Everett, he brought out that Agent Everett performed DNA testing on an envelope addressed to "Betty Hawk" [sic] that was postmarked October 8, 2002, and that a DNA profile developed from the envelope was consistent with the offspring of Samantha's mother, Patty Leming. Dr. Larry Miller, who earlier testified for the State as an expert in handwriting analysis, testified that he had examined the letter and envelope addressed to "Betty Hawk" and postmarked from Chattanooga, Tennessee, on October 8, 2002. He concluded that the handwriting on both the letter and the envelope was written by Samantha. He conceded that there was no way to know when the letter was written or who might have mailed the letter.

T.B.I. Agent Bradley Everett testified that when he tested the white shoes and clothing the defendant was wearing at the time of his arrest, he found no blood. He also conceded that no blood belonging to either victim was found at Betty's 104 Brentwood Drive address.

The defendant introduced the testimony of Dr. Robert Allen, who in September 2002 was Betty's neighbor and her physician as well. Dr. Allen testified that, on September 15, 2002, Betty was hospitalized after she exhibited psychotic behavior, paranoia, and anxiety. In addition, Dr. Allen said, when he went into Betty's residence in mid-September 2002, he observed that it had been vandalized with graffiti on the walls.

The refrigerator and other appliances were overturned, the toilets were busted, and there was insect/maggot-infested food debris on the floor. On September 17, 2002, Dr. Allen wrote a letter to Betty's insurance company to support her claim of vandalism.

Dr. Neal Haskell, a forensic entomology consultant and professor of forensic science at St. Joseph's College in Rensselaer, Indiana, testified in rebuttal to the State's entomologist, Dr. Erin Watson-Horzelski. Dr. Haskell agreed with some of Dr. Watson-Horzelski's broader conclusions—the stage of development and the species of phorid fly. However, he believed there were major flaws in Dr. Watson-Horzelski's analysis of time of death. First, Dr. Haskell faulted her attempt to correlate the temperatures recorded by the weather station in October 2002 to the temperatures recorded inside the storage unit in January 2003, because a cold front had moved through the area in January 2003, so the temperatures were declining. Second, Dr. Haskell faulted Dr. Watson-Horzelski for using too few data points—he believed that she should have used between ten and twenty data points, and she only used four. Third, he perceived that her calculation of the "Kamal data" was flawed because she failed to reference a base temperature, a temperature below which fly development will not occur. In the formula for calculating the time of death, Dr. Haskell asserted, base temperatures are a required factor; different base temperatures will give different values. Fourth, he faulted her for using the same correction factor for the days before the bodies were placed inside the storage unit, because there was no information about where the bodies were on those days so it was impossible to know the microenvironment for fly development. Fifth, he faulted her for using the data for the Megaselia Scalaris sub-species of the phorid fly when the specific sub-species of phorid fly was unidentified. Finally, Dr. Haskell faulted Dr. Watson-Horzelski for assuming immediate colonization of the victim's bodies; he pointed out that phorid flies do not fly at night, so there could have been a delay in colonization. He testified that flies become active during the day, when temperatures reach fifty degrees or warmer. Given the uncertainties in the temperatures and the timing of colonization, Dr. Haskell claimed it was impossible to give a reliable and trustworthy estimate of time of death.

On cross-examination, Dr. Haskell conceded that he did not see the insect samples; in arriving at his opinion, he relied on Dr. Watson-Horzelski's reports. He was not sure whether he had been provided with all of her data when he was reviewing the case and forming his opinion. Dr. Haskell conceded that using weather reports from various agencies to calibrate the crime scene to the weather stations was a common practice. He agreed with Dr. Watson-Horzelski's use of October 2002 temperatures for the ambient temperatures. Dr. Haskell maintained, however, that the flaw in her analysis was in using the January 2003 temperatures to calibrate the temperatures in the storage unit in October 2002, and argued that it would have been better to wait for the anniversary date and make the calculations as of that date. Dr. Haskell agreed that if there were already flies at the murder scene due to the presence of decaying food, it

would be easy for the flies to reach the victims' bodies and begin the egg-laying process. When he was shown photographs of the insect activity in the containers that contained Adam's body and Samantha's body, Dr. Haskell agreed that the pupae in the container that held Adam's body would have been there longer than the larvae in the container that held Samantha's body. Nevertheless, Dr. Haskell said, he could not definitively state whether the victims were killed at different times because there were too many variables. When asked his opinion of forensic anthropologist Dr. Arpad Vass, Dr. Haskell indicated that he had respect for Dr. Vass and his work, but noted that Dr. Vass's work also depended on temperatures, so if the temperature readings were flawed, then Dr. Vass's results would be flawed.

The defendant also presented the testimony of Pamela Marsh, the resident manager of the trailer park in North Georgia at which the victims rented a trailer on September 23, 2002. Ms. Marsh testified that the defendant was with the victims when they rented the trailer, and that the defendant paid their $190 deposit. On the evening of October 4, 2002, Adam came to Ms. Marsh's trailer to make a telephone call. She overheard him telling the person on the other end of the telephone line that he wanted to "come home." Later that same night, about 10:30 p.m., Adam came back to Ms. Marsh's trailer, turned in his key, and told her he was leaving to take care of a sick grandmother in Virginia. Adam sat with Ms. Marsh on her front porch until the defendant drove up, and then Adam left with him. Ms. Marsh did not see Samantha leaving with Adam and the defendant.

Brandon Chancy was the defendant's son-in-law. He owned the blue Jeep that was parked at Marie Holmes' house when police officers came to search the house. Mr. Chancy testified that the rear side window of the Jeep was broken and he used a blue tarp to cover it when it rained. He identified a photograph of Betty Willis and described her as an unusually strong woman. Mr. Chancy recalled one occasion when he saw Betty pick up a container filled with tools, chains, and ropes that he—a car mechanic—had been unable to lift.

Similarly, the defendant's cousin, Steve Holmes, testified regarding Betty's mental illness, her violent nature, and her physical strength. Mr. Holmes' wife Brenda Holmes testified that, within a few days after the defendant was arrested in October 2002, Betty came to the Holmes' house and told her that "Howard" had told her to get some things: a television, bolt cutters, a dolly, and a saw. Betty did not say why she needed those things; at the time, Ms. Holmes assumed they were needed to clean up her house, which had been ransacked. When Ms. Holmes commented on scratches she observed on Betty's arms, Betty alluded to the defendant's "hot temper." Betty also remarked that she needed to move the refrigerator and that there were blood and maggots on the carpet. Ms. Holmes did not give Betty anything except the television. Later, however, she

noticed that the two gasoline containers that had been sitting outside her garage door were missing.

To rebut Ms. Holmes' testimony, the defendant recalled Investigator Todd Hull, who had monitored the defendant's telephone calls from the jail to his mother. Investigator Hull did not recall the defendant asking Betty to retrieve anything except a television. He did not recall the defendant ever asking for tools.

The defendant also called criminal defense investigator Marc Caudel, who was appointed by the trial court to assist the defendant in the investigation of the case. Mr. Caudel testified that, when he interviewed Brenda Holmes, she did not tell him that Betty Willis had told her that the defendant had directed her to get the listed items. Similarly, Mr. Caudel claimed that Ms. Holmes never stated to him that Betty told her the defendant had a bad temper. Ms. Holmes told Mr. Caudel that she was willing to testify for the State but she did not want to come testify for the defendant. Accordingly, the defendant had to subpoena her to testify.

After both parties rested their cases at the end of the guilt phase, the prosecutor made several comments during its closing arguments that the defendant submits were improper. Specifically, the State commented that, in listening to the recordings of telephone conversations the defendant had with Wilda and his mother, the jury should "know" the defendant committed the killings by the "coldness in his voice." The prosecutor said of the defendant, "his coldness does him in." The defendant's objection to the State's characterization was overruled.

After deliberation, the jury found the defendant guilty of: (Ct. 1) the first-degree premeditated murder of Adam, (Ct. 2) the first-degree premeditated murder of Samantha, and (Ct. 3) the felony murder of Samantha in perpetration of or attempt to perpetrate a kidnapping.

## C. Penalty Phase

The State announced that, as to the murder of Adam, it was relying on the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(13) (the defendant knowingly mutilated the body of the victim after death) to support a sentence of death. As to the murder of Samantha, the State was relying on the aggravating circumstances in Tennessee Code Annotated section 39-13-204(i)(5), (6), & (7) (the murder was especially heinous, atrocious, or cruel; the murder was committed to avoid lawful arrest or prosecution of the defendant or another; the murder was knowingly committed by the defendant while the defendant had a substantial role in committing the first-degree murder of Adam; and the murder was knowingly committed by the defendant

while the defendant had a substantial role in committing the kidnapping of Samantha) to support a sentence of death.

Both victims' mothers testified as to the impact the victims' deaths had on their lives. Adam's mother, Teresa Chrismer, testified that Adam was a loving, affectionate, kind, and artistically talented person. He entertained family and friends with impressions of Elvis and Jim Carey. Ms. Chrismer testified that, when she learned that Adam was dead, she was heartbroken and her "world fell apart." At the time of trial, she still had days when she did not think she could go on without him. For a period after Adam's death, she saw a psychiatrist and a counselor. Before Adam died, Ms. Chrismer was able to work as a vendor at flea markets and cleaning houses. She also wrote poetry. After he died, she was unable to do any of those things. Ms. Chrismer testified that Adam's siblings remained "very angry" over the circumstances of his death.

Samantha's mother, Patty Leming, testified that Samantha was a beautiful, happy girl. Everyone loved her, and she had no enemies. She loved animals and talked of becoming a veterinarian or a lawyer. Ms. Leming said that learning of her daughter's death "about killed [her]." At the time of trial, Ms. Leming continued to receive psychiatric treatment and counseling to deal with schizophrenia and depression. Before Samantha's death, she worked regularly, but had not been able to work since, due to an inability to concentrate.

Over defense objections, the court admitted unredacted photographs of the gunshot wounds to each of the victims' heads, a photograph of Adam's body as it was found in the Rubbermaid container, and a photograph of Adam's severed head. After these photographs were introduced into evidence, a recess was taken because one of the female jurors became ill. When the proceedings resumed, the State rested.

The defendant made a motion to make an unsworn statement; this was denied. The defendant then said that he would not submit any evidence in mitigation. At that point, the trial court held a jury-out hearing in which the court advised the defendant of his right to present witnesses and any other proof in mitigation. The defendant indicated that he had consulted with elbow counsel on the issue and understood the risk in foregoing the right to present evidence in mitigation. Elbow counsel advised the court that he believed that the defendant was mentally competent to make that decision. The defendant acknowledged that he understood he had the right to testify and was choosing not to exercise that right. The trial court found that the defendant had made a knowing and voluntary waiver of his right to present mitigating evidence. The defendant then rested.

The State made a brief closing argument with no objection by the defendant. It argued that, as to the murder of Adam, the defendant knowingly mutilated Adam's body

after death by cutting off Adam's head and his hands and by cutting through the body at various points to fit it into the Rubbermaid container. As to the murder of Samantha, the State noted that the evidence supported a finding that Samantha was murdered up to thirty-six hours after Adam was murdered. During that time, the State stressed, Samantha would necessarily have been subjected to mental torture. The State argued further that Samantha was killed because she was a witness to Adam's murder. In addition, the State contended that Samantha's murder was committed while the defendant was committing the murder of Adam, and also in the perpetration of the kidnapping of Samantha, as evidenced by her bound and gagged body. In the State's argument at the close of the penalty phase, the prosecutor's comments included, "make your own judgment as to his emotions, or attitude as he says the words, 'I blew their brains out[,]'" and, "[y]ou can assess the lack of concern that he had as he talks to his mother on different jail calls in that time period. . . . the state submits this defendant doesn't care[,]" and "[n]o where[,] we submit[,] did he show even the least bit of concern for these young people."

The defendant waived his right to make a closing argument.

As to the murder of Adam, the jury found aggravating circumstance (i)(13) (the defendant knowingly mutilated the body of the victim after death), and that this aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt; it imposed a sentence of death. As to the murder of Samantha, the jury found aggravating circumstances (i)(5) (the murder was especially heinous, atrocious, or cruel), (i)(6) (the murder was committed to avoid lawful arrest or prosecution of the defendant or another), (i)(7) (the murder was knowingly committed by the defendant while the defendant had a substantial role in committing the first-degree murder of Adam), and (i)(7) the murder was knowingly committed by the defendant while the defendant had a substantial role in committing the kidnapping of Samantha). The jury found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and it imposed a sentence of death for Samantha's murder as well.

### D. Court of Criminal Appeals

On appeal, the Court of Criminal Appeals held in the defendant's favor on two points. *State v. Howard Hawk Willis*, No. E2012-01313-CCA-R3-DD, 2015 WL 1207859, at *66 (Tenn. Crim. App. Mar. 13, 2015).

First, as to the defendant's incriminating statements to Wilda on January 1 and 3, 2003, it held that the Sixth Amendment right to counsel had attached at the time the statements were made and that Wilda was acting as an agent of the State at the time, and so concluded that the statements were obtained in violation of the defendant's Sixth Amendment right to counsel. *Id.* Furthermore, because these statements led to the discovery of the chainsaw on January 3, 2003, the court also held the trial court should

have suppressed any evidence related to the recovery of the chainsaw. *Id.* The Court of Criminal Appeals noted, however, that the defendant's statements to Wilda professed his innocence and asserted that someone else had committed the murders. Furthermore, there was other evidence that he had used a chainsaw to sever the head and hands of Adam. Finally, the court found that the evidence of guilt as a whole was overwhelming. For those reasons, the court concluded that the admission into evidence of the defendant's January 1 and 3, 2003 statements and the evidence relating to the recovery of the chainsaw was harmless beyond a reasonable doubt. *Id.*

Second, the Court of Criminal Appeals held that the trial court had erroneously permitted dual consideration of the (i)(7) aggravating circumstance in allowing the State to argue, in instructing the jury as separate aggravating circumstances and in allowing the jury to find as separate aggravating circumstances, that the defendant knowingly committed Samantha's murder while committing her kidnapping, and also that he knowingly committed Samantha's murder while committing the first-degree murder of Adam. *Id.* at *95. It noted that the language in subsection (i)(7) does not provide for the treatment of the single aggravating circumstance as multiple and separate aggravating circumstances based upon the number of underlying felonies committed. *Id., see State v. Bell*, 480 S.W.3d 486, 523 (Tenn. 2015). Nevertheless, the Court of Criminal Appeals concluded that this error was also harmless beyond a reasonable doubt. *Willis*, 2015 WL 1207859, at *96. The appellate court noted that, in addition to the (i)(7) circumstance, there were two valid remaining aggravating circumstances, and that the defendant had waived presentation of mitigating evidence during the penalty phase. *Id.* Under all of these circumstances, the Court of Criminal Appeals concluded, the sentence would have been the same even if the jury had given no weight to the invalid factor. *Id.* at *95-96.

## ANALYSIS

### A. *Admissibility of the Defendant's Statements to Wilda Willis*

The defendant filed several pretrial motions that sought suppression of the October 15, 2002, October 16, 2002, January 1, 2003, and January 3, 2003 incriminating statements he made to his ex-wife, Wilda. These motions were denied by the trial court. The Court of Criminal Appeals affirmed as to the October 15 and 16, 2002 statements and reversed as to the January 1 and 3, 2003 statements, and held that the admission into evidence of the chainsaw found by law enforcement on January 3, 2003 was error. *Id.* at *61, 66.

On appeal, the defendant argues that the statements he made to Wilda on all of these dates were procured by the State in violation of his right to remain silent under the Fifth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution; his right to counsel under the Fifth and Sixth Amendments to the federal

constitution and article I, section 9 of the Tennessee Constitution; and his right to due process under the Fourteenth Amendment to the federal constitution and article I, section 8 of the Tennessee Constitution. He contends that the trial court erred by declining to suppress them. In response, the State maintains that none of the statements made by the defendant to Wilda violated the defendant's constitutional rights and urges this Court to reverse the Court of Criminal Appeals' finding that the admission into evidence of the January 1 and 3, 2003 statements and the chainsaw was error.

The standard of review applicable to suppression issues is well established. A reviewing court may consider not only the evidence presented at the suppression hearing, but also the evidence adduced at trial. *State v. Henning*, 975 S.W.2d 290, 297 (Tenn. 1998). When a trial court makes findings of fact after a hearing on a motion to suppress, those findings are generally binding on an appellate court unless the evidence in the record preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). On appeal, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* As the trier of fact at a suppression hearing, the trial judge determines witness credibility, weighs the evidence, and resolves any conflicts therein. *Id.* It is not this Court's job to second-guess these determinations. *State v. Sanders*, 452 S.W.3d 300, 305-06 (Tenn. 2014) (citing *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012)). Objective evidence that does not involve credibility determinations, however, may be reviewed *de novo*, without a presumption of correctness. *State v. Clark*, 452 S.W.3d 268, 282 (Tenn 2014) (citing *State v. Northern*, 262 S.W.3d 741, 748 n.3 (Tenn. 2008); *State v. Payne*, 149 S.W.3d 20, 25 (Tenn., 2004)).

We will first summarize the evidence adduced during the pre-trial hearings on the motions to suppress, as well as any pertinent testimony from the trial; for the sake of having a complete summary of the evidence pertinent to the motions to suppress, this may repeat some of the evidence outlined above. After summarizing the evidence, we will discuss the parties' arguments.

### 1. *Evidence Regarding Motions to Suppress and Lower Court Rulings*

During the time leading up to the victims' disappearance, the defendant was out on bond for cocaine charges that were pending in the United States District Court for the Eastern District of New York. *See United States v. Willis*, 118 F. App'x 570, 571 (2d Cir. 2004). In early September 2002, the defendant's stepfather, Sam Thomas, disappeared. Mr. Thomas was Betty's husband and Wilda's uncle. During the course of the investigation into Mr. Thomas's disappearance, law enforcement officers in Walker County, Georgia, and Bradley County, Tennessee, learned that Mr. Thomas's credit cards

had been used. A video recording from a business at which one of the credit cards was used showed the defendant and victims Adam and Samantha together, using the card to make a purchase. This video caused law enforcement officers to suspect that all three may have been involved in Mr. Thomas's disappearance. They had no reason at that point to suspect that victims Adam and Samantha were either missing or dead, so they began looking for the defendant and the victims to interview them and determine what they knew about Mr. Thomas's disappearance.

Bradley County Sheriff's Office investigators made contact with the defendant, who agreed to come to Bradley County for an interview on Monday, October 14, 2002. Prior to that date, the Bradley County investigators heard that the defendant was trying to obtain false identification, possibly in order to flee the country. To prevent the defendant from fleeing, they contacted the prosecuting U.S. Attorney in New York to inform him of the disappearance of Mr. Thomas and the defendant's possible involvement. Bradley County investigators sent the U.S. Attorney copies of Mr. Thomas's credit card statement and the video recording showing the defendant and the victims using Mr. Thomas's card. The federal authorities issued a warrant revoking the defendant's bond and faxed it to Bradley County to accomplish service of the warrant on the defendant.

Efforts to locate federal authorities to serve the warrant failed. Consequently, on October 11, 2002, Bradley County investigators, assisted by Johnson City Police Department investigators, arrested the defendant on the federal warrant at the Johnson City, Tennessee home of his Aunt Marie. It is not clear in the record whether the defendant was advised of his *Miranda* rights at this juncture, but he was not questioned, and no law enforcement officer who was present recalled the defendant asking for a lawyer. A court date was set for October 15, 2002, in the federal court at Greeneville, Tennessee, and the defendant was transported to the Washington County Sheriff's Office detention center pending the hearing.

That same day, fisherman Luther Whitson found a severed human head floating in Boone Lake, in Washington County, Tennessee. By this time, investigators trying to locate Adam and Samantha to talk to them about Mr. Thomas had spoken to the victims' mothers. The mothers told investigators that neither victim had been seen or heard from since October 4, 2002. Investigators began to suspect foul play in the disappearance of the victims. The next day, two severed human hands were found in the same lake.

Shortly after the defendant's arrest, the Bradley County Sheriff's Office, the Washington County Sheriff's Office, and the Johnson City Police Department began monitoring the telephone calls made at the jail by the defendant to Betty, Aunt Marie, and others. Some of the conversations between the defendant and Betty concerned hiring an attorney. The only charge pending against the defendant at that point was the federal revocation warrant, so law enforcement officers assumed that the reason the defendant

sought to hire an attorney was to handle the federal matter. During the conversations, two different attorneys were mentioned—Richard Pectol and Roger Day—but Betty had no success in hiring either one.

In the defendant's conversations with Betty, there was some reference to the rental of a storage unit. This got the attention of the investigating officers, who began contacting self-storage facilities in the area. Ultimately, they discovered that, on October 10, 2002, Betty had rented a unit at the 24-Hour Self Storage in her name. On Monday, October 14, 2002, investigators obtained a search warrant for the unit. When they searched it, they found the bodies of both victims inside, in Rubbermaid containers. The head and hands were missing from Adam's body.

The defendant testified at the hearing on his motion to suppress. Prior to October 11, 2002, the defendant said, he was aware of an investigation into the disappearance of his stepfather, Mr. Thomas. The defendant was interviewed at least twice at the Bradley County Sheriff's Office. When he was arrested on October 11th at the home of his Aunt Marie, he was searched, handcuffed, and made to sit on a sidewalk. Arresting officers asked him whether he knew victims Adam and Samantha and whether he knew their location. The defendant identified photos of the victims but told officers that he did not know where they were. The defendant said that, when the officer began asking more questions, he asked for an attorney. The questioning then ceased and the officers told him that he would have an opportunity to get an attorney once he arrived at the jail.

The defendant testified that, once he arrived at the jail, he was booked and asked general questions by the officers. Once again he asked for an attorney; the defendant was told he could make a telephone call from the pod. The defendant said that he was not given the opportunity to make a telephone call until the following day, which was a Saturday. He testified that he tried to call three different lawyers that day but did not reach any of them. The defendant called other individuals on October 14, 2002, and he claimed in his testimony that the purpose of those calls was to find counsel. On October 15, 2002, the defendant appeared in federal court and was appointed counsel on the federal charge.

The State offered rebuttal evidence consisting of telephone records from the detention center for October 11, 12 and 13, 2002. Those records reflected that only two calls were made to Attorney Pectol, both from the booking area. No calls were made to Attorney Day on those dates from the area in which the defendant was housed.

After his October 11, 2002, arrest, the defendant contacted Wilda and asked her to come to his October 15, 2002, federal court hearing in Greeneville, Tennessee. Prior to this October 11 contact from the defendant, Wilda had become very interested in the disappearance of her uncle, Mr. Thomas; her car had flyers on the windows with a photo

of her uncle as a "missing person," and she had been working with the Bradley County Sheriff's Office in hopes of discovering what happened to him.  After the defendant asked Wilda to come to his Greeneville federal court appearance, investigators asked her to instead travel to Johnson City, Tennessee, to speak with Johnson City Police Department officers. Wilda did so, and when she arrived in Johnson City, law enforcement officers informed her that a severed human head and severed human hands had been found in "a river."  They did not identify to whom the severed head and hands belonged.

Wilda told the investigators that she wanted to see the defendant. They agreed and had her follow them to the Washington County Detention Facility for that purpose.  Once Wilda arrived in Washington County, detectives explained to her that the defendant faced a bond revocation on his federal charges.  They discussed with her the disappearance of Mr. Thomas and the victims and their concerns that Betty and Aunt Marie might be involved as well.  The officers asked Wilda to visit Betty and Aunt Marie and to wear a "wire" recording device for the visit; she agreed to do so.

Wilda also insisted on seeing the defendant afterward but agreed to tell the officers anything she learned from him.  Drug task officers outfitted Wilda with a recording device, which she wore first to the visit with Betty and Aunt Marie, and then to the detention center for her visit with the defendant.

The Washington County Sheriff's Office made arrangements for Wilda to meet with the defendant on October 15, 2002.  In the meeting area, Plexiglas separated Wilda from the defendant, and they had to communicate through a small hole in the Plexiglas.  This meeting lasted only ten to fifteen minutes because they had such difficulty communicating through the Plexiglas barrier.  The defendant told Wilda that, if she would return the following day with a tape recorder and notepad, he would answer all of her questions.  She indicated that it might be difficult for her to get back in but promised to try.  Wilda said that the defendant suggested that she hire a "fifty-dollar lawyer" to accompany her to the jail, tell jail officials that she was a paralegal, and then once they were in the visitation room, he would tell the attorney to leave the room so that he could talk to her. Wilda interpreted the defendant's suggestion to bring an attorney as a ruse to enable her to get back in to see him and meet face-to-face, so that he could talk to her alone.  The defendant testified that when he told Wilda on October 15, 2002, to return the following day with counsel, it was because he truly wanted to talk to an attorney.  He denied that it was a ruse to get Wilda back into the jail to see him.

The Washington County investigators made arrangements for Wilda to have a contact visit in a private room with the defendant on the evening of October 16, 2002.  Prior to the visit, investigators hid a transmitter inside a trash can in the visitation room so they could listen to their conversation.  Wilda came without an attorney, but she

brought a tape recorder and notepad as the defendant had requested. By this time, Wilda had learned that the bodies of Adam and Samantha had been found in a storage unit, and she informed the defendant of that fact. In the course of responding to this information, the defendant told Wilda that he "blew [Adam's and Samantha's] brains out." He said that the bodies of Adam and Samantha were in a storage unit, except that he had cut off Adam's head and hands and thrown them in a river. The defendant also gave Wilda two possible locations she might find the body of Mr. Thomas, and suggested that she bring a certain Walker County, Georgia detective with her for the search.

Immediately after Wilda left the visitation room but while the defendant was still there, the Washington County and drug task force officers entered the room. The officers planned to interview the defendant, so they began advising him of his *Miranda* rights. As they did so, the defendant requested counsel, so the interview was immediately terminated.

After that visit, the Washington County officers, Johnson City officers and the district attorney general's office discouraged Wilda from continuing to stay in contact with the defendant. They told her that she needed to quit accepting his telephone calls.

A few days later, attorney Jim Bowman contacted law enforcement and told them that he was representing the defendant and that officers could not talk to the defendant any further. Mr. Bowman also spoke with Assistant District Attorney General Janet Hardin and told her that he was representing the defendant and did not want anyone to talk to him. General Hardin transmitted this information to the prosecutor assigned to the defendant's case.

The defendant testified that, after his October 16, 2002 visit with Wilda, he was advised of his *Miranda* rights and he asked law enforcement officers for an attorney. After that, he was taken to the booking area, stripped of his clothes, given a paper gown to wear, and placed in a concrete cell with no bunk; the defendant said that he remained there until the following afternoon. While in that cell, the defendant claimed, he was told that Wilda wanted to talk to him, and he was permitted to call her from a telephone on a desk in an office. He did not recognize the number he was given, but nevertheless Wilda answered. She told the defendant that she was at a fire station on Lookout Mountain.[14] The defendant said that, after he spoke to Wilda, he was permitted to go to another cell to call his daughter. He told his daughter to call the U.S. Attorney and tell the attorney about his alleged maltreatment at the hands of the Washington County Sheriff's

---

[14] Wilda was on Lookout Mountain searching for the body of her uncle, Mr. Thomas. Wilda said that the defendant asked her to bring a deputy with her to look for the body and that she told him in the telephone call that the deputy was with her for the search.

employees. He also surreptitiously called an attorney in New York and told that attorney the same information.

Eventually, the defendant reached attorney Jim Bowman, who agreed to represent him for no charge until he was indicted. In her testimony, Wilda said that, after October 18, 2002, she was aware that the defendant was represented by counsel and that his counsel had advised him not to speak to law enforcement authorities.

On October 23, 2002, the defendant was indicted for the murders of Adam and Samantha. The defendant testified that when he was served with the indictments in these cases, he assumed that Mr. Bowman's representation had ended. He asked the serving officer when he could get counsel and who would be his attorney.

After his indictment for the murders of Adam and Samantha, the defendant continued to call Wilda frequently. Despite the admonition from law enforcement officials that she cease taking the defendant's calls, Wilda continued to talk to him. Wilda could not call the defendant at the jail; she could only accept his calls. She did not tell the defendant that she was cooperating with law enforcement authorities. At the beginning of each of the defendant's telephone calls from the jail, a recorded message warned him that the call was being monitored and might be recorded.

At some point prior to the defendant's indictment, the Bradley County Sheriff's Office provided Wilda with a tape recorder for her phone. She used it to record her conversations with the defendant when he called her, until she returned the recorder sometime in October.[15] Wilda shared the recordings of the telephone calls from the defendant with both the Washington County Sheriff's Office and the Bradley County Sheriff's Office. Wilda testified that, after the defendant initially told her in their October 16, 2002 in-person meeting that he "blew [the victims'] brains out," she had another contact meeting with the defendant in which he asked her questions about the bodies of Adam and Samantha and still acknowledged to her that he killed Adam and cut up his body.

The defendant testified that, on October 29, 2002, before he was arraigned and appointed counsel on the murder charges, he was transferred to New York on the pending federal drug charges. While in the New York detention facility, the Defendant continued to frequently call Wilda from the jail. As it was with the Tennessee detention facility, Wilda could not call the defendant; she only accepted his telephone calls. Again, at the beginning of each of the defendant's telephone calls from the New York detention

_____

[15] Wilda testified at one point that after she returned the tape recorder provided by Bradley County, she put her own tape recorder on her phone. At another point in her testimony, she said that she returned the recorder provided by Bradley County in October 2002 and that "the" recorder was placed back on her phone in December 2002.

-32-

facility, a recorded message advised him that the call was being monitored and might be recorded.

After the defendant's transfer to New York, Wilda said, he began changing his stories on what happened to Adam and Samantha. At one point, he told her that his mother had killed them. Later he told her that Samantha's brother had killed them. At one point, Wilda testified, the defendant claimed that "the Mafia killed them."

In late December 2002, while the defendant was still in the New York detention facility, he asked Wilda to come to New York to see him. She told him she could not because of her work. The defendant's Aunt Marie offered to pay Wilda's way to New York to see the defendant. The defendant and Aunt Marie both insisted that Wilda go to New York. They assured Wilda that, if she went to New York to see the defendant, he would tell her "the rest of the truth" and she would get "all the answers [she] needed" regarding the murders of her uncle and Adam and Samantha.

In considering whether to accede to the defendant's request that she come to New York to see him, Wilda consulted with several of the Tennessee law enforcement officers and district attorneys from Washington County and Bradley County about the request. They all told her not to go to New York to see the defendant.[16]

Despite the discouragement from law enforcement, Wilda traveled to New York to visit the defendant. On January 1, 2003, Wilda had a contact visit with the defendant in the New York detention facility. The visit took place in an open room where other inmates were visiting with their families. Wilda did not bring a recording device and the conversation was not recorded.

During Wilda's January 1 meeting with the defendant, he insisted that someone other than him had killed Adam and Samantha, and outlined things that he needed Wilda to do for him when she returned home to Tennessee. The defendant gave Wilda the precise location where she could find the chainsaw used in the murders; he explained to her that his mother Betty had thrown the chainsaw out of the car window and had told him where it was located. The defendant asked Wilda to bring her two teenage children with her to retrieve the chainsaw. Once she found the chainsaw, the defendant asked Wilda to clean it and make sure there were no fingerprints on it. After that, she was to break into the home of Samantha's brother, Daniel Foster, steal clothing out of his home, wrap the chainsaw in the stolen clothing, put the wrapped chainsaw under the brother's trailer, and then have someone call in a tip about the chainsaw to law enforcement.

---

[16] Asked who told her not to go to New York to see the defendant, Wilda testified, "Steve Finney, Joe Crumley, Todd Hull, Kenny Phillips, Detective Efaw. Anybody that knew I was going told me not to go."

While Wilda was still in New York, she spoke to detectives in both the Washington County Sheriff's Office and the Bradley County Sheriff's Office. When she returned from New York, Wilda shared with the Washington County and Bradley County investigators what the defendant had told her. Specifically, she told them that the defendant had given her possible locations where certain evidence—the chainsaw and a gun—could be located.

On January 3, 2003, a Bradley County officer and other officers accompanied Wilda on the search that the defendant had asked her to conduct. While they were on the search, the defendant called Wilda multiple times from the New York detention center, impatient for her to complete the tasks he had given her. The defendant questioned Wilda about whether she had brought with her the materials he had discussed to clean the chainsaw. The defendant asked Wilda about other items related to the murders that he wanted her to retrieve, items in other locations. The defendant reiterated to Wilda in these conversations that she was to take all of the items to the home of Samantha's brother, Daniel Foster. Wilda recorded the defendant's calls to her and did not tell the defendant that law enforcement officers were with her on the search. Following the defendant's directions, Wilda and the officers found the chainsaw in Bradley County and the other items in Washington County.

The defendant agreed that, at some point, he heard that Wilda was cooperating with the police and turning over recordings of their conversations to them. He continued to talk to her because he trusted her and did not believe she would do such a thing. Furthermore, because he had requested counsel, he was operating under the belief that any statements he made to Wilda were protected. The defendant admitted telling Wilda at the October 16, 2002, meeting that he "blew [the victims'] brains out." He also admitted that when he made telephone calls from jail using inmate telephones, either in Tennessee or in New York, he was informed at the beginning of every call that the call was subject to monitoring and recording.

At the conclusion of the two-day suppression hearing, the trial court made oral findings of fact and conclusions of law. Overall, the trial court found that Wilda was a credible witness and that the defendant was not a credible witness.

Regarding the defendant's statements made to Wilda on October 15 and 16, 2002, the trial court denied the motion to suppress. It found that, on both of these occasions, the defendant initiated the contact with Wilda and spoke freely with her because of their past relationship. The court accredited Wilda's testimony that the defendant's request for her to return with a "fifty-dollar lawyer" was not a genuine request for counsel, but was instead a ruse to enable him to meet with Wilda face-to-face. It found that the defendant's request on October 15 for Wilda to return the next day with a tape recorder

and a notepad was evidence that his statements to her on the 16th were free and voluntary. In both conversations, the trial court found, there was no compulsion, pressure, or police-dominated atmosphere. Under those circumstances, it found no Fifth Amendment violation.

As to the defendant's argument that the October 15 and 16, 2002 statements to Wilda violated his Sixth Amendment right to counsel, the trial court pointed out that the right to counsel is "offense specific." It noted that, at the time of these statements to Wilda, the defendant had been charged with only the federal drug offense, and had not been formally charged with the murders of the victims, which were still under investigation. Consequently, the trial court held that the admission into evidence of the defendant's October 15 and 16, 2002 statements did not violate his Sixth Amendment right to counsel.

As to the defendant's statements to Wilda in their January 1, 2003 meeting in New York and the defendant's January 3, 2003 telephone calls to Wilda, the trial court noted that, immediately following the defendant's October 16, 2002 conversation with Wilda, the defendant was approached by law enforcement, received his *Miranda* rights, and invoked his right to an attorney. It held that, after the defendant was indicted on October 23, 2002, for the murders of the victims, he had a Sixth Amendment right to counsel as to those charges. Nevertheless, it found no Sixth Amendment violation regarding the defendant's January 1 and 3, 2003 statements to Wilda, based on the following findings of fact:

> It appears to the court that Wilda Willis in this case is nobody's agent. She wants to find out what has happened to Sam Thomas. She wants to find his body. Sam Thomas is her uncle. She's driving around in a car with pictures of Sam Thomas on the side of the vehicle---have you seen this man? And later in this case the proof is very clear that---that she's told. . . . All the phone calls are initiated by him, by the defendant, Howard Hawk Willis. Don't . . . take anymore phone calls from him. She keeps taking phone calls. She's told, don't go to New York City. She goes to New York City. Wilda Willis in this case is nobody's agent. She does what she wants to do on her own time, and . . . is driven for her own purposes. . . . [T]he court finds that she's . . . not an agent of law enforcement. . . . And these phone calls. . .---first of all, they're completely initiated by Howard Hawk Willis. He calls her. . . . And both in the Washington County Detention Center, and . . . in the New York Detention Center he knows, every call he's told by this recording that it's subject to monitoring and recording when the call is placed. . . . [T]here is no expectation of privacy at a jail house telephone, particularly, not under these circumstances. . . . [T]here's nothing surreptitious about this. The calls were voluntary, initiated by Mr.

-35-

Willis. There's no trickery. . . . Wilda Willis was a private party, no government action in any . . . sense. She was cooperating, but . . . she was operating on her own.

Thus, the trial court noted that, in going to New York and continuing to accept the defendant's calls, Wilda was acting against the advice of the law enforcement agents who were investigating the victims' murders. It held that, at the time of the defendant's January 1 and 3, 2003 statements to Wilda, she was cooperating with law enforcement but was not an agent of the State; rather, Wilda was acting on her own for her own purposes, namely, solving the murder of her uncle and finding his body. The trial court found that the calls were voluntary in that the defendant initiated all of the calls to Wilda, and the calls were not induced by trickery. It also found that the defendant knew that his telephone calls to Wilda from the New York detention center were subject to being monitored and recorded. Under these circumstances, the trial court held that there was no Sixth Amendment violation.

For these reasons, the trial court denied the defendant's motions to suppress the October 15 and 16, 2002 statements to Wilda, as well as the January 1 and 3, 2003 statements to Wilda.

Following the trial court's initial ruling denying his motion to suppress, the defendant filed three more motions to suppress those statements—one on May 31, 2007, (through new counsel), one on November 13, 2009, (pro se), and one on May 5, 2010 (pro se). The trial court summarily denied the first two motions on the basis that that issue had been previously determined and did not merit re-litigation. Thereafter, Judge Lynn Brown recused himself, and this Court appointed Senior Judge Jon Kerry Blackwood to try the case. After the last motion to suppress was filed, Judge Blackwood allowed the defendant to introduce additional testimony but concluded that he failed to present any new evidence or offer any new legal authority that warranted a different result.

On appeal, the Court of Criminal Appeals affirmed the trial court with respect to admission of the October 15 and 16, 2002 statements. *Willis*, 2015 WL 1207859, at *61-62. However, it reversed the trial court with respect to the January 1 and 3, 2003 statements; it ruled that they were taken in violation of the defendant's right to counsel under the Sixth Amendment to the United States Constitution and Tennessee Constitution article I, section 9, and should have been suppressed. *Id.* at *66. It held that, at the time of the defendant's January 1 and 3, 2003, statements, Wilda was acting as a government agent. *Id.* at *65. The intermediate appellate court noted that Wilda had been assisting law enforcement prior to the defendant's indictment and continued to do so after his indictment. *Id.* at *64-65. It found that, although officers from the Johnson City Police

Department and the Washington County Sheriff's Office discouraged Wilda from continuing to communicate with the defendant, "officers from Bradley County asked Wilda to record [the] conversations" and furnished her with a tape recorder to do so. *Id.* at \*65. The court acknowledged that Wilda "decided to use her own tape recorder to record the conversations" but noted that she provided the tapes to law enforcement. *Id.* It also acknowledged that the officers advised Wilda not to go to New York to meet with the defendant. Nevertheless, it observed that Wilda maintained contact with law enforcement, met with them shortly after she returned from New York, and spoke with the defendant in the presence of officers while searching for the chainsaw. *Id.* It also noted that the defendant was in custody at the time of the statements. *Id.* Based on these facts, the Court of Criminal Appeals held that Wilda was acting as a government agent at the time of the January 1 and 3, 2003, statements, and that Wilda deliberately elicited the incriminating statements from the defendant. *Id.* at \*65-66. As a result, it held that the discovery of the chainsaw was fruit of the unlawful statements and should also have been suppressed. *Id.* at \*66. Nevertheless, the intermediate appellate court ultimately found that the admission of this evidence was harmless beyond a reasonable doubt. *Id.*

### 1. Fifth Amendment/Article I, Section 9 Self-Incrimination Claim

The defendant asserts that the trial court erred in admitting into evidence the statements he made to Wilda on October 15 and 16, 2002, and on January 1 and 3, 2003, because the State violated his right against self-incrimination. He cites several circumstances that support this assertion: (1) the incriminating statements were made to Wilda while he was in custody; (2) after his arrest on the federal charges, no one read him his *Miranda* rights; (3) he (allegedly) invoked his right to counsel; (4) his efforts to obtain counsel were (allegedly) thwarted by law enforcement; and (5) Wilda was at all times acting as an agent of the State. The State responds that this is a "misplaced trust" case, so the defendant's self-incrimination claims have no merit.

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states: "No person . . . shall be *compelled* in any criminal case to be a witness against himself." (Emphasis added). Similarly, the Tennessee Constitution states: "That in all criminal prosecutions, the accused . . . shall not be *compelled* to give evidence against himself." Tenn. Const. art. 1, § 9. (Emphasis added).

Whether a confession is "compelled" or involuntary is a question of fact. *Sanders*, 452 S.W.3d at 305 (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *Self v. State*, 65 Tenn. 244, 253 (1873)); *Clark*, 452 S.W.3d at 282. The State has the burden of proving the voluntariness of a confession by a preponderance of the

evidence. *Sanders*, 452 S.W.3d at 305 (citing *State v. Stamper*, 863 S.W.2d 404, 405 (Tenn. 1993)); *State v. Clark*, 452 S.W.3d 268, 282 (Tenn. 2014). (citing *Sanders*, 452 S.W.3d at 305).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court addressed the compulsion inherent in "custodial interrogations." It observed that the atmosphere surrounding custodial interrogations can generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467. The Court held that, to ensure preservation of the Fifth Amendment privilege against self-incrimination during "incommunicado interrogation of individuals in a police-dominated atmosphere," *id.* at 445, the prosecution may not use statements that stem from the custodial interrogation of a defendant unless it first demonstrates that (1) the accused was informed of his Fifth Amendment rights to remain silent and to the presence of either a retained or appointed attorney and that any statement might be used as evidence against him; and (2) the accused voluntarily, knowingly, and intelligently waived those Fifth Amendment rights. *Id.* at 444-45. The so-called "*Miranda* warning" rule is strictly enforced, "but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984); *see also State v. Goss*, 995 S.W.2d 617, 629 (Tenn. Crim. App. 1998)

In *Perkins*, the Court addressed a situation in which an inmate, incarcerated on other charges, made admissions concerning an unsolved murder to an undercover agent posing as a fellow inmate. Although Mr. Perkins was "in custody" in the sense that he was incarcerated at the time of the conversations, the Court clarified that conversations between an incarcerated suspect and an undercover agent whom the suspect believes to be a fellow inmate do not implicate *Miranda* because the coercive atmosphere that was the underlying premise in *Miranda* is lacking. *Id.* at 296. The Court "reject[ed] the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." *Id.* at 297. It explained:

> *Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner. As we recognized in *Miranda*: "[C]onfessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." . . . Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns.

*Id.* at 297-98 (alternation in original) (internal citations omitted). The *Perkins* Court further concluded that this tactic did not violate the Self-Incrimination Clause of the Fifth Amendment. *Id.* at 298.

Two recent decisions by this Court affirm the principle that the surreptitious recording of a conversation between a suspect and a private citizen who is cooperating with police will not trigger the self-incrimination provisions of either the Fifth Amendment to the United States Constitution or article I, section 9 of the Tennessee Constitution. *Clark* and *Sanders*. As discussed below, for both decisions, the underlying rationale is that, under such circumstances, the defendant's statements are not "compelled."

In *Clark*, the defendant's six-year-old daughter began to exhibit some inappropriate behavior. 452 S.W.3d at 275. This prompted the defendant's wife to talk with their younger daughter, four-year-old "K.C.," about inappropriate touching by adults. *Id.* at 275-76. In the course of the conversation, K.C. told her mother that the defendant sometimes touched her groin area at night while the mother was in bed. *Id.* at 276. Upon hearing this revelation, the defendant's wife left the home with the daughters and contacted law enforcement authorities about K.C.'s allegations. *Id.*

After meeting with a detective, the wife in *Clark* agreed to cooperate with the investigation by making recorded telephone calls to the defendant. The investigating detective wrote notes for the wife, suggesting things she could say to the defendant to elicit a confession. *Id.* In the initial conversations between the defendant and his wife, the defendant denied any inappropriate touching. *Id.* The wife responded by insisting she had to hear the truth before she and the daughters would return home. *Id.* Eventually, the defendant admitted to his wife that he had "touched" both of his daughters but claimed he could not remember the details. *Id.*

The defendant in *Clark* suspected that his conversation with his wife was being recorded, so he insisted they meet face-to-face to talk further. With the wife's express consent, a recording device was installed inside her automobile. *Id.* at 277. The wife then went to a prearranged location, and the defendant got into the wife's car. As police officers monitored, the defendant divulged to his wife details of multiple occasions on which he had touched his daughters inappropriately, and he admitted to her that he had told the girls to keep his conduct a secret. *Id.* Police arrested him immediately after he exited the car. *Id.*

The defendant in *Clark* later retracted the statements made to his wife and made no further incriminating statements. After a hearing, the trial court denied the defendant's motion to suppress the recorded statements. Thereafter, the defendant was convicted on multiple counts of aggravated sexual battery and rape of a child. *Id.* at 278.

On appeal to this Court, Mr. Clark argued that the trial court erred in refusing to suppress the recordings of his conversations with his wife. *Id.* at 279. He asserted that admission into evidence of the surreptitiously-recorded statements violated his right against compulsory self-incrimination and his right to due process of law, because his wife was acting as an agent of the State when she confronted him and pressured him into confessing against his will by using threats, promises, and emotional appeals. *Id.* at 281-282. This Court disagreed. *Id.* at 283-84. Observing that the exclusionary rule is designed to deter *police* misconduct, we noted that, "[w]hen a private citizen obtains admissions from a suspect while cooperating with the police, there is no police misconduct to be deterred." *Id.* at 282 (citing *Sanders*, 452 S.W.3d at 311). In the context of the Fifth Amendment, the Court stated, the key issue is whether the statement in question is coerced. *Id.* at 283. "[W]hen a victim (or victim's relative or friend) goes to the police and then, with police assistance, elicits a confession from a suspect, the suspect has simply misplaced his trust in a confidant." *Id.* (citing *United States v. White*, 401 U.S. 745, 749 (1971); *Hoffa v. United States*, 385 U.S. 293[, 301] (1966); *Lopez v. United States*, 373 U.S. 427, 443–45 (1963); *State v. Branam*, 855 S.W.2d 563, 568 (Tenn. 1993); *State v. Pate*, No. M2009–02321–CCA–R3–CD, 2011 WL 6935329, at *10 (Tenn. Crim. App. Nov. 22, 2011), *perm. app. denied* (Tenn. Apr. 11, 2012); *Clariday v. State*, 552 S.W.2d 759, 769 (Tenn. Crim. App. 1976)). In cases involving misplaced trust, "voluntary statements made to an informant do not warrant constitutional protection." *Id.* at 283 (citing *Sanders*, 452 S.W.3d at 315). Voluntariness hinges on whether the statements made were "the product of a rational intellect and a free will," and the pivotal question is whether the suspect's will was overborne so as to render the statement a product of coercion. *Id.* To analyze voluntariness, the court examines the totality of the circumstances surrounding the confession, including "the characteristics of the accused and the details of the interrogation." *Id.*

In *Clark*, the Court noted that the defendant had arranged the meeting with his wife, had time between the phone calls and the meeting to consider what he should do and say when he met her, entered her car of his own volition, and after doing so almost immediately launched into a detailed account of his abuse of his daughters. *Id.* at 284. There was no confinement, and the wife made no threats beyond the personal and legal consequences to be expected for sexually assaulting one's own children. *Id.* Upon his arrest, the defendant had remained silent in the face of accusations, thus exhibiting the ability to resist the pressures inherent in an interrogation. *Id.* Under the totality of the circumstances, the Court in *Clark* concluded that Mr. Clark's recorded statements were "the product of a rational intellect and a free will," in other words, voluntary, and did not implicate his right against compulsory self-incrimination. *Id.*

*Sanders* involved similar circumstances. 452 S.W.3d 300 (Tenn. 2014). Mr. Sanders lived with his girlfriend and her young daughter. *Id.* at 303. At some point, Mr.

Sanders began touching the daughter inappropriately; over time, his acts progressed to sexual intercourse. The victim finally reported the sexual abuse to a school counselor who, in turn, contacted law enforcement authorities. *Id.*

Mr. Sanders' girlfriend was reluctant to believe the abuse allegations, so she decided to meet with the defendant to see if he would admit to them. At the suggestion of the investigating detective, the girlfriend agreed to wear a concealed microphone during her meeting with the defendant. The girlfriend met with the defendant while law enforcement officers listened to, recorded, and visually monitored the conversation from an unmarked police car parked nearby. *Id.*

During the conversation, the girlfriend told Mr. Sanders, "I already know what happened; I need to hear it from you." She led the defendant in *Sanders* to believe that, if he were truthful with her, she would keep the investigation from going further by not taking the victim to an upcoming Department of Children's Services interview. *Id.* at 303-04.

When Mr. Sanders initially denied the allegations, the girlfriend responded by threatening him with seeing his face on the television news if he were not honest with her. *Id.* at 304. Gradually, the defendant began to admit to inappropriate conduct, first characterizing it as inadvertent contact with the girlfriend's daughter while "wrestling." Eventually he admitted inappropriate touching and kissing, coupled with disclaimers that the daughter initiated the contacts and purportedly asked him for sexual intercourse. The defendant closed by asking the girlfriend for mercy and thanking her for talking to him. *Id.*

A month later, the girlfriend in *Sanders* made a monitored and recorded telephone call to Mr. Sanders, but he made no admissions during that conversation. The police then contacted him and asked to meet with him. During that meeting, Mr. Sanders admitted to nothing and declined to give a DNA sample. Thereafter, he was indicted on charges of aggravated sexual battery and rape of a child.

Mr. Sanders filed a motion to suppress the recorded statements to the girlfriend. He argued that his girlfriend was acting as an agent of the State and had coerced him into making a false confession. He asserted that admission of the statements into evidence would violate his right to due process and his privilege against self-incrimination. The trial court denied the motion to suppress, the statements were admitted into evidence, and the jury convicted the defendant of multiple counts of aggravated sexual battery and rape of a child. *Id.* at 304-05.

Mr. Sanders made the same arguments on appeal to this Court. *Id.* at 305. The *Sanders* Court noted that the exclusionary rule is a prophylactic measure designed to

deter police misconduct: "[E]vidence gathered by private persons is generally not subject to the exclusionary rule because with private action there is no police misconduct to be deterred." [17]   *Id.* at 311 (citing *United States v. Leon*, 468 U.S. 897, 906-10 (1984); *United States v. Janis*, 428 U.S. 433, 447-54 (1976)). The Court observed, "In the early stages of an investigation, it is constitutionally acceptable for the police to cooperate with friends or relatives of the victim or the suspect to see if these individuals can goad the suspect into confessing." *Id.* at 316 (citing *United States v. Henry*, 447 U.S. 264, 272 (1980)). The *Sanders* Court cited a Court of Criminal Appeals case that involved a rape victim who agreed to make a police-controlled phone call to the defendant, and noted that, in a case of misplaced trust, "neither the Fourth, Fifth, or Sixth Amendment protects a suspect who voluntarily offers information to a confidant." *Sanders*, 452 S.W.3d at 314-15 (citing *State v. Bacon*, No. 03C01-9608-CR-00308, 1998 WL 6925, at *12 (Tenn. Crim. App. Jan. 8, 1998). "In cases that involve suspects making confessions to friends, relatives, and other associates, the law need not be concerned with whether that confidant could properly be labeled as a private citizen or an agent of the State." *Id.* at 311. Under the "misplaced trust" doctrine, *Sanders* explained, "courts need not expend their energies to determine the point at which a suspect's confidant becomes a government agent" because "it makes no constitutional difference whether the person who overhears the confession is an undercover police officer, an associate who later relays the confession to the authorities, or an associate who is already cooperating with the police and using a police recording or transmitting device." *Id.* at 315 (citing *United States v. White*, 401 U.S. at 751-53).

As in *Clark*, the *Sanders* Court characterized Mr. Sanders' situation as one of "misplaced trust." *Id.*  It noted that neither the Fifth Amendment of the federal constitution nor article I, section 9 of the Tennessee Constitution applies to cases in which a suspect is deceived by an associate who applies "moral or psychological" pressure to elicit an incriminating statement or confession. *Id.* at 312. Likewise, the Due Process Clause of the Fourteenth Amendment offered the defendant no protection under these circumstances: "'The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause'" *Id.* at 315-16 (quoting *Colorado v. Connelly*, 479 U.S. 157, 166 (1986)). The *Sanders* Court commented:  "As the United States Supreme Court cautioned, a person 'contemplating illegal activities must realize and risk that his companions may be reporting to the police. . . . [T]he risk is his.'" *Id.* at 315 (alterations in original) (quoting *White*, 401 U.S. 745 at 752).

The defendant in this case seeks to distinguish *Clark* and *Sanders* on the basis that neither defendant in those cases was incarcerated at the time of the incriminating

---

[17] The Court in *Clark* distinguished Fourth Amendment cases that applied the exclusionary rule to searches conducted by private persons at the behest of the police.  *Clark*, 452 S.W.3d at 282.

statement. We reject this argument. *Perkins*, discussed above, belies any such distinction. *See Perkins,* 496 U.S. at 296. Similarly, in *State v. Branam*, a trusted family member consented to be "wired" with a recording device in order to tape her conversation with the defendant, who was incarcerated on other unrelated charges. 855 S.W.2d 563, 567 (Tenn. 1993). Mr. Branam made incriminating statements during their conversation, which were recorded and played at trial over his objection. *Id.* On appeal, Mr. Branam argued that the State's surreptitious use of a "jail-plant" to secure his incriminating statements violated his due process rights under the Fifth and Fourteenth Amendments to the federal constitution and under article I, section 9 of the state constitution. *Id.* at 568. He also challenged the statements under the Fifth Amendment, asserting that because he was "in custody" at the time he made them, he should have been advised of his *Miranda* rights before being "interrogated" by his aunt, whom he characterized as an "undercover agent" for the State. *Id.* We agreed with the reasoning in *Illinois v. Perkins* that there was no constitutional basis to invalidate Mr. Branam's jailhouse confession to his aunt, under either the Fifth Amendment to the federal constitution or article I, section 9 of our own constitution. *Id.* at 568.

Turning to the facts of this case, we find the use of a timetable helpful.

| Date | Event |
|---|---|
| October 11, 2002 | Defendant arrested on federal warrant for violating the terms of his release on pending federal charges in New York. |
| October 15, 2002 | Defendant taken before federal magistrate regarding the federal warrant and appointed counsel in that case. Defendant and Wilda met at the jail that evening, and Defendant told Wilda to return the next day. |
| October 16, 2002 | Defendant and Wilda had a meeting at jail, and Defendant confessed to killing the victims. After that meeting, Sgt. Phillips read the defendant his *Miranda* rights and attempted to interview him. Defendant requested counsel, and interview ceased. |
| October 18, 2002 | Attorney Bowman informed the State that he was representing Defendant in the case involving the victims' deaths. |
| October 23, 2002 | Defendant indicted for the murders of the victims. |
| October 29, 2002 | Defendant transferred to New York on the federal charges. |

| January 1, 2003 | At Defendant's request, Wilda traveled to New York. They had meeting at federal prison in New York and Defendant told Wilda that he wanted her to perform certain tasks for him upon her return to Tennessee, including retrieving chain saw used in the murders of the victims. |
|---|---|
| January 3, 2003 | Defendant called Wilda from jail in New York while she and police were searching for chain saw; he gave her explicit instructions on where to locate the chain saw. Based on his directions, Wilda and police officers found and recovered the chain saw. |

It is undisputed that, at the time Wilda initially met with the defendant, he was arrested and in custody on unrelated federal charges. As noted above, neither the fact that the defendant was in custody at the time he made the incriminating statements nor the fact that Wilda was cooperating with the police matters to an analysis under either the self-incrimination clause or the due process clause. *See Perkins*, 496 U.S. at 296-98; *Sanders*, 452 S.W.3d at 311; *Clark*, 452 S.W.3d at 282-83 "[T]he United States Constitution provides no protection for those who voluntarily offer information to a confidant." *Sanders*, 452 S.W.3d at 314 (quoting *Pate*, 2011 WL 6935329, at *9).

To avoid this, the defendant argues that his statements were involuntary because they were induced by "deception and subterfuge." Similar to the defendant in *Branam*, the defendant in this case in effect "asks us, evidently as a matter of state law, to adopt the viewpoint expressed in a concurring opinion in *Perkins*, in which Justice Brennan decried the 'deliberate use of deception and manipulation by the police.'" *Branam*, 855 S.W.2d 563, 568 (quoting *Illinois v. Perkins*, supra, 496 U.S. at 303 (Brennan, J., concurring)). The *Branam* Court recounted: "Invoking the Fourteenth Amendment's guarantee of due process, Justice Brennan would require a review of the 'totality of the circumstances' surrounding elicitation of a suspect's statement by deceptive means, in order to ensure that the defendant's 'will was [not] overborne.'" *Id*. at 569 (alteration in original). The *Branam* Court did not adopt Justice Brennan's preferred approach, noting that, despite his family member's deception, there was nothing in the record to suggest that his statements "were the result of a will that had been 'overborne.'" *Id*.; *see also Sanders*, 452 S.W.3d at 314. Similarly, we decline to adopt Justice Brennan's approach. Moreover, we find nothing in the record to suggest that the defendant's will was "overborne." As noted in *Sanders*, "the Fifth Amendment and Article I, Section 9 forbid official coercion, not mere 'strategic deception.'" *Sanders*, 452 S.W.3d at 312 (citations omitted). "These constitutional provisions are not concerned 'with moral or psychological pressures to confess emanating from sources other than official coercion.'" *Id*. (quoting *Erving L.*, 147 F.3d at 1247; *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

The defendant also intertwines his Fifth Amendment self-incrimination claim with his Fifth Amendment and Sixth Amendment right to counsel claim, arguing in effect that

-44-

the alleged circumvention of his right to counsel somehow affected the voluntariness of his statements to Wilda. We reject this as well. The self-incrimination and right to counsel claims are separate and distinct, and we address the right to counsel claims below. As noted above, for Fifth Amendment and article I, section 9 purposes, we need not ascertain whether Wilda was acting as an agent of the State at the time the defendant made the incriminating statements in order to determine whether his right against self-incrimination was infringed.

From our review of the record, the evidence supports a finding that the relationship between the defendant and Wilda remained cordial after their divorce, and the defendant initiated the contact visit with Wilda on October 15, 2002. After that meeting proved unsatisfactory, the defendant wanted Wilda to meet with him again the next day. To this end, the defendant suggested that she bring a "fifty dollar lawyer" with her and pose as the lawyer's paralegal to gain access. If that proved successful, he told Wilda, he would send the attorney out of the meeting room so he could speak to her alone. The trial court declined to credit the defendant's testimony that this suggestion of a "fifty dollar lawyer" was a genuine request for counsel, and instead credited Wilda's testimony that it was a ruse for her to gain access into the jail the following day. The defendant instructed Wilda to bring with her on October 16, 2002 a tape-recorder, a note pad, and a pen to take notes, and during the October 16, 2002 meeting, the defendant controlled the tape recorder, turning it on and off to present his version in the best possible light. He wasted no time in confessing to killing the victims, although he tried to cast it as a form of "self-defense." These facts do not support the defendant's assertion that the circumstances at the October 15, 2002 meeting and the October 16, 2002 meeting amounted to a police-dominated atmosphere, compulsion. or pressure for him to make a statement.

As for any telephone calls made by the defendant from jail either in Tennessee or in New York, the defendant initiated every single telephone call and spoke freely, despite the clear recorded warning that the conversations were subject to monitoring and recording. The defendant and his Aunt Marie asked Wilda to come to New York on January 1, 2003. His confinement at those times does not render his statements to Wilda involuntary. The issue of voluntariness was resolved against the defendant by the trial court and the Court of Criminal Appeals, and we agree with the lower courts' holding that the defendant's Fifth Amendment and article I, section 9 rights against compelled self-incrimination were not violated.

### 2. Right to Counsel Claim

#### a. Fifth Amendment Right to Counsel

Initially, we note the distinction between the *Miranda* Fifth Amendment right to counsel, which is designed to protect against coercion, and the Sixth Amendment right to counsel, which guarantees to a criminal defendant the right to legal assistance in any critical confrontation with state officials, irrespective of coercion. *State v. Berry*, 592 S.W.2d 553, 557 (Tenn. 1980); *see also W. Mark Ward*, Tennessee Criminal Trial Practice § 5:5 Right to counsel—The confusing relationship between the Fifth and Sixth Amendments (2015-2016 ed.). The Fifth Amendment right to counsel under *Miranda* attaches any time a suspect is subject to custodial interrogation, even if formal charges have not been filed. *See Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981); *Miranda*, 384 U.S. at 444-45. The Court in *Miranda* recognized that the right to counsel is intertwined with the ability to deal with the "inherently compelling pressures" of custodial interrogation. *Miranda*, 384 U.S. at 444. Consequently, after the mandated warnings are given, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. *Id.* at 474. *See also State v. Climer*, 400 S.W.3d 537, 556-68 (Tenn. 2013) (discussing the interplay between the Fifth Amendment right to counsel and the *Miranda* safeguards against compelled self-incrimination). The prosecution may not use statements stemming from the custodial interrogation of a defendant unless it demonstrates that the accused was informed of, and voluntarily, knowingly, and intelligently waived, both his right to remain silent and his right to the presence of an attorney.

Given that the Fifth Amendment right to counsel springs from the desire to protect against compelled self-incrimination, we conclude that, as with the defendant's Fifth Amendment self-incrimination claim, a "misplaced trust" analysis is also appropriate for his Fifth Amendment right to counsel claim. As discussed above, under a misplaced trust analysis, neither the fact of the defendant's incarceration nor Wilda's alleged status as an "agent" for the State is a factor. *See Perkins*, 496 U.S. at 297; *Branam*, 855 S.W.2d at 568. As we have already concluded under the misplaced trust analysis for the defendant's right against self-incrimination, the defendant's statements to Wilda were free and voluntary and not the product of coercion. Hence, there was no violation of the defendant's Fifth Amendment right to counsel.

*b. Sixth Amendment and Article I, Section 9*

*Right to Counsel*

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." *See Gideon v. Wainwright*, 372 U.S. 335, 342 (1963) (holding that Sixth Amendment right to counsel in criminal proceedings applies to states through Fourteenth Amendment). Similarly, article I, section 9 of the Tennessee Constitution provides: "That in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel." Tennessee courts have consistently interpreted the right to counsel under article I, section 9 of the Tennessee Constitution as identical to the Sixth Amendment right to counsel. *See State v. Downey*, 259 S.W.3d 723, 732-33 (Tenn. 2008); *State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996); *State v. March*, 395 S.W.3d 738, 767-68 (Tenn. Crim. App. 2011).

The Sixth Amendment right to counsel attaches after the initiation of formal charges. *Maine v. Moulton*, 474 U.S. 149, 176 (1985); *Brewer v. Williams*, 430 U.S. 387, 401 (1977) (discussing *Massiah v. United States*, 377 U.S. 201 (1964)); *State v. Berry*, 492 S.W.2d at 557. In Tennessee, formal charges may be initiated by an arrest warrant, indictment or presentment. *Huddleston*, 924 S.W.2d at 669 (citing *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980); *State v. Butler*, 795 S.W.2d 680, 685 (Tenn. Crim. App. 1990)). "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings. Interrogation by the State is such a stage." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citations omitted). Once the defendant is indicted, he is entitled to rely on counsel as a "medium" between himself and the State. *See Michigan v. Jackson*, 475 U.S. 625, 632 (1986); *Moulton*, 474 U.S. at 176 *overruled on other grounds by Montejo*, 556 U.S. at 788. A Sixth Amendment violation does not depend upon coercion. *Wyrick v. Fields*, 459 U.S. 42, 54 (1982).

*Massiah* is the seminal federal case on the circumstances under which post-indictment statements made by an accused to an undercover government agent will be deemed an infringement of the accused's Sixth Amendment right to counsel. *Massiah,* 377 U.S. 201. In *Massiah*, the defendant and a co-conspirator were indicted for violating federal narcotics laws. Massiah retained a lawyer and pleaded not guilty. *Id.* at 202. He and his co-conspirator were both released on bail. *Id.* Unbeknownst to Massiah, the co-conspirator had decided to cooperate with law enforcement officers and allow them to install a listening device under the front seat of his automobile. *Id.* at 202-03. After the device was installed, the defendant and his co-conspirator held a lengthy conversation

while sitting in the co-conspirator's automobile; investigators monitored it from a car parked out of sight down the street. *Id.* at 203. Incriminating statements made by the defendant during the course of this conversation were introduced into evidence at trial over the defendant's objection. *Id.* The Supreme Court in *Massiah* held that the Sixth Amendment right to counsel "appl[ies] to indirect and surreptitious interrogations as well as those conducted in the jailhouse." *Id.* at 206. It found that the investigators had "deliberately elicited" Massiah's incriminating statements from him by use of the government agent "after he had been indicted and in the absence of his counsel." *Id.* Under these circumstances, the Court commented, "Massiah was more seriously imposed upon. . . because he did not even know that he was under interrogation by a government agent." *Id.* (internal citation omitted). It held that the investigators' deliberate elicitation of incriminating statements by the use of a government agent amounted to interrogation of the defendant "after he had been indicted and in the absence of his counsel," in violation of the accused's Sixth Amendment right to counsel. *Id.* at 206.

In a series of subsequent decisions, the Court clarified what constitutes interrogation under the Sixth Amendment, and specifically what is encompassed by the phrase "deliberately elicited" as used in *Massiah*. *United States v. Henry* involved a jailhouse informant housed in the same cell as the indicted accused. *United States v. Henry*, 447 U.S. 264, 266 (1980). Law enforcement instructed the informant not to initiate conversations with the accused or ask them about the charges against them, but to pay attention to any statements the accused made. *Id.* at 268. The government argued that the incriminating statements to which the informant later testified were not "deliberately elicited" from the accused, as required in *Massiah*. The Court in *Henry* noted that incarceration may make a defendant "particularly susceptible to the ploys of undercover Government agents." *Id.* at 274. It held that law enforcement had "intentionally creat[ed] a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel" and so had deliberately elicited the statements in violation of the defendant's Sixth Amendment right to counsel. *Id.*

In *Maine v. Moulton*, a co-defendant agreed to cooperate with law enforcement in return for a promise of no further charges against him. *Maine v. Moulton*, 474 U.S. 159, 163 (1985). After the indicted accused asked the informant co-defendant to meet with him to discuss the charges against them, the co-defendant agreed to law enforcement's request that he wear a recording device for the meeting. *Id.* Statements made by the defendant during the meeting were admitted into evidence at the defendant's trial. The defendant argued that there was a violation of his Sixth Amendment right to counsel.

The State in *Moulton* maintained that there was no interrogation because it had not "deliberately elicited" the defendant's statements. It relied on the fact that the State did not set up the meeting between the defendant and the informant co-defendant, rather, the defendant had asked the informant co-defendant to meet with him. For this reason, it

argued, there was no violation of the Sixth Amendment. *Id.* at 174. The Court rejected this argument. It noted that the Sixth Amendment guarantees the accused the right to rely on counsel as a "medium" between the defendant and the State. *Id.* at 176. This right, the Court held, "includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right" and the determination of "whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation." *Id.* The *Moulton* Court observed that "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Id.* (citing *Henry*, 447 U.S. at 276 (Powell, J., concurring)). In that case, however, it held that the State had deliberately elicited the statements by "knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent" and so had violated his Sixth Amendment rights. *Id.*

The Court reflected on the parameters of interrogation under the Sixth Amendment in *Kuhlmann v. Wilson*, 477 U.S. 436 (1986), and the purpose of the "deliberately elicited" test set forth in *Massiah*. *Kuhlmann* explained that *Massiah* "held that, once a defendant's Sixth Amendment right to counsel has attached, he is denied that right when federal agents 'deliberately elicit' incriminating statements from him in the absence of his lawyer. The Court adopted this test. . . to protect accused persons from 'indirect and surreptitious interrogations as well as those conducted in the jailhouse.'" *Id.* at 457 (internal citation and quotation marks omitted). The *Kuhlman* Court summarized the aim of *Massiah* and the cases that followed it:

> [T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.* at 459 (internal citations omitted). *Kuhlmann* involved a jailhouse informant housed in the same cell as the indicted defendant. *Id.* at 439-40. Law enforcement authorities instructed the informant to ask no questions of the defendant about the crime but merely to listen to whatever he might say. *Id.* at 440-41. The defendant made unsolicited incriminating statements to the informant, who responded only that it "didn't sound too

-49-

good." *Id*. at 460. The defendant sought to suppress the incriminating statements; the trial court found that the statements to the informant were "spontaneous" and "unsolicited" and so denied the motion to suppress. *Id*. at 440. The intermediate appellate court focused on the circumstances of the incarcerated defendant and the single remark made by the informant and stated, "Subtly and slowly, but surely, [the informant's] ongoing verbal intercourse with [the defendant] served to exacerbate [the defendant's] already troubled state of mind." *Id.* at 460. On this basis, the intermediate appellate court held that the incriminating statements were deliberately elicited in violation of the defendant's Sixth Amendment rights. *Id*. The Supreme Court ejected the intermediate appellate court's finding that there was "deliberate elicitation" of the incriminating statements. *Id.* at 460-61. It determined that the intermediate appellate court had failed to accord the required presumption of correctness to the trial court's factual findings on whether the statements were deliberately elicited by the State. *Id*. at 459. The *Kuhlmann* Court held that the record supported the trial court's finding that the State had not "deliberately elicited" the defendant's incriminating statements, so there was no interrogation and thus no Sixth Amendment violation. *Id*. at 460-61.

This Court considered the Sixth Amendment right to counsel[18] in *State v. Berry*, 592 S.W.2d 553 (Tenn. 1980). Shortly after Berry was indicted for first degree murder, law enforcement authorities decided to plant an agent, posing as a captured felon, in the Greeneville City Jail for the express purpose of making contact with the defendant. *Id.* at 554-55. The defendant was arrested the next day and hired an attorney. *Id.* at 555. His attorney contacted the Greene County Sheriff and requested that the defendant not be questioned; the Sheriff agreed. *Id.* Despite this agreement, the Sheriff "booked" the undercover agent into the Greeneville City Jail with the defendant. With no knowledge of the government agent's true identity, the defendant initiated a conversation in which the government agent asked questions of the defendant and received answers that included incriminating statements. *Id.* The defendant sought to suppress the statements as violative of his Sixth Amendment right to counsel.

Relying on *Massiah*, the Court in *Berry* held that the conversations between Mr. Berry and the government agent constituted a form of interrogation. *Id.* at 561. The Court added: "The law will not permit law enforcement officials to do by ruse, trickery, deceit and deception that which it is not permitted to do openly and honestly." *Id.* The *Berry* Court held that the statements were taken in violation of Mr. Berry's Sixth Amendment right to counsel, and reversed the conviction on that basis. *Id.*

These cases provide helpful background by explaining what does, and does not, constitute "secret interrogation by investigatory techniques that are the equivalent of

---

[18] *State v. Berry* referred only to the Sixth Amendment of the United States Constitution and did not refer to article I, section 9 of the Tennessee Constitution.

direct police interrogation" for purposes of the Sixth Amendment right to counsel, with focus on the boundaries of the "deliberately elicited" test adopted in *Massiah*. *Kuhlmann*, 477 U.S. at 459. However, each case was premised on the following facts: (1) the defendant's Sixth Amendment right to counsel had attached at the time that the statements in question were made, (2) the individual to whom the statements were made was acting as an agent of the government at the time, and (3) the defendant had not waived his Sixth Amendment right to counsel when he made the incriminating statements. In contrast, in the case at bar, these threshold issues must be addressed. As discussed below, this defendant's Sixth Amendment claims squarely present the issues of whether the defendant's Sixth Amendment right to counsel had attached when he made the incriminating statements, whether Wilda was acting as an agent of the State at the time the statements were made, and whether the defendant impliedly consented to law enforcement monitoring his conversations and thus effectively waived his rights under the Sixth Amendment.

### 1. October 15 & 16, 2002, Statements

The defendant argues on appeal that the incriminating statements he made to Wilda on October 15 and 16, 2002, were admitted into evidence in violation of his Sixth Amendment right to counsel. The defendant admits, as he must, that the Sixth Amendment right to counsel does not attach until "after the initiation of adversary criminal proceedings," *Maine v. Moulton*, 474 U.S. at 170, and it is undisputed that the defendant was not indicted for offenses arising out of the murder of victims Adam and Samantha until October 23, 2002, after he met with Wilda on October 15 and 16, 2002, and told her that he "blew [the victims'] brains out."

The defendant argues that it does not matter that he had not yet been indicted for the murders of Adam and Samantha at the time he made the October 15 and 16, 2002 statements to Wilda. He reasons that his arrest for violating the conditions of his release in the federal case rested upon the suspicion that he had engaged in foul play in the disappearance of Mr. Thomas and the victims. In that sense, he asserts, his federal arrest was factually intertwined with the murder charges. Accordingly, he contends that because he had been appointed counsel in the federal case, his right to counsel had necessarily attached in this case regarding the murders of Adam and Samantha.

The defendant concedes that he did not make this argument in the trial court. In an ordinary, non-capital criminal case, arguments not first raised in the trial court are waived on appeal. Tenn. R. App. P. 36(a); *State v. Hayes*, 337 S.W.3d 235, 256 (Tenn. Crim. App. 2010). However, Tennessee Code Annotated section 39-13-206(a)(1) requires mandatory review in capital cases. Therefore, in capital cases, when suppression issues are raised for the first time on appeal, the appellate courts will review the issue for plain error. *State v. Dotson*, 450 S.W.3d 1, 48-49 (Tenn. 2014), *cert. denied*, 135 S. Ct.

1535 (2015).  When conducting plain error review, this Court will grant relief only when the following five prerequisites are satisfied:  (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *Id.* (citing *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007) (internal citations and quotation marks omitted)).  The defendant bears the burden of persuading an appellate court that plain error exists.  *Id.* (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)).

As noted by both of the lower courts, the Sixth Amendment right to counsel is "offense specific."  Statements obtained regarding an offense for which adversary judicial proceedings have not begun are admissible, even if they were deliberately elicited during an investigation of a separate offense for which there was a right to counsel.  *Texas v. Cobb*, 532 U.S. 162, 173 (2001) (holding the right to counsel is "offense specific" and does not necessarily extend to offenses that are "factually related" to those that have been charged); *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (holding invocation of Sixth Amendment right to counsel is offense specific, while *Miranda* is not offense specific); *Maine v. Moulton*, 474 U.S. 159, 168 (1985) (holding statements relating to the uncharged crime may be admitted).  Assertion of the right to counsel for an indicted offense does not serve to invoke the right for all future prosecutions.  *McNeil*, 501 U.S. at 176.  The Sixth Amendment right to counsel attaches only to offenses that, even if not formally charged, would be considered the "same offense" under the *Blockburger* test.  *Cobb*, 532 U.S. at 173.  *Blockburger* defines offenses as the "same" only where neither statute requires proof of a fact that the other does not.  *Blockburger v. United States*, 284 U.S. 299, 304 (1932).

In this case, the pending federal charge for violating the conditions of release in New York and the Tennessee murder charges related to the victims in this case were clearly not the "same offense" for purposes of attachment of the Sixth Amendment right to counsel.  Therefore, when the defendant made his statements to Wilda on October 15 and 16, 2002, he had not been charged with the murders and the Sixth Amendment right to counsel had not attached as to those charges.  Therefore, no "clear and unequivocal rule of law" was breached so as to warrant plain error relief.

### 2. *January 1 & 3, 2003 Statements*

On October 23, 2002, the defendant was indicted on the murder charges related to Adam and Samantha, so his Sixth Amendment right to counsel attached at that point. *See Kirby v. Illinois*, 406 U.S. 682, 689 (1972); *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980).  Therefore, as to the defendant's January 1 and 3, 2003 statements to Wilda, this threshold requirement is met. We must consider, however, (1) whether Wilda was acting

-52-

as an agent of the State when she visited the defendant in New York on January 1, 2003, and (2) whether the defendant had impliedly consented to law enforcement monitoring his January 3, 2003 telephone conversations with Wilda during the search for the chainsaw and other evidence, thereby effectively waiving his rights under the Sixth Amendment.

First we consider whether Wilda was acting as a government agent in her visit with the defendant in New York on January 1, 2003. As noted by the Court of Criminal Appeals below, neither the United States Supreme Court nor this Court has adopted a definitive test for determining when a cooperating witness will be deemed an agent of the government for purposes of the Sixth Amendment right to counsel. The Court of Criminal Appeals cited with approval a decision by the Sixth Circuit Court of Appeals that rejected what it termed a "bright-line" test for agency adopted by some circuits and instead held: "[A]lthough direct written or oral instructions by the State to a jailhouse informant to obtain evidence from a defendant would be sufficient to demonstrate agency, it is not the only relevant factor. A court must also analyze the facts and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant at the time the elicitation took place that supports a finding of agency." *Willis*, 2015 WL 1207859, at *64 (quoting *Ayers v. Hudson*, 623 F.3d 301, 311-12 (6th Cir. 2010)) (footnotes omitted). Our Court of Criminal Appeals went on to hold that Wilda was acting as an agent of the State at the time of her January 1, 2003 meeting with the defendant in New York, and that the statements the defendant made to Wilda in that meeting violated the defendant's Sixth Amendment right to counsel and should have been suppressed. *Willis*, 2015 WL 1207859, at *65.

The majority of federal circuits have adopted a version of the so-called "bright-line" test for determining whether an informant was acting as an agent of the government at the time the incriminating statements were elicited. Under this test, regardless of whether a particular informant had cooperated with law enforcement in the past, the defendant must offer proof that law enforcement instructed or requested the informant to obtain information from this particular defendant in order for the informant to be deemed a government agent relative to incriminating statements made thereafter by the particular defendant to the informant. The First, Second, Fourth, Seventh, Eighth, Eleventh, and District of Columbia Circuits, have either expressly adopted a "bright-line" test or have opined in a manner that is consistent with it. *See, e.g.*, *United States v. McFadden*, 187 F. App'x 290, 294 (4th Cir. 2006) (holding that for agency, government must have directed informant to elicit incriminating statements from defendant); *United States v. LaBare*, 191 F.3d 60, 65-66 (1st Cir. 1999) ("Where the government asks a jail mate to report incriminating statements by anyone but has in no way focused the jail mate's attention on an individual defendant, it is a stretch to describe the jail mate's inquiries of the defendant as government interrogation."); *Moore v. United States*, 178 F.3d 994, 999 (8th

Cir. 1999) (holding that informant becomes government agent only when informant has been instructed by law enforcement to get information about the particular defendant); *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997) (stating that where informant's cooperation agreement with government did not require him to elicit information from any particular defendant, "the Sixth Amendment rights of a talkative inmate are not violated when a jail mate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant"); *United States v. D.F.*, 63 F.3d 671, 682 n. 16 (7th Cir. 1995) (finding that central question to be whether government directed informant to get incriminating information from the defendant); *Stano v. Butterworth*, 51 F.3d 942, 946 (11th Cir. 1995) (finding jailhouse informant with cooperation agreement is not government agent where informant received no instruction from law enforcement to do anything regarding the defendant); *United States v. Watson*, 894 F.2d 1345, 1347 (D.C. Cir. 1990) ("We join the circuits that have expressly 'refuse[d] to extend the rule of *Massiah* and *Henry* to situations where an individual acting on his own initiative, deliberately elicits incriminating information"); *see also, United States v. Corona*, 2008 WL 114989, at *9 (E.D. Tenn. Jan. 10, 2008) (gathering cases). Regardless of whether a given jurisdiction applies a "bright-line" test for agency, the various jurisdictions generally agree upon "one common principle: 'to qualify as a government agent, the informant must at least have some sort of agreement with, or act under instructions from, a government official.'" *Parsons v. State*, 2016 WL 552189, at *2 (Tex. App. Feb. 11, 2016) (quoting *Manns v. State*, 122 S.W.3d 171, 183 (Tex. Crim. App. 2003)) (gathering cases).

In considering whether Wilda was acting as a government agent on January 1, 2003, the Court of Criminal Appeals stated that, "Because '[d]irect proof of the State's knowledge will seldom be available,' [a] defendant 'must only present evidence that 'the State must have known that its agent was likely to obtain incriminating statements from the accused in the absence of counsel.'" *Willis*, 2015 WL 1207859, at *64 (quoting *Moulton*, 474 U.S. at 176 n.12).[19] To the extent that this statement suggests that the defendant may establish that an informant was a government agent by a mere showing that the State "must have known that its agent was likely to obtain incriminating statements" from the defendant without counsel present, we respectfully disagree. We

---

[19] Respectfully, to the extent that the Court of Criminal Appeals relied on the quote from *Moulton* to explain how agency is established for purposes of the Sixth Amendment, this reliance is misplaced. In *Moulton*, it was undisputed that the co-defendant informant was a government agent; the issue presented was whether the government agent had interrogated the defendant, that is, whether the agent deliberately elicited the incriminating statements from the defendant. Thus, *Moulton* does not indicate that an informant becomes an agent of the government simply because of what law enforcement "must have known" would occur. We note that the Court of Criminal Appeals may have intended to quote from *Moulton* for some other reason, such as what constitutes interrogation, but because the statement is contained in a paragraph that opens with, "To establish that the informant was a government agent," *Willis*, 2015 WL 1207859, at *64, we presume that the reference was intended to pertain to agency.

-54-

must reject any test that would deem an informant to be a government agent simply because the government was aware or "must have known" that the informant would likely receive incriminating statements from the defendant. As explained below, such a test would be at odds with basic principles of agency and inconsistent with the analysis of the majority of courts.

"Traditional principles of agency help determine government agent status." *United States v. Li*, 55 F.3d 325, 328 (7th Cir. 1995) (Sixth Amendment right to counsel). An agency relationship arises when the principal manifests assent or intention to have an agent act on its behalf and subject to its control, and the agent consents to do so. *United States v. Aldridge*, 642 F.3d 537, 541 (7th Cir. 2011) (Fourth Amendment search); *see also United States v. Alexander*, 447 F.3d 1290, 1295 (10th Cir. 2006) (citing "traditional indicia of agency") (Fifth Amendment). "The defendant bears the burden of proving agency, based on all the circumstances." *Aldridge*, 642 F.3d at 541; *see also Gordon v. Greenview Hosp., Inc.,* 300 S.W.3d 635, 653 (Tenn. 2009) ("The burden of proof rests with the party asserting the agency relationship.").

A review of case law from other jurisdictions indicates that, for a cooperating witness or informant to be deemed a "government agent" for purposes of the Sixth Amendment right to counsel, the defendant must show that the principal—the State, in the form of law enforcement officers—manifested assent, either explicitly or implicitly, to have the cooperating witness act as a government agent, and that the State had some level of control over the witness's actions with respect to the defendant. *See*, *e.g.*, *Fairbank v. Ayers*, 632 F.3d 612, 622 (9th Cir. 2011) (finding inmate to whom defendant made incriminating statements was not a state agent because law enforcement had not asked him to solicit information from defendant), *amended by* 650 F.3d 1243 (9th Cir. 2011); *Abrante v. St. Amand*, 595 F.3d 11, 16-17 (1st Cir. 2010) (holding that inmate who answered police questions about defendant was not state agent because his move to defendant's cell was coincidental and no other agency evidence was introduced); *United States v. Lentz*, 524 F.3d 501, 521 (4th Cir. 2008) (finding informant who had previously volunteered information was not a government agent until asked by government official to collect information); *Moore v. United States,* 178 F.3d 994, 999 (8th Cir. 1999) (finding cellmate who testified about incriminating statements made by defendant was not a state agent because, though cellmate had agreement with government to report information, defendant was not subject of agreement); *Castro v. Ward*, 138 F.3d 810, 819 & n.5 (10th Cir. 1998) (finding cellmate who informed government of defendant's incriminating drawings not state agent because information was not elicited under agreement between state and cellmate); *Creel v. Johnson*, 162 F.3d 385, 393-94 (5th Cir. 1998) (finding informant who solicited incriminating evidence was not a state agent because government never promised benefit to informant and because informant did not act under state direction); *United States v. Murray*, 103 F.3d 310, 323 (3d Cir. 1997) (finding inmate who listened to defendant's incriminating statements not a state agent

because he was not placed near defendant to elicit information); *United States v. Stevens*, 83 F.3d 60, 65 (2d Cir. 1996) (finding inmate who obtained incriminating documents from defendant not a state agent because informant was told by government agent to "avoid affirmatively seeking further contact with [defendant]"); *United States v. Li*, 55 F.3d 325, 327-28 (7th Cir. 1995) (finding accomplice who deliberately elicited information from defendant was not a state agent because accomplice arranged meeting and elicited information without government direction); *United States v. Watson*, 894 F.2d 1345, 1347-48 (D.C. Cir. 1990) (finding that individual who elicited incriminating statements from defendant in jail was not a state agent because individual acted without government direction); s*ee Right to Counsel*, 42 Geo. L.J. Ann. Rev. Crim. Proc. 525, 570 n.1566 (2013) (gathering cases).

In this case, it is important to examine the interactions between Wilda and law enforcement authorities both before and after the defendant's Sixth Amendment rights attached. Prior to the defendant's indictment for the murders of Adam and Samantha, before the defendant's Sixth Amendment right to counsel attached, it is undisputed that law enforcement authorities from Johnson City, Washington County and Bradley County all actively recruited Wilda's assistance in investigating the crimes. They facilitated meetings between Wilda and the defendant and planted listening devices in the detention facility's meeting room.

The defendant's Sixth Amendment right to counsel attached on October 23, 2002, when he was indicted for the murders of Adam and Samantha. The proof at the suppression hearing established that, after Wilda's October 16, 2002 visit with the defendant, Washington County officers, Johnson City officers, and the district attorney general's office discouraged Wilda from continuing to stay in contact with the defendant, and they told her that she needed to quit accepting his telephone calls. Sometime in October 2002, Wilda returned to Bradley County law enforcement the tape recorder they had provided to her before the defendant was indicted.

In December 2002, after the defendant had been moved to the detention facility in New York, he asked Wilda to come to New York to see him. After she declined, the defendant's Aunt Marie offered to pay her way to New York to see the defendant. The defendant and Aunt Marie both insisted that Wilda go to New York, and assured her that, if she did, the defendant would tell her "the rest of the truth" and give her answers about the murders of her uncle and Adam and Samantha.

In the course of considering the defendant's request that she go to New York to see him, Wilda consulted with several of the Tennessee law enforcement officers and district attorneys from Washington County and Bradley County. Wilda's undisputed testimony was that *all* of them told her not to go to New York to see the defendant. Wilda

traveled to New York to see the defendant *despite* the discouragement from all of the law enforcement officers.

Considering all of the proof and the credibility of the witnesses, the trial court found that Wilda was told by law enforcement authorities not to accept any more telephone calls from the defendant, but she nevertheless continued to accept his phone calls. Importantly, the trial court credited Wilda's testimony that law enforcement officers told her, "don't go to New York City," but she went anyway. The trial court said of Wilda: "Wilda Willis in this case is nobody's agent. She does what she wants to do on her own time, and . . . is driven for her own purposes. . . . [T]he court finds that she's . . . not an agent of law enforcement. . . ." It added: "Wilda Willis was a private party, no government action in any . . . sense. She was cooperating, but . . . she was operating on her own."

Despite the trial court's factual finding, the Court of Criminal Appeals concluded that Wilda was acting as a State agent at the time of her January 1, 2003 meeting with the defendant. It based this conclusion primarily on (1) Wilda's past assistance in the police investigation before the defendant was indicted, (2) Wilda's calls to law enforcement officers from New York and her contacts with them once she returned home, and (3) Wilda's purpose in going to New York, namely, to obtain information from the defendant about the murders of the victims and her uncle. *Willis*, 2015 WL 1207859, at *64-65.

We agree with the Court of Criminal Appeals that these facts are pertinent. An agency agreement between an informant and the government need not be formal or explicit but may be inferred from the evidence, and these facts are relevant to the question of whether there was an agreement between Wilda and law enforcement officials at the time the incriminating statements were made. We disagree, however, with the Court of Criminal Appeals' conclusion that these facts are sufficient.

Whatever the arrangement between Wilda and law enforcement officials prior to the defendant's indictment for the murders of these victims, as discussed below, the facts as found by the trial court show that a clear break had occurred by the time Wilda went to New York on January 1, 2003. Once the defendant was indicted, the trial court found, law enforcement advised Wilda to stop accepting the defendant's calls. In contrast with Wilda's meetings with the defendant prior to his indictment, there is no evidence that law enforcement made arrangements for Wilda to meet with the defendant in New York. Certainly there is no evidence that law enforcement controlled or directed Wilda with regard to the defendant. To the contrary, law enforcement officials advised Wilda not to accede to the defendant's request that she visit him in New York but she went anyway, at the defendant's insistence, for her own reasons. Wilda brought no recording device to her

-57-

meeting with the defendant in New York, and the conversation was not recorded.[20] Thus, there are no facts showing that law enforcement officials assented to having Wilda act as an agent of the government in the January 1, 2003 New York meeting, or that they controlled or directed Wilda with regard to that meeting. *See Alexander v. Smith*, 342 F. Supp. 2d 677, 688 (E.D. Mich. 2004) ("[T]he courts have upheld the prosecution's use of incriminating statements made by a defendant in custody to a . . . jailhouse visitor, where the [visitor] had not arranged in advance with the police or prosecutor to elicit information from the defendant, and where there otherwise was no indication that the government had directed or controlled the informant's interaction with the defendant.") (collecting cases).

Evidence that Wilda reached out to law enforcement officers does not equate to evidence of actions by law enforcement officials manifesting assent to have Wilda act as a government agent while she was in New York. The existence of an agency relationship cannot be proved based *only* on the actions of the alleged agent. In the context of the Sixth Amendment, "there is general agreement that affirmative conduct by a government official is required to convert an . . . informant into a government agent." *Hailey v. State*, 413 S.W.3d 457, 474 (Tex. App. 2012) (quoting *Manns,* 122 S.W.3d at 187). "The government's willing acceptance of information provided . . . by an . . . informant did not make the informant the government's agent under the Sixth Amendment." *Elizondo v. State*, 338 S.W.3d 206, 211 (Tex. Crim. App. 2011), *aff'd*, 382 S.W.3d 389 (Tex. Crim. App. 2012). "[A]ll citizens . . . have a duty to report information about criminal activities, and while the Sixth Amendment may limit the government's ability to *encourage* such reporting behavior, the government should not be required to actively *discourage* such behavior either." *Manns*, 122 S.W.3d at 185 (emphasis in original). If we were to hold that law enforcement officers had to refuse either Wilda's telephone calls or the after-the-fact the information she offered, such a holding "would preclude police from using informants at all, a result we find untenable." *Matteo*, 171 F.3d at 894.

---

[20]We note that, in its discussion of the defendant's Sixth Amendment argument on the January 2003 incriminating statements, the Court of Criminal Appeals stated that officers asked Wilda to record conversations and furnished her with a tape recorder and blank tapes. *Willis*, 2015 WL 1207859, at *65. From our review of the record, Bradley County officers provided Wilda with a recorder earlier, during the investigation and prior to the defendant's indictment. It is unclear whether the recorder Wilda used in January 2003 was her own or whether officers continued to give her blank tapes. Regardless, this does not affect our conclusion for several reasons: (1) Wilda's meeting with the defendant at the New York detention facility was not recorded, (2) as discussed in more detail below, the defendant impliedly consented to the recording of all telephone calls made from jail, and (3) the furnishing of a recorder or tapes is not sufficient to show that the government assented to have Wilda act as its agent for the New York trip or that it had any control over her actions. *See Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 894 (3d Cir. 1999) (concluding that the fact that government showed informant how to use recording equipment on the phone "was trivial and does not pose a problem of constitutional dimension.") (informant was not government agent, so there was no Sixth Amendment violation).

The Court of Criminal Appeals noted that Wilda visited the defendant in New York in order to obtain information from him about the murders of the victims and her uncle. This fact is undisputed; indeed, the offer of such information was how the defendant persuaded Wilda to accept his invitation to visit him in New York. It shows Wilda's motivation for meeting with the defendant. It does not, however, substitute for evidence of actions by law enforcement officers manifesting their assent to have Wilda act as a government agent in that meeting. "[T]he protections of the Sixth Amendment right to counsel enunciated in *Massiah* and *Henry* are inapplicable when, after the right to counsel has attached, statements by a defendant are made to an individual who is not an agent for the Government, although he may be a Government informant. This is so regardless of whether the statements were 'deliberately elicited.'" *United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir. 1986); *see also Hailey*, 413 S.W.3d at 477-78 (noting that, "even if the State hoped for a confession from [the defendant], this is not sufficient to establish that [the informant] was an agent") (citing *Manns*, 122 S.W.3d at 185).

Citing *Henry*, the Court of Criminal Appeals also pointed out that Wilda was trusted by the defendant and that he was incarcerated on January 1, 2003, when he made the incriminating statements to her.[21] *Willis*, 2015 WL 1207859, at *65 (citing *United States v. Henry*, 447 U.S. at 270, 274). In *Henry*, the status of the informant as a government agent was not in question; the fact that the defendant trusted the informant and the effects of incarceration on the defendant were cited in *Henry* as factors in determining whether the defendant's incriminating statements were "deliberately elicited," that is, whether it amounted to a surreptitious interrogation by the government agent, in violation of the Sixth Amendment.[22] The issue of interrogation is separate from the question of agency. *See Hailey*, 413 S.W.3d at 478 ("[T]he 'agency inquiry' constitutes a separate and distinct analysis from whether the informant 'deliberately elicited' [the] information sought to be suppressed as being obtained in violation of the accused's Sixth Amendment right to counsel." (internal quotation marks omitted)); *see also Manns*, 122 S.W.3d at 182 (noting that numerous courts "recognize that an informant must be a government agent before the protections in *Massiah* are implicated and further recognize that this agency inquiry is separate from whether the informant

---

[21] It is unclear whether the Court of Criminal Appeals considered these facts in determining that Wilda was acting as an agent of the government, or in determining that she interrogated the defendant or "deliberately elicited" incriminating information from him.

[22] We note that the Court of Criminal Appeals correctly cited *Matteo* as stating that these two factors were pertinent to the question of whether the informant was a government agent. *Willis*, 2015 WL 1207859, at *65 (citing *Matteo*, 171 F.3d at 894-95), We disagree with this portion of *Matteo*'s analysis, as *Matteo* also incorrectly cited *Henry* for the proposition that these facts were pertinent to the question of agency, rather than the question of interrogation or deliberate elicitation. *Matteo*, 171 F.3d at 894-95 (citing *Henry*, 447 U.S. at 274).

'deliberately elicited' information"). The defendant's trust of Wilda and the fact that he was incarcerated do not bear on the question of whether Wilda was acting as a government agent in their January 1, 2003 New York meeting.

In short, the defendant has failed to prove an explicit or implicit arrangement between Wilda and law enforcement officers for her to act as an agent of the government in her January 1, 2003 meeting with the defendant in New York. In the absence of proof showing that the government had agreed for Wilda to act as a government agent in that meeting, there was no Sixth Amendment violation with respect to the incriminating statements made by the defendant. "It is merely a tautology to argue that the government should not be in the business of providing a market for information that infringes Sixth Amendment rights; there is no infringement unless the informant was a government agent, and there is no agency absent the government's agreement [with] the informant for his services." *State v. Hernandez*, 842 S.W.2d 306, 316 (Tex. Crim. App. 1992 (quoting *United States v. York*, 933 F.3d 1343, 1357 (7th Cir. 1991)). Accordingly, we reverse the Court of Criminal Appeals' holding that the trial court erred in denying the defendant's motion to suppress evidence of the statements he made to Wilda on January 1, 2003.

We next consider the defendant's motion to suppress the incriminating statements he made during his telephone calls to Wilda on January 3, 2003, as she was accompanied by officers and following the defendant's directions to search for the chainsaw and other items associated with the murders of the victims. The trial court found that all of the phone calls from the New York detention facility were initiated by the defendant. It emphasized: "[I]n the New York Detention Center [the defendant] knows, every call he's told by this recording that it's subject to monitoring and recording when the call is placed. . . . [T]here is no expectation of privacy at a jailhouse telephone, particularly, not under these circumstances. . . . [T]here's nothing surreptitious about this." *Willis,* 2015 WL 1207859, at *65.

The Court of Criminal Appeals observed that, while the officers and Wilda were searching for the chainsaw based on the information the defendant gave Wilda in New York, "appellant called Wilda multiple times. Wilda spoke to him in the presence of the officers and recorded the conversations using a recorder provided by the officers." It found that Wilda was acting as a state agent during these January 3, 2003 conversations and that she interrogated him as such, so the recorded telephone calls violated the defendant's Sixth Amendment right to counsel. *Id.*

The Court of Criminal Appeals appeared to give little weight to the fact that all of the telephone calls the defendant made to Wilda on January 3, 2003, were from a jail telephone and were preceded by a recording informing the defendant that all calls are subject to monitoring and recording. We consider this fact determinative.

-60-

"[T]he Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (internal citations omitted). In this case, the monitoring and recording of the defendant's January 3, 2003 telephone conversations with Wilda was neither indirect nor surreptitious. The defendant acknowledges that he was warned at the beginning of each and every call that his conversations were subject to being monitored and recorded. He disregarded the warnings and made the telephone calls anyway.[23] By placing the telephone calls to Wilda with full knowledge that they were subject to monitoring and recording, the defendant impliedly consented to the monitoring and recording of his conversations. In doing so, he voluntarily, knowingly and intelligently waived his Sixth Amendment rights. *United States v. Medlin*, No. 3:09-00204, 2010 WL 796857, at *6 (M.D. Tenn. Mar. 1, 2010) (citing *Montejo*, 556 U.S. at 786); *People v. Mares*, 263 P.3d 699, 706 (Colo. App. 2011) ("Where a prison inmate . . . is required to permit monitoring of telephone calls as a condition of using prison telephones, the prisoner impliedly consents if he has notice of monitoring and still places calls on the prison telephones."); *Jackson v. State*, 18 So. 3d 1016, 1030 (Fla. 2009) ("Jackson was aware through repeated, automated warnings that the jail would record and monitor his communication. Thus, Jackson implicitly consented to the interception."); *State v. Haq*, 268 P.3d 997, 1011-13 (Wash. Ct. App. 2012), as corrected (Feb. 24, 2012) (finding no Sixth Amendment violation where defendant and his family were told that each telephone conversation was subject to being recorded and monitored); *State v. Riley*, 704 N.W.2d 635, 640 (Wis. Ct. App. 2005) ("[S]o long as an inmate is given meaningful notice that his or her telephone calls over institutional phones are subject to surveillance, his or her decision to engage in conversations over those phones constitutes implied consent to such surveillance."). "The Sixth Amendment does not prevent the admission of a defendant's voluntary statements." *United States v. Lentz*, 419 F. Supp. 2d 820, 833 n.32 (E.D. Va. 2005); *see also Sanders*, 452 S.W.3d at 315 ("[N]either the Fourth, Fifth, or Sixth Amendment protects a suspect who voluntarily offers information to a confidant. . . .") (citing *State v. Bacon*, 1998 WL 6925, at *12 (Tenn. Crim. App. Jan 8, 1998)).

In sum, the record fully supports the trial court's finding that there was "nothing surreptitious" about law enforcement officials monitoring and recording the defendant's January 3, 2003 telephone conversations with Wilda. The defendant admitted that the

---

[23] The defendant testified that he was under a misimpression that, once he hired an attorney, whatever he said to Wilda was protected, presumably by the attorney-client privilege. However, prior to hiring an attorney, the defendant demonstrated that he was aware that his telephone calls from the jail were subject to monitoring. During a telephone call from the jail, the defendant's mother Betty referred to the "storage shed" and the defendant quickly shushed her, to which Betty responded, "They already know."

calls he made from the New York detention facility were each preceded by a warning that all calls were subject to monitoring and recording. Under these circumstances, the defendant impliedly consented to the monitoring and recording of his January 3, 2003 telephone conversations with Wilda, and thus effectively waived his Sixth Amendment right to counsel as to those telephone calls. Consequently, there was no Sixth Amendment violation with respect to the incriminating statements made by the defendant to Wilda on January 3, 2003, and we reverse the Court of Criminal Appeals' holding the trial court erred in denying the defendant's motion to suppress evidence of those statements.

In the January 3, 2003, telephone conversations between the defendant and Wilda, he directed her to the location of the chainsaw, instructed her to wipe it clean of fingerprints and plant it at the home of Daniel Foster, then gave her directions to another location at which she was to search near a river for another piece of evidence that apparently had been thrown off a bridge. Applying the exclusionary rule, the Court of Criminal Appeals held that the trial court should have excluded not only the primary evidence, that is, the incriminating statements, but also the other incriminating evidence—the chainsaw—derived from the primary evidence, as the "fruit" of the incriminating statements. *Nix v. Williams*, 467 U.S. 431, 441-42 (1984) (discussing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920); *Wong Sun v. United States*, 371 U.S. 471 (1963)). In view of our determination that there was no violation of the defendant's Sixth Amendment right to counsel, we reverse this holding by the Court of Criminal Appeals as well. Our holding pretermits the question of whether the admission into evidence of the defendant's incriminating statements and the chainsaw were harmless beyond a reasonable doubt.

*3. Due Process Claim*

As we noted above, just as the Fifth Amendment does not protect a criminal suspect from misplaced trust in an associate or family member, neither does the Due Process Clause of the Fourteenth Amendment provide any such protection. *Sanders*, 452 S.W.3d at 315-16 (quoting *Colorado v. Connelly*, 479 U.S. at 166). The facts of this case are similar to those in *Branam*, where an incarcerated defendant gave voluntary statements to a trusted family member. *See Branam*, 855 S.W.3d at 568. Just as we held in *Branam*, there is no constitutional basis to invalidate the defendant's jailhouse confession to Wilda under the due process clauses of either the Fifth Amendment to the United States Constitution or article I, section 9 of the Tennessee Constitution. *Id.* at 569. The defendant is not entitled to relief on this issue.

*B. Validity of the Search of 104 Brentwood Drive and*
*24 Hour Storage Unit X-47*

The defendant asserts in general that the searches of both Betty's house and unit X-47 at the 24-Hour Storage facility violated his Fourth Amendment and article I, section 7 rights to be free from unreasonable searches and seizures. For this reason, he contends, the trial court erred in denying his motion to suppress the evidence obtained in those searches.

At the outset, we note that the defendant set forth no facts in his motion to suppress showing that he had an expectation of privacy in the storage unit. He made no such an argument to the trial court, nor did he make such an argument in his briefs, either to the Court of Criminal Appeals or to this Court. Accordingly, we find that, absent plain error, any issues related to the validity of the search of the storage unit are waived. *See* Tenn. R. App. P. 27(a)(7)(A) (requiring the appellant's brief to argue issues raised with citations to relevant authorities and references to the record); Tenn. R. App. P. 36(a) (providing for waiver of errors for which a party is responsible); *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (finding that failure to include references to the record and to cite relevant authority resulted in waiver of issue raised on appeal).

As we have noted, however, when a suppression issue is raised for the first time on appeal in a capital case, we will review the issue for plain error despite procedural waiver. *State v. Dotson*, 450 S.W.3d at 48-49. For plain error review, we consider whether the following five prerequisites are satisfied: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *Id.* (citing *State v. Gomez*, 239 S.W.3d at 737). The defendant bears the burden of persuading the appellate court that plain error exists. *Id.* (citing *State v. Bledsoe*, 226 S.W.3d at 355).

In this case, the record reflects that only Betty's name was on the lease of the storage unit. The check submitted as payment for the first month's rental was written in her name with her signature. There is no evidence that the defendant had any ownership interest whatsoever in the storage unit. Furthermore, one of the defense theories at trial was that Betty, not the defendant, was responsible for the murders of the victims. Claiming an ownership interest in the storage unit would have undermined this defense. Accordingly, the evidence strongly suggests that the defendant waived this issue for tactical reasons, and he is not entitled to plain error relief. Accordingly, we confine our discussion to the issues that relate to the search of the house.

The defendant preserved his issue concerning the search of his mother's house. On February 24, 2010, he filed a pro se "Motion to Compel and Motion for Suppression of Evidence," the substance of which alleged the "faulty procurement of search warrants." The motion alleged that the affidavits upon which the search warrants were

based included "intentionally false or recklessly made statements." It asserted that without the "false and misleading" statements in the affidavit, the officers could not establish a "nexious [sic nexus] to criminal activity or probable cause" to his mother's house. The motion claimed that the defendant had standing by virtue of the fact that his name was on the search warrants; he did not expressly allege an expectation of privacy in the house. The motion went on to set out the defendant's version of the facts that transpired prior to the application for the search warrants. The focus in the motion was on discrepancies in dates and times of the reported disappearance of Mr. Thomas, whether the defendant may have been in permissive possession of Mr. Thomas's credit cards on the date he was videotaped using them, and discrepancies in the dates, times, and places where Adam was last seen before he disappeared.

The only affidavit attached to the motion to suppress was related to the search of Betty's house at 104 Brentwood Drive, in Johnson City. The affidavit included the following basic facts, which we summarize for the sake of brevity:

1. That on October 5, 2002, Sam Thomas was reported missing, that there were signs of blood at Thomas's house, and that the defendant and Adam Chrismer were observed on a September 5 & 7, 2002, Ft. Oglethorpe, Georgia, Walmart surveillance video using Thomas's credit card. Further, the defendant's daughter reported that, when she called Thomas's cell phone on October 5, 2002, it was answered by the defendant.

2. That on October 1, 2002, Adam Chrismer told his mother that he was staying with the defendant's mother, Betty Willis, in Johnson City, Tennessee, and investigation revealed that Betty Willis resided at 104 Brentwood Drive, Johnson City, Tennessee.

3. That on October 11, 2002, a severed human head was found in Boone Lake.

4. That the defendant was arrested on October 11, 2002, at the residence of his aunt, Marie Holmes, 1324 Lowell Street, Johnson City, Tennessee. During the arrest, officers observed on the property a blue 1991 Jeep Cherokee that had a dark stain in the rear cargo area. On October 13, 2002, Adam Chrismer's mother reported him missing, and that he and wife Samantha Chrismer were last seen driving a blue Jeep Cherokee.

5. That on October 12, 2002, two severed hands were found in Boone Lake.

6.      That on October 14, 2002, investigators received a physical description of Adam Chrismer that included a left ear piercing, a small surgical scar on his right cheek from a cyst that had been removed, a cyst growth on his temple, and a BB imbedded in his left cheek from a previous injury.

7.      That medical examiner Dr. Gretel Harlan reported that the physical description of Adam Chrismer as related to law enforcement was consistent with the human head recovered from Boone Lake on October 11, 2002.

8.      That on October 14, 2002, Adam Chrismer's mother reported to law enforcement that in the last week of September, 2002, she saw her son and Samantha Chrismer in a blue Jeep, that Adam told her that he was going to do one last thing for Howard Willis, and that on October 1, 2002, Adam told her he was in Johnson City at the home of Howard Willis's mother.

The State argued that the defendant had failed to establish standing to contest the search warrants. During a March 10, 2010, hearing on the motion, the defendant argued that, while the Brentwood Drive address belonged to his mother, he also was living there. The trial court denied the motion to suppress on the ground that the defendant's motion had failed to include a factual basis to support his allegations, and that his statements regarding standing were conclusory.

The Court of Criminal Appeals did not expressly address the trial court's finding that the defendant failed to adequately allege standing. It nevertheless affirmed the trial court's denial of an evidentiary hearing on the basis that his motion to suppress failed to allege sufficient facts that, if proven, would establish the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant, so as to entitle him to an evidentiary hearing. *Willis*, 2015 WL 1207859, at *71.

In this Court, the defendant argues both the standing and the underlying substantive issue. As to standing, he argues that his oral representation during the March 10, 2010 hearing, that he was residing in his mother's home at the time, was sufficient to establish standing. As to the sufficiency of his underlying claim, the defendant argues that his motion to suppress was sufficient to allege that the affidavit upon which the trial court relied to issue the search warrant contained material misrepresentations of fact and failed to establish probable cause that a crime had been committed. He also contends that, given the fact that he was self-represented, the trial court applied an impermissibly strict reading of his pleadings. The State argues that (1) the defendant failed to establish standing to contest either of the searches and (2) the defendant failed to make a substantial preliminary showing of any "false statement" necessary to the finding of probable cause. We agree with the State.

-65-

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  Similarly, article I, section 7 of the Tennessee Constitution provides: "That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted."  Tenn. Const. art. I, § 7. This Court has stated previously that article I, section 7 is "identical in intent and purpose with the Fourth Amendment," and that federal cases applying the Fourth Amendment should be regarded as "particularly persuasive." *State v. Hayes*, 188 S.W.3d 505, 511 (Tenn. 2006) (quoting *Sneed v. State*, 221 Tenn. 6, 423 S.W.2d 857, 860 (1968)).

A defendant who seeks to suppress evidence seized pursuant to a search warrant has the burden to prove, by a preponderance of the evidence (1) a legitimate expectation of privacy in the place or property from which the items were seized, (2) the identity of the items sought to be suppressed, and (3) the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant. *State v. Henning*, 975 S.W.2d at 298 (citing *State v. Evans*, 815 S.W.2d 503, 505 (Tenn. 1991); *State v. Harmon*, 775 S.W.2d 583, 585-86 (Tenn. 1989)).

Tennessee Rule of Criminal Procedure 41(g) provides that a court may suppress evidence "if the evidence in support of the motion shows that . . . the search warrant relied on was issued on evidence consisting in material part of willful or reckless misrepresentations of the applicant to the issuing magistrate, resulting in a fraudulent procurement [of the warrant]."  Tenn. R. Crim. P. 41(g)(3).

In *Franks v. Delaware*, the United States Supreme Court explained that a defendant who challenges an affidavit supporting a search warrant may be granted an evidentiary hearing *only* after showing a substantive basis for the challenge:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be

false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

438 U.S. 154, 171-72 (1978) (footnote omitted). Thus, an evidentiary hearing need not be held unless the motion to suppress alleges facts that, if proved, would require the grant of relief. *Evans*, 815 S.W.2d at 505. Factual allegations that are general and conclusory, or based upon suspicion and conjecture, will not suffice. *Id.* With these principles in mind, we address the defendant's arguments regarding his motion to suppress the search of his mother's house.

*Standing*

The Fourth Amendment is a personal right that must be invoked by an individual. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("[T]he Fourth Amendment protects people, not places."). The extent to which a person is protected by the Fourth Amendment depends in part on where the person is. The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (citing *Katz*, 389 U.S. at 353); *see also Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980). Although the text of the Amendment suggests that its protections extend only to persons in "their" houses, the Supreme Court has held that in some circumstances a person may have a legitimate expectation of privacy in a house that belongs to someone else. In *Minnesota v. Olson*, for instance, the Court held that an overnight guest has a legitimate expectation of privacy in his host's home. 495 U.S. 91 (1990). Tennessee courts have likewise recognized that an overnight guest enjoys a legitimate expectation of privacy. *See*, *e.g.*, *State v. Transou*, 928 S.W.2d 949, 958 (Tenn. Crim. App. 1996).

In this case, the face of the affidavit supporting the search warrant stated that "104 Brentwood Drive is a residence of Elizabeth Hawk, mother of Howard Hawk Willis, [w]here Willis also visits *and resides*." (Emphasis added). It requested that the warrant

issue "to search the person and premises of Elizabeth Hawk and Howard Hawk Willis at 104 Brentwood Drive, Johnson City, Tennessee," thus indicating an awareness that the defendant had an interest in the premises.

Pleadings prepared by self-represented litigants untrained in the law should be measured by less stringent standards than those applied to pleadings prepared by lawyers. *Stewart v. Schofield*, 368 S.W.3d 457, 462 (Tenn. 2012) (citing *Carter v. Bell*, 279 S.W.3d 560, 568 (Tenn. 2009); *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003); *Young v. Barrow*, 130 S.W.3d 59, 63 (Tenn. Ct. App. 2003)); *see also Baxter v. Rose*, 523 S.W.2d 930, 939 (Tenn. 1975). In our view, despite the inartful wording of the *pro se* defendant's motion, the face of the affidavit taken together with his oral assertion of standing were sufficient to preclude the trial court from relying on lack of standing to deny a hearing on the defendant's motion to challenge the search. However, as set forth below, apart from standing, there was ample basis for the trial court to reject the defendant's request for an evidentiary hearing.

*Dismissal for Insufficient Pleadings*

Assuming *arguendo* that the defendant had standing, we nevertheless agree with the State that the substance of the defendant's motion was insufficient to warrant a hearing on the merits. As explained below, even taking the defendant's allegations as true, there was no factual basis for finding that false statements were deliberately or recklessly made.

"There are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made." *State v. Little*, 560 S.W.2d 403, 407 (Tenn. 1978). "Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time." *Id.*; *see also Franks* 438 U.S., 155–56 (holding that the Fourth Amendment requires exclusion of evidence obtained pursuant to warrant issued on probable cause based on false statements made knowingly and intentionally or with reckless disregard for the truth). "Allegations of negligence or innocent mistakes are insufficient to invalidate the search warrant." *State v. Yeomans*, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999) (citing *Franks*, 438 U.S. at 171). In order to be "essential to the establishment of probable cause," the false or reckless statement must be the only basis for probable cause or if not, the other bases, standing alone, must not be sufficient to establish probable cause. *State v. Norris*, 47 S.W.3d 457, 469 n.4 (Tenn. Crim. App. 2000) (citing *State v. Tidmore*, 604 S.W.2d 879, 882 (Tenn. Crim. App. 1980)).

In this case, the defendant alleged six instances of falsity. As explained below, none meet the standard to justify an evidentiary hearing.

First, the defendant asserted that the affidavit supporting the search warrant stated that Mr. Thomas was reported missing on October 5, 2002, when the missing person report was actually filed on September 23, 2002. Even assuming that the recited date of the report was erroneous, it was not material. The critical fact was that Mr. Thomas was missing and the defendant was recorded using Mr. Thomas's credit cards in the company of missing victims Adam and Samantha.

Second, the defendant alluded in his motion to his admissions in pre-warrant interviews with law enforcement and statements from other witnesses to the effect that he possessed Mr. Thomas's credit card prior to Mr. Thomas's disappearance. This is likewise insufficient to warrant a hearing. The fact that the defendant admitted to being in possession of the credit card, which he could hardly dispute in light of the security video, does not support his claim that he had Mr. Thomas's permission to use the cards. Neither does it make false the averment in the affidavit that the defendant was seen using the cards in the company of Adam.

Third, the defendant challenged the statement in the affidavit that his daughter Kelly told Captain Bill Burtt (not the affiant, Investigator Todd Hull) that she called Mr. Thomas's cell phone on October 5, 2002, and the defendant answered the call. The defendant attached to his motion an October 10, 2002 affidavit from his daughter stating that the call to Mr. Thomas's cell phone occurred on September 5, 2002, and that she called the number back ten minutes later and Mr. Thomas answered the phone. This is also insufficient. If the defendant's assertion that the call occurred on September 5, 2002 is correct, the fact that Mr. Thomas later answered the phone, at most, made the information irrelevant to a determination of probable cause, since the point made by the affiant was that the defendant was with Mr. Thomas at some time near the date Mr. Thomas disappeared. At no point in the motion did the defendant make a preliminary showing that any misstatement regarding the date of the call was made with intent to deceive the court. At most, a review of the affidavit and the exhibits attached to the defendant's motion supports a finding that the misstatement of the date was a typographic or negligent error—not one made to deceive or mislead the court.

Fourth, in his motion, the defendant challenged the statement in the affidavit that Teresa Chrismer told law enforcement that she spoke with Adam on October 1, 2002, and that he told her that he was at the home of the defendant's mother in Johnson City, Tennessee. The defendant's motion did not claim that Ms. Chrismer did not make the statement set forth in the affidavit. It asserted only that Adam was in fact not staying at his mother's house on that date, and noted that there was other evidence that Adam had moved into a trailer in Rossville, Georgia, and "hurriedly" left the trailer on October 4,

2002. As with the defendant's other allegations, this is insufficient to warrant an evidentiary hearing. First, "[t]he deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant." *Franks*, 438 U.S. at 171. Furthermore, the "other evidence" cited by the defendant is not inconsistent with the statement in the affidavit, since the overall evidence in the record indicated that the defendant and the victims apparently often moved back and forth between Johnson City and Rossville, Georgia.

Fifth, the defendant asserted that the statement in the affidavit that investigators "observed a dark color stain in the rear cargo area of a blue 1991 Jeep Cherokee" was disproved by later forensic testing. This assertion was not supported by affidavits or otherwise reliable evidence concerning such forensic testing and, in any event, negative results from forensic tests would not mean that the affiant's earlier visual observations were untrue.

Sixth, the defendant asserted in his motion that the statement in the affidavit that Teresa Chrismer saw the victims driving a blue Jeep was untrue. The motion cited the fact that the missing person report indicated that Samantha's mother, Patty Leming, told Ms. Chrismer that she (Ms. Leming) saw the victims driving a blue Jeep. On this basis, the defendant claimed that Ms. Chrismer did not personally see the victims driving the Jeep. Initially, we reiterate that a defendant is not entitled to a hearing to challenge the truthfulness of information provided by a nongovernmental informant. *Id.* Moreover, the defendant cites nothing indicating that any misstatement by the affiant in this portion of the affidavit was anything other than negligence or innocent mistake. In any event, the claimed difference was immaterial; the point of including this information in the affidavit was to show that the victims were seen in a blue Jeep and that the defendant possessed a blue Jeep.

Last, the defendant contended that the affiant omitted the fact that officers previously conducted a consent search of the Brentwood Drive address and found no evidence of a crime. He failed, however, to attach affidavits or other reliable evidence of the consent search. *See id.* His failure to do so is particularly significant in light of the State's response to the motion to suppress, in which it said it was prepared to show that officers were not allowed into the garage during the consent search, and the garage is where police later found the victims' personal effects. Thus, there is no reason to conclude that the omission of a reference to the prior consent search was either deliberate or reckless.

In sum, the defendant failed to provide the trial court with any basis to conclude that any alleged misstatement or omission in the affidavit supporting the search warrant was either deliberate or reckless. This is ample justification for the trial court's denial of the defendant's request for an evidentiary hearing on his motion. Moreover, even if any

allegedly misstated facts were deemed reckless and deleted from the affidavit, the remainder is clearly sufficient to support the finding of probable cause. *See id,* at 171-72. The defendant is not entitled to relief on this issue.

### C. Denial of Defense Motions for a Crime Scene Expert and False Confession Expert

In May 2010, the defendant filed *ex parte* motions seeking the assistance of various expert witnesses. Some were granted but two were denied: the defendant's motion for a crime scene expert and his motion for a false confession expert. The defendant now seeks relief as to the denial of these two requests.

In his *ex parte* motion for a crime scene expert, the defendant asserted that such an expert was needed to disprove the State's theory that 104 Brentwood Drive was the scene of the crime. He attached to the motion an affidavit from his proposed crime scene expert, the expert's fee structure, and the expert's curriculum vitae. In his *ex parte* motion for a false confession expert, the defendant asserted that such an expert was needed "to disprove the State[']s case in regards to the alleged confession being false." He attached a statement from the proposed false confession expert that set forth the expert's general qualifications and his procedure in analyzing a particular interrogation.

The trial court denied both of these motions. The court found that as to these particular experts, the defendant had failed to establish a particularized need for those two experts, had failed to state that the evidence from them would be admissible, and had failed to indicate whether the experts would be available for trial.

In this Court, the defendant argues that the trial court's denial of his motions for these two experts was an abuse of the trial court's discretion. The State contends that the trial court's ruling was correct because the defendant failed to establish a "particularized need" for such experts. As explained below, we agree with the State.

"While a State need not provide an indigent defendant with all the assistance his wealthier counterpart might buy . . . fundamental fairness requires a State to provide an indigent defendant with the 'basic tools of an adequate defense or appeal.'" *State v. Barnett*, 909 S.W.2d 423, 426 (Tenn. 1995) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). The trial court's obligation to provide an indigent defendant with the benefit of expert assistance does not arise unless and until the defendant makes a threshold showing of a "particularized need" for the expert assistance. *See* Tenn. Sup. Ct. R. 13, § 5(c)(1); *Barnett*, 909 S.W.2d at 430-31. Particularized need is established

> when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering

the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

Tennessee Supreme Court Rule 13, section 5(c)(2).

Rule 13, section 5(c) provides, in part:

(1) Funding shall be authorized only if, after conducting a hearing on the motion, the court determines that there is a particularized need for the requested services and that the hourly rate charged for the services is reasonable in that it is comparable to rates charged for similar services.

(2) Particularized need in the context of criminal trials and appeals is established when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

. . . .

(4) Particularized need cannot be established and funding requests should be denied where the motion contains only:

(A) undeveloped or conclusory assertions that such services would be beneficial;

(B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;

(C) information indicating that the requested services relate to factual issues or matters within the province and understanding of the jury; or

(D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

Tenn. Sup. Ct. R. 13, § 5(c) (citing *Barnett*, 909 S.W.2d at 430; *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985); *State v. Abraham*, 451 S.E.2d 131, 149 (N.C. 1994)). A defendant's unsupported assertions that an expert is needed to counter proof offered by the State is not sufficient to establish particularized need. *Barnett*, 909 S.W.2d at 423, 430.

The standard of review on appeal for denial of a motion for expert services is for abuse of discretion. *Id.* In order to demonstrate on appeal that the trial court abused its discretion in denying a request for investigative or expert assistance, the defendant must show that denial of the requested services prevented him from receiving a fair trial. *State v. Dellinger*, 79 S.W.3d 458, 469 (Tenn. 2002); *State v. Black*, 815 S.W.2d 166, 179-80 (Tenn. 1991).

## 1. *Crime Scene Reconstruction Expert*

The defendant argues that the trial court erred in denying his motion for the crime scene reconstruction expert because State evidence linking the murders to 104 Brentwood Drive could have been refuted by a showing of absence of blood or gun residue at the scene. The defendant's motion made only unsupported allegations that the crime scene reconstruction expert was necessary to counter proof offered by the State; this is insufficient to establish particularized need. *See Barnett*, 909 S.W.2d at 431.

During cross-examination of the State's witnesses, the defendant was able to highlight the lack of blood at the home as well as the presence of unidentified foot and palm prints at the storage unit, even without an expert witness. Ultimately, it was unhelpful because the State's case did not depend on reconstruction of a crime scene at the Brentwood Drive address. Rather, the focus of the State's case was connecting items found at the storage unit to items at the Brentwood Drive address. Thus, the defendant failed to show a particularized need for a crime scene reconstruction expert.

## 2. *False Confession Expert*

The defendant asserts that the trial court erred in denying his motion for a false confession expert because, he claims, his statement to Wilda that he "blew [the victims] brains out" was coerced by maltreatment and coercive police tactics. Again, the defendant's motion for a false confession expert made only unsupported allegations that such an expert was necessary to counter proof offered by the State, which is insufficient to establish particularized need. *Id.*

As discussed above, in connection with the defendant's motion to suppress, the trial court had already ruled—correctly—that the defendant's statements to Wilda were not the product of interrogation, but voluntary statements made out of misplaced trust in Wilda. In any event, the defendant was able to bring out the circumstances of his confession through cross-examination of the witnesses. Thus, the defendant failed to show a particularized need for a false confession expert.

In short, neither of the requested experts would have testified relating to a matter that was likely to be a significant issue in the defense at trial. Neither expert was necessary to protect the defendant's right to a fair trial.

*D. Admissibility of Autopsy Photographs*

The defendant argues that the trial court abused its discretion in admitting into evidence certain photographs during the guilt phase and the sentencing phase because they were of limited evidentiary value and inflammatory in nature.  The challenged photographs are:  (Guilt Phase) Trial Exhibits 1 (color photograph of Adam's severed and severely decomposed head); 2 (color photograph of severed hand A); 3 (color photograph of severed hand B); 9 (color photograph of fly larvae at bottom of door to storage unit); 21 (color photograph of fly pupae); 22 (color photograph of collected fly larvae); 34 (color photograph of storage tote A with Samantha's body inside); 41 (color photograph of Adam's head, viewed from under chin and depicting bullet hole); 43 (color photograph of piece of Adam's skull); 51 (color photograph of rear of Samantha's head depicting bullet hole); 58 (color autopsy photograph of Samantha from the rear, depicting her bound hands and feet); 60 (color photograph of Samantha's decomposing head and chest with extensive fly larvae activity); and Penalty Phase Exhibits 1 (color autopsy photograph depicting severely decomposed headless and handless body of Adam) and 2 (color photograph of Adam's severed and severely decomposing head).

The State responds that all of the photographs in question were properly admitted into evidence.  It asserts that the photographs introduced at trial were probative of the element of premeditation and other contested issues. The photographs introduced at sentencing, the State insists, were probative of aggravating circumstance (i)(5), that the killing of Samantha was heinous, atrocious, or cruel and aggravating circumstance, (i)(13) that the defendant mutilated Adam's body after killing him.   *Willis*, 2015 WL 1207859 at *84.

The Court of Criminal Appeals held that the photographs introduced during the guilt phase were relevant to contested issues, including the issue of premeditation, to supplement the testimony of the medical examiner regarding the victim's injuries and to supplement the testimony of entomologist Dr. Watson-Horzelski and forensic anthropologist Dr. Vass regarding the time of the victims' deaths.[24] *Id.* The intermediate appellate court found that the defendant failed to establish that the probative value of these photographs was substantially outweighed by the danger of unfair prejudice, and it held that the trial court did not abuse its discretion in admitting them into evidence in the

---

[24] The Court of Criminal Appeals stated in its opinion that the defendant failed to identify in his brief which photographs he alleges were admitted erroneously.  Respectfully, the Court was mistaken.  Although the photographs were not expressly referenced in the argument section of the defendant's brief under the heading for this issue, they were identified in the Facts section of the brief.  We assume that the intermediate appellate court nevertheless considered all of the challenged photographs in its review. *Willis*, 2015 WL 1207859 at *84.

guilt phase of the trial. *Id.* As to the two photographs introduced during the penalty phase of the trial, the Court of Criminal Appeals agreed that these photographs were gruesome, but held that they were relevant to support aggravating circumstance (i)(13), that the defendant knowingly mutilated the victim's body after death. It found again that the defendant failed to establish that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice, and so held that the trial court did not abuse its discretion in admitting them into evidence in the penalty phase. *Id.* The Court of Criminal Appeals also concluded that the admission into evidence of the photographs did not affect the results of the trial. *Id.*

The admissibility of photographic evidence lies within the sound discretion of the trial court, and its ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. *State v. Carruthers*, 35 S.W.3d 516, 576-77 (Tenn. 2000); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978) (quoting Tenn. R. Evid. 403 advisory committee cmt.). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. To decide whether visual evidence is admissible, the court determines the relevance of the evidence and weighs its probative value against any undue prejudice. *Id.* It is deemed "unfairly prejudicial" if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*

This Court has outlined factors to be considered in determining the admissibility of photographic evidence of a victim in a murder case: "The matters to be taken into consideration include the value of photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions." *Banks*, 564 S.W.2d at 951; *see also State v. Lafferty*, 749 P.2d 1239, 1257 (Utah 1988) ("[F]actors [that] come into play in the balancing process . . . may include whether the photographs are in color or black and white, when they were taken in relation to the crime, whether they are closeups or enlargements, their degree of gruesomeness, the cumulative nature of the evidence, and whether facts shown are disputed by the defendant.").

Our Court of Criminal Appeals recently analyzed whether the trial court erred by admitting into evidence photographs of deceased victims in a case of vehicular homicide by intoxication. In *State v. Harper*, No. E2014-01077-CCA-R3-CD, 2015 WL 6736747 (Tenn. Crim. App. Nov. 3, 2015), the intermediate appellate court first viewed the crime

scene and autopsy photographs of the victims and found that they were clearly "graphic and gruesome." *Id*. at \*15. In light of this finding, it methodically analyzed whether the photographs' "probative value was substantially outweighed by the danger of unfair prejudice." *Id*. It looked at the charges against the defendant and the issues at trial to which the photographs may have been relevant, such as whether the defendant was driving so recklessly that it created a substantial risk of death, and whether he knew or reasonably should have known that death resulted from the accident. *Id*. In doing so, it examined in some detail the issues which the defendant either stipulated or did not dispute. *Id*. As to the remaining issues at trial, the *Harper* court found that the photographs had only "minimal probative value." *Id*. at \*16. Against that, it weighed the "inflammatory nature of the graphic photographs" and held that the trial court had abused its discretion in admitting the photographs into evidence. *Id*. Judge John Everett Williams wrote a separate concurring opinion to place an exclamation point on the majority opinion, describing the photographs as "grotesque, horrifying, and unnecessary" and cautioning that a "combination of overzealous prosecuting and weak gatekeeping by the trial court can result in an unfair trial for a defendant." *Id*. (Williams, J., concurring).

We agree with Judge Williams' warning. Indeed, the Court in *Banks* observed: "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." *Banks*, 564 S.W.2d at 951 (citing *Commonwealth v. Scaramuzzino*, 317 A.2d 225 (Pa. 1974)). Against that backdrop, we analyze the photographs admitted into evidence.

The intermediate appellate court in *Harper* commented, "[T]he question of whether a photograph is or is not graphic or gruesome is often a subjective determination, and what may be graphic or gruesome to one person may not be so to another. However, at other times a photograph may be so troubling or disturbing that there can be no reasonable question about the graphic or gruesome nature of the photograph." *Harper*, 2015 WL 6736747, at \*15. In this case, because of the advanced state of decomposition of the victims' bodies and the severity of the injuries, all of the photographs were quite disturbing, some of the worst we have seen. In particular, Exhibit 1 in the guilt phase of the trial is a color photograph of Adam's decapitated head as it was found; apparently because of the skull fragment that was missing, the remains look more like a mask than a human head. Two photographs were admitted in the sentencing phase; Exhibit No. 1 was a similar color photograph of Adam's decapitated head but taken at autopsy, and Exhibit No. 2 was a color photograph of Adam's torso, absent the severed head and hands. Both of the photographs introduced during the sentencing phase were enlarged to an 11 x 14 size. While not determinative, it is noteworthy that the trial court found it necessary to take a recess after these photographs were shown because one of the jurors became physically ill at viewing them. It is fair to classify the photos admitted in this case as both graphic and gruesome.

-77-

To determine probative value, we examine the charges against the defendant and the issues presented. The defendant was indicted for the premeditated first-degree murder of Adam, the premeditated first-degree murder of Samantha, and the felony murder of Samantha in the perpetration of a kidnapping. As to the photographs admitted in the guilt phase of the trial, we agree with the State that all had probative value. For example, the locations of the victims' bullet wounds (under Adam's chin and to the back of Samantha's head), were relevant to the issue of premeditation, and photographs are clearly an aid. The depiction of either fly larvae or pupae on the victims' bodies was relevant to show time of death, also a contested issue. The State sought to establish premeditation in part by demonstrating the perpetrator's methodical, deliberate actions and exceptional cruelty. The photographs, including the photograph of Adam's decapitated head as it was found, are relevant to premeditation in that they demonstrate "the particular cruelty of the killing." *State v Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

The other two photographs were admitted during the penalty phase of the trial, in which the State sought to prove that the defendant should be sentenced to death as to the murders of both victims. In this phase of the trial, as to the murder of Adam, the State relied on the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i) (13), that the defendant knowingly mutilated the body of the victim after death. As to the murder of Samantha, the State relied on several aggravating circumstances, namely, that the murder was especially heinous, atrocious, or cruel; that the murder was committed to avoid lawful arrest or prosecution of the defendant or another; that the murder was knowingly committed by the defendant while he had a substantial role in committing the first-degree murder of Adam; and that the murder was knowingly committed by the defendant while he had a substantial role in committing the kidnapping of Samantha. Tenn. Code Ann. § 39-13-204(i)(5) to -(7). The State argues that these photographs were relevant to the aggravating circumstances that supported the State's decision to seek the death penalty.

We do not believe that either Exhibit No. 1, the enlarged color photograph of Adam's decapitated head taken at autopsy, or Exhibit No. 2, the enlarged color photograph of Adam's torso without his severed head and hands, had probative value as to the aggravating circumstances for the murder of Samantha. However, it can readily be seen that both photographs were relevant to the aggravating circumstance as to the murder of Adam, namely, whether the defendant had mutilated Adam's body after death. Thus, the photographs admitted in the sentencing phase of the trial had probative value as to the murder of Adam.

We go on, then, to determine whether the probative value of these photographs is outweighed by the danger of unfair prejudice. Our Court of Criminal Appeals has noted: "Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs

are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at \*9 (Tenn. Crim. App. Aug. 12, 2011) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)). Thus, the fact that the State could have made its case using only descriptive words is a consideration in balancing the probative value against the prejudicial effect, but does not mandate exclusion of the photographs.

All of the photographs admitted into evidence are accurate and clear, without alteration by a third party or by autopsy. *See Banks*, 564 S.W.2d at 951; *see also Bullard v. State*, 436 S.E.2d 647, 651 (Ga. 1993) (holding that it was not error to admit photos and video of body parts of dismembered body as found by law enforcement and stating that "[t]he gruesome nature of the photographs and videotape complained of results entirely from the acts of the appellant, not from any alteration or autopsy by the state"). At trial and at sentencing, the defendant proceeded *pro se*, so virtually all issues remained contested.

In determining whether any prejudice that might result from admission of the photographs was unfair, the trial court is permitted to take into account the nature of the crimes at issue. Here, the State sought to prove more than recklessness, as in *Harper*, or even intent without premeditation, as in *Collins*. The grisly photos in this case captured the expected, indeed desired, result of a series of purposeful, deliberate choices by the perpetrator. As to Adam, the perpetrator decided first to kill the victim, then to saw the head and hands off of the victim's body with a chainsaw, then to mutilate the body to better fit it into a Rubbermaid container, and finally to transport the decapitated head and severed hands to a lake and toss them in. In determining whether any prejudice to the defendant was unfair, the trial court could fairly take into account the grotesque and horrifying nature of the conduct charged. "Insofar as the photographs tend to be shocking or gruesome, it is because the crime depicted is of that sort." *State v. Sandles*, 740 S.W.2d 169, 177 (Mo. 1987) (en banc) (citing *State v. Clemons*, 643 S.W.2d 803, 805 (Mo. 1983)).

We note that two of the photos at issue were enlarged, which would have enhanced their disturbing effect. The enlarged photographs were used only during the sentencing phase; the jury was not shown these enlarged photos during the guilt phase. *See Sandles*, 740 S.W.2d at 177 ("[T]he remaining photos and the video were not admitted until the penalty stage. Thus the jury was not overly exposed to these photographs when it returned a guilty verdict."). Moreover, these two photographs were not enlarged beyond what would be appropriate to facilitate the State's argument that the aggravating circumstance as to Adam's murder, the defendant's knowing mutilation of Adam's body after death, warranted the imposition of a sentence of death.

-79-

On appeal, we review the trial court's decision for an abuse of discretion. The reviewing court need not find that the trial court made the best decision or the one the appellate court would have made; instead, the reviewing court must confine itself to determining whether the trial court's decision was within the range of acceptable alternatives. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). An appellate court should permit a trial court's discretionary decision to stand if reasonable judicial minds can differ concerning its soundness. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn.Ct.App.1999)). Further, when it comes to the admissibility of evidence, and specifically with respect to the admission of photographic evidence in both civil and criminal cases, there is a general policy of liberality. *See Banks*, 564 S.W.2d at 949. In determining whether to admit photographic evidence, we recognize "the superior position of the trial court for balancing the probative value and prejudicial effect" of photos on the jury. *Sandles*, 740 S.W.2d at 177.

Considering all of these factors, we cannot say that the trial court's decision to admit the photographs into evidence was outside the range of acceptable alternatives. We agree with the Court of Criminal Appeals that the defendant failed to establish that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice, and conclude that the trial court did not abuse its discretion when it overruled the defendant's objection to the admission of the photographs into evidence. This holding pretermits the issue of whether admission of the photographs into evidence would have affected the jury's verdict.

*E. Mandatory Review under Tenn. Code Ann. § 39-13-206*

Tennessee Code Annotated section 39-13-206(a)(1) provides for the automatic review of capital cases by this Court. Subsection (c)(1) lists several issues for mandatory review:

> In reviewing the sentence of death for first degree murder, the reviewing courts shall determine whether:
>
> (A) The sentence of death was imposed in any arbitrary fashion;
>
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
>
> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

## 1. Arbitrariness

The defendant does not expressly argue that his sentences are arbitrary. After an in-depth review, it is clear that the trial court conducted the trial and sentencing hearing in accordance with the applicable statutes and procedural rules. Despite the fact that the defendant proceeded to trial *pro se*, he did a reasonable job with the assistance of elbow counsel, and the trial court went out of its way to insure that he received a fair trial. The ample circumstantial evidence, together with the defendant's own confession, was clearly sufficient to support the jury's finding of guilt beyond a reasonable doubt. Furthermore, the jury unanimously found one valid aggravating circumstance for the murder of Adam, and three valid aggravating circumstances for both the premeditated murder of Samantha and the felony murder of Samantha. The jury also found that those aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt in each count. Apart from the jury's double-counting of the felony-murder aggravating circumstance in the counts related to the murder of Samantha, reduced by the Court of Criminal Appeals to a single aggravating circumstance, the evidence was clearly sufficient to support each aggravating circumstance. Given the lack of evidence of mitigating circumstances, the sentence is not arbitrary.

## 2. Sufficiency of Proof of Aggravating Circumstances

The defendant does not expressly argue that the evidence was insufficient to support the aggravating circumstances found by the jury.

a. Tenn. Code Ann. § 39-13-204(i)(13) ("The defendant knowingly mutilated the body of the victim after death"). The term "mutilate" is defined as "to cut up or alter radically so as to make imperfect," or "to cut off or permanently destroy a limb or essential part of." *See* the Merriam-Webster On-Line Dictionary at http://www.merriam-webster.com/dictionary/mutilate; *see also State v. Jordan*, 325 S.W.3d 1, 71 (Tenn. 2010) (citing *State v. Thompson*, 43 S.W.3d 516, 525 (Tenn. Crim. App. 2000)) (quoting Webster's Third New International Dictionary, 1493 (1993), (Tenn. 2001); *State v. Price*, 46 S.W.3d 785, 827 (Tenn. Crim. App. 2000), (Tenn. Feb. 26, 2001) (same). The evidence established that the defendant severed the head and both hands from Adam Chrismer's body, then cut through the bones of Adam's legs so as to position his body in the storage bin. This evidence is sufficient to establish this aggravating circumstance as to the murder of Adam Chrismer.

b.   Tenn. Code Ann. §39-13-204(i)(5) ("The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death").   This aggravating circumstance is applicable if the evidence supports a finding of either torture or serious physical abuse beyond that necessary to produce death.  "Torture" has been defined by this Court as the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. *State v. Pike*, 978 S.W.2d 904, 917 (Tenn. 1998) (citing *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985). With respect to "serious physical abuse beyond that necessary to produce death," we have explained that "serious" alludes to a matter of degree, and that the physical abuse must be "beyond that" or more than what is "necessary to produce death."  *Pike*, 978 S.W.2d at 917 (citing *State v. Odom*, 928 S.W.2d 18, 26 (Tenn.1996)).   The law does not require that jurors agree as to which theory supports the view that the murder is "especially heinous, atrocious, or cruel." *State v. Keen*, 31 S.W.3d 196, 209 (Tenn. 2000).  So long as the proof is sufficient under either theory for finding the aggravating circumstance beyond a reasonable doubt, and so long as all jurors agree that the aggravating circumstance is present and applicable to the case at hand, different jurors may rely upon either theory to reach their conclusion.  *Id.*

The evidence in this case suggests that Samantha was alive to witness Adam's murder and was kept alive after that for at least a day before she was killed.  She was stripped naked and bound at the ankles and wrists with plastic zip ties that were applied so tightly around her ankles that they caused bruising.  She was also beaten—as evidenced by bruising on her right leg, chest, breast, and shoulder—and gagged with such force as to knock out her teeth.

A defendant's actions in causing the victim to fear death or physical harm may be considered in determining whether the defendant created the severe mental pain or anguish relevant to a finding of torture.  *See, e.g.*, *Jordan*, 325 S.W.3d at 68; *State v. Carter*, 114 S.W.3d 895, 903-04 (Tenn. 2003) (recognizing that "the anticipation of physical harm to oneself is torturous"); *State v. Nesbit*, 978 S.W.2d 872, 886-87 (Tenn. 1998); *State v. Hodges*, 944 S.W.2d 346, 357-58 (Tenn. 1997).  The evidence is clearly sufficient to support the jury's finding of this aggravating circumstance under either the "torture" or the "serious physical abuse" prong.

c.   Tenn. Code Ann. § 39-13-204(i)(6) ("The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another").  This aggravating circumstance focuses on a defendant's motives for killing his victim.  *State v. Terry*, 46 S.W.3d 147, 162 (Tenn. 2001).  Regarding this circumstance, the desire to avoid arrest or prosecution need not be the sole motive for killing the victim. Instead, such a desire need only be one of the purposes that motivated the defendant to kill. *Id.* (citing *State v. Carter*, 714 S.W.2d 241, 250 (Tenn. 1986)).  The evidence in this case—primarily the defendant's own confession—indicates that

Samantha was a witness to the murder of her husband. Contrary to his assertion to Wilda that he killed her at the same time that he killed Adam, there was strong evidence that Samantha was left alive for at least a day after Adam was killed. From the sequence of events, it can reasonably be inferred that Samantha was not the defendant's primary target, but he decided to kill her to eliminate her as a witness. A juror could reasonably find that the proof supported this aggravating circumstance beyond a reasonable doubt.

d. Tenn. Code Ann. § 39-13-204(i)(7) ("The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, . . . [or] kidnapping . . . ."). The jury was instructed and the jury found, as two separate aggravating circumstances, that the defendant had killed Samantha both while he had a substantial role in committing her kidnapping and while he had a substantial role in committing Adam's murder. *Willis*, 2015 WL 1207859, at \*95. The Court of Criminal Appeals properly noted that the jury should have been instructed on a single aggravating circumstance based upon the multiple felonies of kidnapping and first-degree murder. As we recently held in *State v. Bell*, 480 S.W.3d 486 (Tenn. 2015), "the felony murder aggravating circumstance may be applied only once to a single murder committed in the course of multiple felonies." *Id.* at 523 (citing *State v. Henretta*, 325 S.W.3d 112, 145-46 (Tenn. 2010) (considering the felony murder aggravating circumstance as a single aggravating circumstance although the murder occurred while the defendant was committing kidnapping, robbery, and rape)); *State v. Morris*, 24 S.W.3d 788, 798-99 (Tenn. 2000) (considering the felony murder aggravating circumstance as a single aggravating circumstance when the murder occurred while the defendant was committing another first degree murder, rape, burglary, and kidnapping)); *State v. Buck*, 670 S.W.2d 600, 608-09 (Tenn. 1984) (considering the felony murder aggravating circumstance as a single aggravating circumstance when the murder occurred while the defendant was committing rape, robbery, and kidnapping)). As in *Bell*, "[w]hile the evidence in this case supported the application of the felony murder aggravating circumstance as a single aggravating circumstance, the trial court's error impermissibly allowed the jury to apply twice a single aggravating circumstance." *Id.*

We must now consider the effect of the error. When a jury is allowed to consider an invalid aggravating circumstance, this Court may not affirm the death sentence unless it determines, beyond a reasonable doubt, that the jury would have imposed the death sentence absent any consideration of the invalid aggravating circumstance. *See State v. Howell*, 868 S.W.2d 238, 259 (Tenn. 1993).

In making this determination, the Court must

completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator[s], and the nature, quality and strength of mitigating evidence.

*Id.* at 260-61. As noted above, the jury had before it ample evidence to support the (i)(5) and (i)(6) aggravating circumstances, and a single (i)(7) aggravating circumstance. From our careful review of the record, even without any consideration of the invalid (i)(7) aggravating circumstance, the jury certainly would have sentenced the defendant to death. Accordingly, the error was harmless.

### *3. Whether the Aggravating Circumstances Outweighed the Mitigating Circumstances beyond a Reasonable Doubt*

As to the sentence for the murder of Adam, the jury had proof beyond a reasonable doubt that the defendant mutilated Adam's body in a horrific manner after killing him. The defendant presented no evidence in mitigation. Accordingly, the evidence supports the jury's finding that this aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt.

As to the sentence for the murder of Samantha, the jury had proof beyond a reasonable doubt that the killing was heinous, atrocious, or cruel, that the defendant killed her to eliminate her as a witness to Adam's murder, and that he committed the murder while kidnapping her. The defendant presented no evidence in mitigation. Accordingly, the evidence supports the jury's finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

### *4. Proportionality*

First, the defendant argues that the comparative proportionality review used by this Court is constitutionally inadequate because the pool of cases used for comparison is too small. We addressed, and rejected, these same arguments in *State v. Pruitt*, 415 S.W.3d 180, 217 (Tenn. 2013).

Next, the defendant argues that his death sentence is disproportionate. His sole argument is that the circumstances of his case are not as bad as one of the cases used for comparison by the Court of Criminal Appeals—the mass-murder case of *State v. Jordan*, 325 S.W.3d 1. That is not the proper standard. In completing proportionality review, the reviewing court looks for comparison to other first-degree murder cases in which (1) the State sought the death penalty, (2) a capital sentencing hearing was held, and (3) a jury

determined whether the sentence should be life, life without parole, or death. *State v. Rice*, 184 S.W.3d 646, 679 (Tenn. 2006). The test is not whether the case is exactly like prior cases, or "more or less" like other death penalty cases. Instead, the test is whether "the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." *State v. Dotson*, 450 S.W.3d 1, 81 (Tenn. 2014) (citing *State v. Bland*, 958 S.W.2d 651, 665 (Tenn. 1997)); *see also Pruitt*, 415 S.W.3d at 214. As this Court noted in *Dotson*,

> [T]his Court uses the precedent-seeking method of comparative proportionality review in which we compare the case before us with other cases involving similar defendants and similar crimes. . . . This method requires an examination and comparison of the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved in the case under review, with other similar cases.

> In conducting this comparison, we consider the following factors, which focus on the nature of the crime: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of provocation; (7) the absence or presence of justification; and (8) the injury to and effects on non-decedent victims.

> When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim(s); and (8) the defendant's capacity for rehabilitation.

*Dotson*, 450 S.W.3d at 81-82 (citations omitted) (citations and internal quotation marks omitted).

In this case, the means of death for both teenage victims was by a gunshot wound to the head. In Samantha's case, the evidence supports a finding that she witnessed the death of her husband and was kept alive for up to two days, during which she surely contemplated her own fate. Her body was bound and gagged, and showed signs that she was also beaten. The initial motivation for Adam's killing is not entirely clear, although the evidence supports a reasonable inference that it was to cover up the killing of Sam Thomas. Within a day or two of killing Adam, the defendant also killed Samantha. The

-85-

evidence supports a reasonable inference that the defendant killed her to cover up the death of Adam. There was no credible evidence of provocation or justification for the killings. After the killings were complete, the defendant severely mutilated the body of Adam by using a chainsaw to cut off his head and hands, and to otherwise mutilate his body.

As to the characteristics of the defendant, we initially note that the report filed in accordance with Tennessee Supreme Court Rule 12 is woefully lacking in meaningful information concerning the defendant. His educational level, his intelligence level, and his employment history remain unknown. We glean that at the time of the killings, he was a fifty-one-year-old Caucasian male, divorced, and the father of one grown daughter. By his own admission to Wilda, he was intricately involved in the murders of these young victims. There was no proof that he had any remorse for his actions, or any capacity for rehabilitation. Instead of cooperating, he made every attempt to manipulate the investigation to mislead investigators, and manipulate the trial to thwart justice. Although his only prior criminal conviction was for a misdemeanor theft offense in New York, there is evidence he was also involved in the sale and distribution of cocaine, as he was on bond for those offenses when these killings occurred.

The Court of Criminal Appeals used the following pool of death penalty cases for comparison:

In *State v. Freeland*, 451 S.W.3d 791 (Tenn. 2014), the twenty-seven-year-old African-American male defendant shot and killed an older female victim in the course of kidnapping her from a grocery store parking lot, then disposed of her body in a remote location. Mr. Freeland was a high school graduate with some college education, and the unmarried father of two young children. He had one prior felony conviction and several misdemeanor convictions. The jury found aggravating circumstances (i)(2) (the defendant had previously been convicted of one or more felonies involving the use of violence), (i)(6) (the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant), and (i)(7) (the murder was knowingly committed while the defendant had a substantial role in committing a robbery). Mr. Freeland argued that he was an accomplice in the murder committed by another person and his participation was relatively minor, and that he acted under extreme duress or under the substantial domination of another person. The defendant's mother, stepfather, and younger brother testified in mitigation, supplemented with photographs, certificates, and numerous letters of support from community members and friends.

In *State v. Davidson*, 121 S.W.3d 600 (Tenn. 2013), the fifty-two-year-old Caucasian male defendant killed the victim during the course of a kidnapping. He severed her head and left hand after death. Mr. Davidson had an extensive criminal

record for felony sexual offenses.  Mr. Davidson's mother, several of his co-workers, and his minister testified in mitigation. He was raised by his grandparents and had not completed school because he was always in trouble with the law, although he ultimately obtained his General Education Equivalency (GED) degree.  He was of average intelligence.  His mother described him as a quiet boy who had few friends. He had no contact with his father throughout his life. At some indefinite time in the past, he had spent one to two years at Central State Hospital for mental problems. His younger brother's death in Vietnam had affected him deeply.  Co-workers testified that the defendant was a good worker, a good friend, and a nice, considerate man who would help anyone. They found his involvement in the victim's murder inconsistent with his behavior when he was around them. The last witness for the defense was a minister, who described the defendant as quiet and passive, with an interest in the Bible's prophetic books and openness to learning new things. The minister opined that Mr. Davidson would not be a threat in prison and would participate in work or educational programs. The jury found aggravating circumstances (i)(2) (prior convictions for felonies whose elements involved the use of violence to the person), (i)(7) (he committed the killing in the course of a kidnapping), and (i)(13) (he knowingly mutilated the victim after the killing).

In *Terry v. State*, 46 S.W.3d 147 (Tenn. 2001), the defendant was a forty-two-year-old Caucasian male who was married with four children.  He was a high school graduate, employed as a minister, and had no prior criminal record.  Mr. Terry concocted an elaborate scheme to disappear and change his identity.  As part of that plan, he shot and killed the church handyman, dismembered the body, and set fire to the church.  The jury was instructed on the following mitigating circumstances:  (1) the defendant had no significant history of prior criminal activity; (2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance (depression); (3) prior to the commission of the murder, the defendant had been a positive and contributing member of the community, as a caring pastor, husband, and parent; (4) the defendant accepted responsibility for his crime and exhibited remorse; (5) for the ten years preceding the sentencing hearing, the defendant exhibited a serious and consistent effort to rehabilitate himself by functioning at a high level within the limits of his confinement; (6) the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense to the crime but which substantially affected his judgment.  The jury found aggravating circumstances (i)(5) (that the murder was especially heinous, atrocious, or cruel), and (i)(6) (that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution).

In *State v. Carruthers*, the twenty-six-year-old African-American male defendant kidnapped, bound, shot, and buried alive three victims in a pit beneath another person's

grave. 35 S.W.3d 516, 570 (Tenn. 2000). The proof indicated that the victims were bound and abused for some time before being shot and buried. The defendant's educational background and intelligence level were not reported in the Rule 12 report. However, the record reflected that he had an extensive prior criminal record and showed no remorse for the killings. In mitigation, he testified that he was innocent. The defendant's sister testified that he had been raised in difficult circumstances, and she believed the defendant when he said he did not commit the offenses. *Id.* at 531. A prison minister testified that the defendant was a person of worth and was upset about the deaths of the victims. The jury found aggravating circumstances (i)(2) (prior violent felony conviction), (i)(5) (heinous, atrocious, or cruel), (i)(7) (committed during commission of another felony), and (12) (mass murder). *Id.* at 530.

In *State v. Bondurant*, the defendant beat an unarmed and unsuspecting victim to death after a card game. 4 S.W.3d 662, 665 (Tenn. 1999). The beatings continued for thirty minutes after the victim had died. Immediately thereafter, the defendant and his brother dismembered the victim's body, transported the pieces to their parents' home and burned the corpse. Mitigating evidence portrayed the defendant as an exemplary son, a good family man, and a hard-working employee. The jury found aggravating circumstances (i)(2) (prior violent felony conviction), and (i)(5) (heinous, atrocious, or cruel). *Id.* No Rule 12 report is on file.

In *State v. Smith*, the forty-nine year-old Caucasian male defendant shot and stabbed to death his estranged wife and her sixteen and thirteen-year-old sons; he eviscerated the thirteen-year-old son. 868 S.W.2d 561, 565-66 (Tenn. 1993). The Rule 12 report reflects that the defendant had four other children from a prior marriage. Although a high school dropout, Mr. Smith had an I.Q. of 94 and a steady record of employment. His only prior criminal conviction was an assault from over ten years prior. Personnel and an inmate from the jail where he had been incarcerated testified that he was a good prisoner. Former co-workers testified that he was a good employee. His mother and his daughter from a previous marriage testified about his character and the fact he had a severely retarded teenage son who depended emotionally on him. There was evidence that the defendant had suffered from psychological problems and formerly had a "nervous breakdown." His family was dysfunctional; his father was a diagnosed paranoid schizophrenic. A psychologist testified that the defendant would pose no danger in the highly structured environment of prison. The jury found aggravating circumstances (i)(5) (heinous, atrocious, or cruel), (i)(6) (murders committed to avoid prosecution or arrest), (i)(7) (felony murder), and (i)(12) (mass murder).

In *State v. Bates*, the twenty-eight-year old Caucasian male defendant escaped from jail, broke into a home and stole a shotgun, came upon the victim jogging, kidnapped her, tied her to a tree, gagged her, and told her he was going to retrieve her car from her motel. 804 S.W.2d 868, 871-72 (Tenn. 1991). The defendant then stepped

behind the victim and shot her once in the back of the head, killing her. The defendant hid the victim's body under some branches and brush and then stole her car and some traveler's checks. Although of average intelligence, the defendant advanced only to the third grade in school. He had no work history due to steady incarceration resulting from a series of felony convictions over the course of his adult life. The defendant submitted as mitigating circumstances that (1) the murder was committed while he was under the influence of extreme mental or emotional disturbance; (2) he acted under extreme duress or under the substantial influence of another person; (3) his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment. The jury found aggravating circumstances (i)(2) (prior violent felony), (i)(6) (crime committed to avoid prosecution or arrest), and (i)(7) (felony murder).

In *State v. Alley*, the twenty-nine-year-old Caucasian male, while driving under the influence, struck a young woman jogging on the side of the road. 776 S.W.2d 506, 508-09 (Tenn. 1989). He then kidnapped her and took her to another location where he stabbed her in the head with a screwdriver, raped her with a thirty-one inch tree branch, then beat and strangled her to death. The defendant was of average intelligence and had obtained his GED. He was the father of two young children and otherwise had no prior criminal record. The jury found aggravating circumstances (i)(5) (heinous, atrocious, or cruel) and (i)(7) (felony-murder). *Id.* at 508.

In *State v. Thompson*, the twenty-three-year-old African-American male defendant was seeking transportation to escape the area after persons threatened to report his association with a runaway female juvenile. 768 S.W.2d 239, 243-44 (Tenn. 1989). The defendant and the juvenile accosted the victim in a Walmart parking lot, kidnapped her, drove her to a deserted area and stabbed her four times in the back. The defendant was a high school graduate of average intelligence with no significant prior criminal history. The jury found aggravating circumstances (i)(5) (heinous, atrocious, or cruel), (i)(6) (murders committed to avoid prosecution or arrest) and (i)(7) (felony-murder). *Id.* at 244.

In *State v. Wright*, the twenty-nine-year-old African-American defendant and two victims were engaged in a drug transaction when the defendant shot and killed both victims. 756 S.W.2d 669, 671-72 (Tenn. 1988). Mr. Wright was a high school dropout whose intelligence level was unknown. He had two felony and four misdemeanor prior convictions. The jury found a single aggravating circumstance, (i)(7) (felony-murder), as to one of the victims, and sentenced him to death. The trial court sentenced him to life imprisonment for the death of the second victim. *Id.* at 671.

In *State v. King*, after the victim and defendant used drugs and had sex, the victim accused the defendant of raping her. 718 S.W.2d 241, 243-44 (Tenn. 1986). The twenty-

one-year-old Caucasian male defendant and a companion placed her in the trunk of her car, drove to a quarry, and shot her in the head. They then took the victim's money and her car. There was some evidence that the defendant was under the influence at the time of the murder and that he might suffer from organic brain syndrome. Although he dropped out of high school in the ninth grade, he was of average intelligence and had managed to remain gainfully employed as a laborer. During the same time frame as this murder, however, the defendant went on an extensive crime spree that included one other first-degree murder. The jury found aggravating circumstances (i)(2) (prior violent felony convictions) (including the other first-degree murder), (i)(5) (heinous, atrocious, or cruel), (i)(6) (murders committed to avoid prosecution or arrest) and (i)(7) (felony-murder). *Id.* at 248.

We agree that although not identical in every respect, these cases are appropriate for comparison. Given the brutality of these murders and considering the characteristics of the defendant, we agree with the Court of Criminal Appeals that the sentences are not disproportionate to those imposed in cases with similar circumstances and similar defendants.

## CONCLUSION

As set forth above, we hold that: (1) the defendant's October 15 and 16, 2002, and January 1 and 3, 2003 statements were not extracted from him and used at trial in violation of the Fifth, Sixth, or Fourteenth Amendments to the United States Constitution or article I, sections 8 and 9 of the Tennessee Constitution; (2) the searches of neither the home at 104 Brentwood Drive nor Unit X-47 at the 24-Hour Self Storage facility in Johnson City, Tennessee, violated the Fourth Amendment to the United States Constitution or article I, section 7 of the Tennessee Constitution; (3) the trial court did not abuse its discretion in denying the defendant's *ex parte* motions for a crime scene expert and a false confession expert; and (4) the trial court did not abuse its discretion in declining to exclude certain photographs of the victims. We also hold, in accordance with Tennessee Code Annotated section 39-13-206(c)(1), that: (1) the sentences of death were not imposed in any arbitrary fashion; (2) the evidence supports the jury's findings that the aggravating circumstances were proven beyond a reasonable doubt; (3) the evidence supports the jury's findings that as to each first degree murder conviction, the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt; and (4) the sentences of death are neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crimes and the defendant. Accordingly, the judgments of the trial court and the Court of Criminal Appeals upholding the defendant's two convictions of first degree murder and sentences of death are affirmed. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals and include relevant portions thereof in an appendix to this opinion.

The sentence of death shall be carried out as provided by law on the 12th day of July, 2017, unless otherwise ordered by this Court or other proper authority. It appearing that Defendant Howard Hawk Willis is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
HOLLY KIRBY, JUSTICE

Appendix

(Excerpts from the Decision of the Court of Criminal Appeals)


IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 16, 2014 Session

**STATE OF TENNESSEE v. HOWARD HAWK WILLIS**

**Appeal from the Criminal Court for Washington County**
**No. 28343    Jon Kerry Blackwood, Senior Judge**

_____

**No. E2012-01313-CCA-R3-DD – Filed July 6, 2016**
_____


ROGER A. PAGE, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee (on appeal); Kathleen Morris, Nashville, Tennessee (on appeal); and Howard Hawk Willis, pro se (at trial), for the appellant, Howard Hawk Willis.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; Anthony Clark, District Attorney General; and Dennis Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**

[Analysis]

**I.  FORFEITURE/WAIVER OF RIGHT TO COUNSEL**

Appellant contends that Judge Brown erred in finding in 2008 that appellant had implicitly waived and forfeited his right to counsel.  Appellant also contends that Judge Blackwood erred in denying appellant's pro se motion to appoint counsel, in denying

appellant the opportunity to present proof in support of his motion, and in finding that he did not have the authority to appoint counsel following this court's opinion affirming Judge Brown's ruling.

The circumstances leading to Judge Brown's 2008 ruling were summarized by this court on appeal as follows:

> The trial court initially appointed two lawyers to represent the indigent defendant. Lead counsel had practiced for 36 years and had handled approximately 20 capital cases. None of his clients had been placed on "death row." In the defendant's case, counsel filed numerous and extensive motions supported by legal memoranda. The motions included a motion to suppress upon which the trial court conducted a lengthy evidentiary hearing.

> *First change of counsel*

> With the trial scheduled for April 11, 2005, the defendant, acting pro se, moved the court on March 14, 2005, to discharge his counsel and to appoint new counsel. On the same day, both attorneys moved to withdraw, alleging that the "attorney client relationship has deteriorated to such an extent that the attorneys should be permitted to withdraw" and that they had "encountered constant difficulty in obtaining the cooperation of the defendant in the preparation of the defense." Counsel further alleged:

>> The defendant has consistently refused to cooperate in providing requested information. He has insisted that the attorneys pursue factual investigations unrelated to this case; . . . that they file unrelated lawsuits against individuals involved in this case. T he defendant has insisted that the attorneys obtain evidence for him to review and then refused to review the evidence. He had demanded that he receive medical treatment and then refused to accept the treatment when it was provided. He has instructed defense investigators to conduct investigations not specifically authorized by the attorneys and to withhold information from the attorneys. He has accused some associated with the defense investigation of working for the State. His conduct in regard to the efforts of the attorneys to prepare this case can be best described as "stone-walling."

On March 15, 2005, the trial court conducted an extensive hearing in which it reviewed each of the 55 complaints the defendant had leveled against his attorneys. The court expressed concern that lead counsel and co-counsel had worked on the case for one and one-half years. The court, after reviewing the defendant's complaints one by one, found them to be baseless and denied the defendant's motion to discharge counsel. At one point in the dialogue with the defendant, the trial judge remarked that ultimately the defendant may be "representing [himself] in this." The judge opined that the defendant had shown that he was "virtually impossible to communicate with."

On March 18, the court conducted further hearing on counsels' motions to withdraw. The judge stated that both lead counsel and co-counsel were very experienced, effective lawyers and indicated that "the whole problem [was] caused by [the defendant]." The judge further commented,

> [I]t appears to the court that what he is doing—he's manipulative. He's looking—he's come within less than a month of a trial date, and he wanted things reheard [on the motion to suppress] he couldn't get heard. He managed to do that through the back door. . . . But, he is coming close to forfeiting his right to counsel. This court is not going to continue appointing counsel forever. . . . [T]he court finds in this case that [the defendant] has unreasonably requested counsel to withdraw. At this point I don't think the court has any option but to allow [counsels'] motion to be relieved as counsel.

> . . . .

> [If] I were the parent of . . . either of [the victims], . . . I would think the system is absolutely crazy; that—that somebody in [the defendant's] shoes can manipulate the system; can refuse to acknowledge what the law is; refuse to assist counsel; refuse to answer questions; refuse to look at evidence; and refuse to acknowledge the controlling authority in the law and—result in—in manipulation of the system and his case being continued because of new lawyers. The problem with the situation is that the court finds that [counsel] just cannot under the requirements of the ethics of

the profession represent him, even though, it is entirely his fault.

Thus, the trial court granted counsels' motion to withdraw and appointed the First District Public Defender to represent the defendant. The trial court then had the defendant sworn and asked him, "[D]o you understand that— that if you cause the conflict with your next set of lawyers that you may very well [be] representing yourself?" The defendant responded, "I do." The court then addressed a series of questions to the defendant as a means of assuring that he understood the implications of defending a capital murder case without representation of counsel.

The trial court canceled the April 11, 2005 trial setting.

*Second change of counsel*

On April 4, 2005, the First District Public Defender moved to withdraw, citing conflicts of interests among members of the defendant's family and assistant public defenders. On April 5, 2005, the trial court granted this motion and appointed the Second District Public Defender to represent the defendant.

*Third change of counsel*

On the same day, April 5, 2005, the Second District Public Defender moved the court to vacate the appointment order on the grounds that the trial court was not authorized to appoint "a district public defender outside of their specific district." The trial court agreed and appointed new lawyers to represent the defendant.

*Fourth change of counsel*

On May 25, 2005, the newly appointed attorney moved to withdraw on the basis of serious illness in his immediate family. On May 31, 2005, the trial court granted the motion and appointed two other lawyers to serve as new counsel.

In August 2005, the trial court reset the trial for January 30, 2006.

*Fifth change of counsel*

On September 28, 2005, the defendant's lead counsel moved to withdraw from the case on the ground that a conflict of interests had emerged when the defendant filed a complaint against counsel with the Board of Professional Responsibility ("BPR"). The court conducted a hearing on November 7, 2005. Lead counsel, who had practiced law for 21 years, stated that the defendant had claimed in a complaint to the BPR that counsel had not read the discovery materials in the case. Counsel characterized the defendant as "a blatant prevaricator" and added, "This is the type of behavior that [the defendant] persists in. You try to get information out of him you can't get information out of him." Co-counsel stated that the filing of the complaint with the BPR had brought the case to a "standstill." The trial judge commented, "[I]t appears that [the defendant] is manipulating the system, but, it still doesn't leave the court any—any choice, at least, at this point. The motion to withdraw is granted."

The court then admonished the defendant that if he "create[d] another conflict then [he was] going to be representing [himself]." In its order granting the withdrawal motion, the trial court stated that "the attorney/client relationship between lead counsel . . . and the [d]efendant . . . has deteriorated to the point where lead counsel's zealous representation of the [d]efendant is extremely difficult if not impossible." The court appointed new lead counsel. The two lawyers then representing the defendant filed an extensive, supplemental battery of motions.

The trial remained scheduled for January 30, 2006, but at some point, the trial court reset the trial for September 19, 2006.

*Sixth change of counsel*

On August 8, 2006, lead counsel moved to withdraw citing "irreconcilable conflict"; however, counsel apparently agreed to withdraw the motion in consideration of the defendant's dismissing a "complaint" he had filed against counsel. The trial court ordered a mental health evaluation of the defendant and continued the trial until October 24, 2006.

On October 9, 2006, the mental health evaluators in Kingsport filed with the trial court a letter in which they reported that they were "unable to properly evaluate [the defendant, who] did not cooperate with the evaluation process as he insisted on speaking to his attorney prior to the assessments." The evaluators expressed "no confidence that rescheduling this evaluation would yield a different outcome." On October 13, 2006, the trial court ordered that the defendant be sent to Middle Tennessee Mental

Health Institute in Nashville (MTMHI). The October trial date was continued. In November and December 2006, MTMHI reported to the trial court that the defendant "is capable of adequately assisting in his defense in a court of law . . . [,] that he does understand the charge pending [against] him . . . [,] and [that he] is able to advise counsel and participate in his own defense." MTMHI noted that the defendant "was not willing to participate in some of the evaluation processes" although the "evaluation staff did have a great deal of observational data during the inpatient assessment." Essentially, MTMHI concluded that a defense of legal insanity was not supportable, that the defendant evinced no evidence of organic brain damage, and that he was of average intelligence.

In March 2007, the trial court set the case for trial on October 29, 2007.

*Seventh change of counsel*

On March 19, 2007, both lead counsel and associate counsel moved to withdraw from the case, citing "irreconcilable conflicts" and the defendant's filing a complaint against both attorneys with the BPR. The defendant also moved the trial court to discharge his lawyers.

In the March 19, 2007 hearing, the trial court urged the defendant to have "a prayer meeting" with his attorneys. The judge directed comments to the defendant:

> I'm not going to go on appointing one lawyer, after another lawyer, after another lawyer. If I find that you're the one causing the conflict then you're stuck, and you're much more likely to get the death penalty if you try to represent yourself. It is an extremely stupid thing to do. But, we've been through the law on this before. If the court finds that appointment of additional counsel is futile then that's where you are.

At this point, the court declined to rule on counsels' motion to withdraw and the defendant's motion to discharge counsel.

On October 8, 2007, both attorneys filed motions to withdraw indicating that the defendant had "fired" the attorneys and had, on October 4, "refused to speak with counsel [or] co-counsel." The record reflects no immediate ruling on these motions.

-97-

Although the trial began on October 29, 2007, the proceedings were suspended during jury selection when the jury pool was depleted.

On February 7, 2008, the defendant filed a motion to have his lawyers removed. On April 16, 2008, the defendant's lead counsel moved to withdraw alleging that "the relationship between the [d]efendant and [c]ounsel has deteriorated to such a degree that [counsel] can no longer act as a zealous advocate."

The trial court conducted a hearing on April 17, 2008. The defendant informed the court that he had "mailed out" lawsuits against both lead counsel and co-counsel to the United States District Court in Greeneville. The defendant said, "And since this is filed I really don't think there's much controversy. I don't think they can continue—continue under any circumstances."

The defendant was then sworn and testified that his lawyers were ineffective because they failed to file motions for "search warrants [and] for expert witnesses" and that they had failed to "file[ ] for various other investigative things to be done." The defendant called witnesses, including co-counsel on the case, to try to impugn the affidavit supporting a search warrant. This effort, aimed at showing counsels' ineffectiveness, was, in a word, ineffectual.

Lead counsel explained that pursuing the motion to suppress sought by the defendant would have been "a terrible mistake" because it tied him "to a potential crime scene. We felt that—that the more we distanced him from that, that would be the better strategy." Counsel explained, however, that the defendant had ceased talking to counsel about issues in the case.

Addressing counsels' motions to withdraw, the trial court agreed that the defendant's filings against his attorneys both with the BPR and in the federal district court posed conflicts for counsels' continued representation of the defendant. The trial court granted counsels' motions to withdraw and held that the defendant had forfeited his right to counsel. The court stated,

> So, it appears he's waived his right to counsel because he's persistently demanding counsel of his choice and he refuses to cooperate. He refuses to talk to you all, refuses to communicate. He has refused to talk to the experts to evaluation, and—this is quite serious. [Denying the

-98-

appointment of further counsel] should be done only when it gets to the point that appointing additional counsel would be futile. . . . [H]e knows how to put [the case] off again. He knows to file a complaint to the Board of Professional Responsibility about his lawyers, and he knows he can sue his lawyers. But, he—he hasn't shown the court that [the lawyers] have even begun to do anything other than what was in his best interest. So, the conclusion the court reaches . . .is that [the defendant has] egregiously manipulated the constitutional right to counsel resulting in delay, disruption and it's prevented the orderly administration of justice.

*Willis*, 301 S.W.3d at 646-50.

On July 9, 2009, this court filed its opinion affirming the trial court's order on interlocutory appeal. *See id.* at 652. The Tennessee Supreme Court denied appellant's application for permission to appeal on November 23, 2009. The mandate was issued on December 9, 2009.

On January 27, 2010, appellant filed a pro se motion to appoint counsel. Judge Brown subsequently recused himself, and Judge Blackwood was designated to hear the case. During a hearing on March 16, 2010, the trial court denied the motion stating that the issue had already been litigated in this court.

The State asserts that appellant's claims are barred by the law of the case doctrine. "[U]nder the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998). This doctrine "applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication," but the doctrine does not apply to dicta. *Id.* (citation omitted). The doctrine "is not a constitutional mandate nor a limitation on the power of a court" but "is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." *Id.* (citations omitted). Application of the doctrine promotes finality, efficiency, consistent results, and obedience to appellate decisions. *Id.*

There are three "limited circumstances" that may justify a departure from the law of the case doctrine and subsequent reconsideration of an issue decided in a previous appeal:

-99-

(1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id.*

Appellant contends that the trial court erred in requiring him to proceed pro se at trial and that this court's opinion upholding the trial court's order was "clearly erroneous." In affirming the trial court's order, this court reasoned:

> The trial court found that the spate of conflicts with appointed counsel was the defendant's fault. It warned the defendant on multiple occasions that his persistence in engendering conflicts that led to changes in counsel would result in his representing himself in the case. When the trial court ordered the first change of counsel, it engaged the defendant in an extensive voir dire of his understanding of the imminence, difficulty, and risks of self-representation. Despite the trial court's warnings and explanations of the law, the defendant persisted in intentional conduct that prompted the disqualification of counsel. In these circumstances, the trial court was justified in holding that the defendant had implicitly waived his right to counsel.
>
> Furthermore, the record supports a finding of forfeiture. The trial court found that the defendant used the tactic of suing his lawyers or filing complaints against them with the Board of Professional Responsibility as a means of coercing the court into discharging counsel and that the pattern was for the tactic to be employed as trial dates approached. The trial court gave the defendant ample opportunity to show via argument, documents, and testimony that he was justified in complaining about counsel's performance. Nevertheless, the defendant neither articulated nor established any basis for complaint against any of his attorneys. Additionally, the record shows that the defendant refused to communicate with counsel and to cooperate with mental health evaluators. His conduct was egregiously manipulative and abusive of the judicial process; it warrants a finding that he forfeited his right to counsel.

*Willis*, 301 S.W.3d at 652. Appellant has failed to establish that this court's holding was "clearly erroneous."

Moreover, after the case was remanded, appellant failed to allege evidence or circumstances that were substantially different from the circumstances that existed during the initial proceedings. On appeal, appellant failed to specify what change in circumstances warrant reconsideration of this court's initial holding. In his motions for appointment of counsel filed after remand, appellant sought to reargue the alleged deficiencies of prior counsel, raised issues of ineffective assistance of appellate counsel, and relied upon an "interest of justice-oversight" argument for which he offered no supporting authority. None of these claims constitute changed circumstances that qualify as an exception to the law of the case doctrine.

Finally, appellant has not established that this court's prior decision is contrary to a change in controlling law. Rather, appellant relies upon the Tennessee Supreme Court's decision in *State v. Carruthers*, 35 S.W.3d 516 (Tenn. 2000), the same case upon which this court relied in affirming the trial court's decision in appellant's initial appeal. *See Willis*, 301 S.W.3d at 650-51. Accordingly, appellant's claims are barred by the law of the case doctrine.

. . .

## IV. DENIAL OF A CONTINUANCE

Appellant asserts that the trial court erred in denying his multiple motions to continue the trial. The decision of whether to grant a continuance is left to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion and prejudice to the defendant. *State v. Vaughn*, 279 S.W.3d 584, 598 (Tenn. Crim. App. 2008) (citing *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004)*; State v. Blair*, 145 S.W.3d 633, 640 (Tenn. Crim. App. 2004)). On appeal, appellant bears the burden of demonstrating that harm ensued from the denial of the requested continuance. *Id.* (citations omitted); *see also Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). An appellant may demonstrate an abuse of discretion by establishing that he was denied a fair trial or that one could reasonably conclude that a different result would have been reached had the motion been granted by the trial court. *Vaughn*, 279 S.W.3d at 598 (citing *Odom*, 137 S.W.3d at 589; *State v. Thomas*, 158 S.W.3d 361, 392 (Tenn. 2005); *State v. Goodwin*, 909 S.W.2d 35, 44 (Tenn. Crim. App. 1995)).

Appellant argues that the trial court erred in failing to rule upon his pro se motion filed on June 3, 2008, in which he requested that the trial court reconsider its previous denial of his motion to continue the trial. In April 2008, the trial court found that appellant forfeited his right to counsel, required appellant to proceed pro se at trial, appointed advisory counsel, and scheduled jury selection for July 10 and 11, 2008. On May 20, 2008, appellant filed a pro se motion to continue the trial, which the trial court denied. On June 3, 2008, appellant filed a motion to reconsider. Before the trial court

ruled on the motion, this court entered an order on June 27, 2008, granting appellant's application for an interlocutory appeal and staying the trial. By staying the trial, this court essentially granted appellant's request that the trial be continued from the July 10, 2008 date. Appellant is not entitled to relief regarding this issue.

Appellant next contends that the trial court erred in denying his pro se motion to continue the trial filed on April 7, 2010, his pro se motion to reconsider filed on May 5, 2010, and his pro se motion for a seven-day continuance filed on the first day of trial. The record reflects that appellant was first appointed counsel in 2003, approximately seven years prior to trial. During a prior pretrial hearing, the trial court told appellant, "You've had three investigators, or maybe this is the fourth one. You've had two mitigation experts that have quit. You have had three lead counsel and two secondary counsel who have put hundreds of hours in the case." The trial court previously found that appellant manipulated the right to counsel for purposes of delay. This court affirmed the trial court's finding and described appellant's conduct as "egregiously manipulative and abusive of the judicial process." *Willis*, 301 S.W.3d at 652. Although appellant claimed in his motion to continue that the State had just turned over additional evidence to him, the trial court stated that the appropriate remedy for any discovery violations would be to disallow the evidence. Although appellant claimed that he did not have sufficient time to prepare the case since being required to proceed pro se, the trial court rejected this claim, noting that appellant "has been the author of his own representation. He's been in charge, whether he admits it or not, it's been his lawsuit." The trial court further stated that the trial would occur over multiple days and that appellant would have sufficient time to subpoena witnesses. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellant's request to continue the trial.

Furthermore, appellant failed to establish prejudice. Appellant claims that he was unable to present evidence through a Wal-Mart surveillance video that someone else purchased the Rubbermaid totes in the days before the victims' bodies were discovered. Investigator Hull, however, testified at trial that the quality of the video surveillance tapes was poor and that he was not able to determine the identity of the person who purchased the items. Appellant also claims that the denial of a continuance prevented him from presenting evidence that the two people who were with him at Wilda Willis's home on October 4, 2002, were not the victims and from securing the presence of five out-of-state witnesses. Appellant fails to specify what the testimony of the five out-of-state witnesses would have been and fails to demonstrate that the evidence would have been obtained with a continuance. Moreover, multiple witnesses testified at trial to seeing appellant with the victims on October 4, 2002. Appellant is not entitled to relief regarding this issue.

## V. STAYING THE INVESTIGATION
## DURING THE INTERLOCUTORY APPEAL

-102-

During the same hearing on April 17, 2008, in which the trial court required appellant to proceed pro se at trial, the trial court denied appellant's pro se motion to be transferred to Riverbend Maximum Security Institution so that he may have access to a law library. Rather, the trial court ordered that appellant should leave a list of case law, statutes, and other reasonable legal treatises necessary for his defense at the desk at the jail by noon every Thursday. The trial court further ordered that an investigator with the Washington County Public Defender's Office deliver the requested materials to the front desk of the jail by noon the following Monday.

On April 18, 2008, the trial court appointed advisory counsel. During a hearing on May 28, the trial court granted appellant's request for expanded telephone privileges, allowed him to have possession of a cassette player and compact disc player to listen to recordings provided by the State, and ordered the trial court clerk's office to provide copies of pleadings filed "[f]rom this point forward" to the parties. On June 10, the trial court entered an order granting appellant funds to hire an investigator.

On June 27, 2008, this court entered an order granting appellant's application for interlocutory appeal and staying the trial pending further orders of a court with appropriate jurisdiction. During a hearing on July 2, the trial court suspended appellant's expanded telephone privileges, funding for the investigator, and the other privileges that the trial court had previously granted until appellant's interlocutory appeal was resolved. The trial court noted that multiple attorneys, three or four investigators, and two mitigation experts had expended "hundreds of hours" on appellant's behalf. The trial court further noted that one of appellant's prior investigators reported that appellant was sending him "on wild goose chases." The trial court stated that appellant "wasted a lot of taxpayers' money" and that if this court decided that appellant should be appointed counsel, the new counsel would be required to "start over."

On July 6, 2009, this court filed its opinion affirming the trial court's order requiring appellant to proceed pro se at trial. *See Willis*, 301 S.W.3d at 645. During a hearing on August 21, 2009, the trial court confirmed its prior order suspending appellant's privileges until the Tennessee Supreme Court issued a ruling. On November 23, the Tennessee Supreme Court denied appellant's application for permission to appeal. Appellant's privileges were restored on March 16, 2010. Jury selection was scheduled to begin on June 7, 2010, in Knox County, and the trial was scheduled to begin on June 14.

Appellant submits that the trial court's suspension of his privileges until his interlocutory appeal was resolved violated his right to manage and conduct his own defense pursuant to the Fifth and Sixth Amendments. Appellant relies upon the United States Supreme Court's decisions in *Faretta v. California*, 422 U.S. 806 (1975), and *McKaskle v. Wiggins*, 465 U.S. 168 (1984), regarding the rights of a defendant who proceeds pro se at trial.

In *Faretta*, the Court considered whether a criminal defendant who wished to proceed pro se at trial could be required to present his defense exclusively through counsel. 422 U.S. at 807. The Court noted that the United States Court of Appeals for the Second Circuit had held that "implicit in the Fifth Amendment's guarantee of due process of the law, and implicit also in the Sixth Amendment's guarantee of a right to the assistance of counsel, is 'the right of the accused personally to manage and conduct his own defense in a criminal case.'" *Id.* at 817 (quoting *United States v. Plattner*, 330 F.2d 271, 274 (2nd Cir. 1964)). While the Court in *Faretta* concluded that a criminal defendant has the right to self-representation, the Court did not rely upon the Fifth Amendment. *See id.* at 818. Rather, the Court concluded that a defendant has the right to mount his own defense personally under the Sixth Amendment. *Id.* at 819.

The United States Supreme Court later held in *McKaskle* that

[a] defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The pro se defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial.

465 U.S. at 174.

The record reflects that appellant was accorded all of these rights. Appellant filed multiple pro se motions prior to trial. On November 13, 2009, while appellant's interlocutory appeal was pending, appellant filed a ninety-seven-page motion to suppress his statements, in which he attempted to revisit the trial court's prior rulings. Appellant attached to the motion transcripts from prior proceedings, police reports, letters, previously filed pleadings, and transcripts of telephone conversations. This motion demonstrates that contrary to appellant's assertions, he had access to transcripts of prior proceedings, the pleadings that had previously been filed, and discovery from the State and that he was able to review the materials while his interlocutory appeal was pending and in preparing his defense. Moreover, the fee claims of appellant's prior counsel were included in the appellate record and indicate that counsel spent many hours meeting with appellant about the case. As early as 2004, appellant was aware of the evidence that the State intended to present at trial based upon the State's "Proposed Evidence List" and a "Notice of Intent to Use Statements" filed on July 14, 2004. Prior to trial, the court warned the prosecution that any failure to provide appellant with discovery in a timely manner would result in the exclusion of the evidence at trial. While appellant claimed in the trial court that he was unable to review the voluminous discovery and documents between the time when his privileges were restored and the trial, the record on appeal

establishes that appellant had access to this information prior to and while his interlocutory appeal was pending.

During the trial, appellant conducted the defense's voir dire of prospective jurors. He made the opening statement and closing argument to the jury. He cross-examined the State's witnesses and lodged objections. Appellant selected witnesses for the defense, examined them, and chose not to testify. During the penalty phase, he chose not to present mitigating evidence.

In determining whether a defendant's right to self-representation has been respected, "the primary focus must be on whether the defendant had a fair chance to present his case in his own way." *McKaskle*, 465 U.S. at 177. We conclude that despite the trial court's actions in suspending appellant's privileges, appellant had a fair chance to present his case in his own way. Once appellant's interlocutory appeal concluded and Judge Blackwood was designated to hear the case, Judge Blackwood not only restored appellant's privileges but increased the amount of time that appellant could have each day to access a telephone and a private room to interview witnesses and prepare for trial. Appellant's defense at trial was that he did not kill the victims and that his confession was false and the result of coercion. During the trial, appellant cross-examined the State's witnesses in an effort to challenge the State's evidence and to support his defense theory. Appellant was able to obtain funding to retain an expert in forensic entomology and presented the expert as a witnesses at trial in an effort to challenge the State's evidence regarding the time of the victims' deaths. Appellant also presented multiple witnesses at trial to challenge the State's evidence and to support his claim that Betty Willis alone killed the victims. There is nothing in the record establishing that appellant did not have a fair chance to present his case in his own way.

Appellant next contends that the trial court's temporary suspension of funding for the investigator and his other privileges resulted in the denial of his constitutional right to meaningful access to the courts. "The constitutional right of access to court 'includes the requirement that prison authorities assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.'" *State v. Goodwin*, 909 S.W.2d 35, 42 (Tenn. 1995) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). This requirement is met when an inmate is provided with either the "legal tools necessary for [the preparation of] a defense or the assistance of an attorney." *Id.* at 42 n.1 (citing *Martucci v. Johnson*, 944 F.2d 291, 295 (6th Cir. 1991)). "'A prisoner whose access to the courts is otherwise protected is not deprived of a constitutional right, even if his access to a law library itself is restricted.'" *State v. Kenneth L. Anderson*, No. W2012-01039-CCA-R3-CD, 2013 WL 5531703, at *9 (Tenn. Crim. App. Oct. 4, 2013), *perm. app. denied* (Tenn. Feb. 11, 2014) (quoting *Lloyd v. Corr. Corp. of America*, 855 F. Supp. 221, 223 (W.D. Tenn. 1994)).

"'[R]estricted access to the law library is not per se denial of access to the courts.'" *Id.* (quoting *Lloyd*, 855 F. Supp. at 223).

This court has previously held that the provision of standby counsel affords a defendant the legal tools necessary for the preparation of a defense equivalent to access to an adequate law library. *See id.*; *Lawrence Ralph Jr. v. State*, No. M2011-02067-CCA-R3-PC, 2012 WL 6645037, at *9 (Tenn. Crim. App. Dec. 20, 2012), *perm. app. denied* (Tenn. Mar. 5, 2013). While the trial court in the present case suspended appellant's privileges and funding for his investigator while his interlocutory appeal was pending, appellant was still afforded advisory counsel. Furthermore, as noted by the trial court, the appellant had multiple investigators who had worked on the case during the years in which the case had been pending. Once appellant's privileges were restored, his investigator continued investigating the case, enabling appellant to prepare his defense for the trial. Under these circumstances, we conclude that appellant was not denied his right to access to the courts.

## VI. SUFFICIENCY

Appellant argues that the evidence is insufficient to support his convictions. The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury,

nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Appellant was convicted of the premeditated first degree murder of Adam, the premeditated first degree murder of Samantha, and felony murder of Samantha in the perpetration of a kidnapping. First degree murder includes the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2002). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(d).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." *Id.* at § 39-13-202(a)(2). At the time that the offenses were committed, "kidnapping" was defined as false imprisonment

> (1) Under circumstances exposing the other person to substantial risk of bodily injury; or
> (2) Where the confinement of another is in a condition of involuntary servitude.

*Id.* at § 39-13-303(a) (Supp. 2002). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* at § 39-13-302(a) (Supp. 2002).

Appellant argues that the State failed to present sufficient evidence to corroborate his statement to Wilda Willis on October 16, 2002. Our supreme court recently adopted the "modified trustworthiness standard" for determining whether an extrajudicial confession is sufficiently corroborated. *State v. Bishop*, 431 S.W.3d 22, 58 (Tenn. 2014). Under this standard, a defendant's extrajudicial confession is sufficient to support a

conviction if the State presents "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss of injury." *Id.* (citation omitted). Our supreme court explained:

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

*Id.* at 58-59 (footnote and citations omitted).

In presenting independent prima facie evidence that the injury actually occurred, the State is not required to establish that the injury resulted from a criminal act or link the defendant to the injury. *Id.* at 59. In cases of felony murder, the "loss or injury" at issue is not the predicate felony but the death that occurred during the commission of the felony. *Id.* at 62. In the present case, the State clearly established that the injuries occurred. The fact of the victims' deaths and the identities of the victims were undisputed.

The State also must present substantial independent evidence that the defendant's confession is trustworthy. *Id.* at 59. To establish trustworthiness, the independent evidence must corroborate essential facts included in the defendant's statement. *Id.* The independent corroborating evidence need not establish by itself the offense beyond a reasonable doubt or by a preponderance of the evidence. *Id.* at 60 n.33. The independent evidence also need not establish each element of the offense. *Id.* However, independent evidence that only corroborates collateral circumstances surrounding the confession is insufficient to establish trustworthiness. *Id.* at 60.

On October 16, 2002, appellant informed Wilda Willis that he "blew [the victims'] brains out" at Betty Willis' home, that he cut off Adam's head and hands and threw them in the river, and that he put Samantha's body and the remaining portion of Adam's body in a storage building. Adam's head and hands were discovered in Boone Lake. Officers located Samantha's body and the rest of Adam's body in a storage unit that was rented by Betty. Both of the victims were shot in the head at close range, and officers later found the gun used to shoot the victims near Betty's home. Items connected to Betty's home were found inside the containers with the victims' bodies. We conclude that the State

-108-

presented significant independent evidence that corroborated appellant's description of the events immediately following the killing of the victims. *See id.* at 60 (noting that "[o]ne way the State can effectively bolster the defendant's admission or confession is to present independent evidence that 'parallel[s] the defendant's confession' or corroborates the defendant's account of what happened immediately before or after the crime").

Appellant identifies portions of his statement that conflicted with other evidence and details that he states were uncorroborated. The State, however, is not required to present independent evidence corroborating every detail of a defendant's confession. Rather,

> once the State presents independent evidence establishing the prima facie trustworthiness of the defendant's extrajudicial confession, the existence of contradictory evidence does not necessarily render the confession untrustworthy. Instead, contradictory evidence raises a credibility issue to be resolved by the factfinder.

*Id.* at 61.

We conclude that the victims' deaths and identities were proven and that appellant's confession was trustworthy. Accordingly, appellant's extrajudicial confession was sufficient to support his convictions for two counts of first degree premeditated murder and one count of felony murder.

. . .

## VIII. DEPRIVATION OF CONSTITUTIONAL RIGHTS

Appellant maintains that the trial court failed to apply a "higher standard of due process to all aspects of the instant case." He submits that the trial court erred in (1) denying him access to a law library; (2) denying him a full evidentiary hearing regarding the ineffective assistance of counsel; (3) denying him the opportunity to consult with advisory counsel regarding the appointment of counsel; (4) appointing attorney James Bowman as advisory counsel; and (5) denying him the opportunity to present proof of ineffective assistance of appellate counsel.

### A. Access to a Law Library

Appellant argues that the trial court erred in denying his motion to be transferred to Riverbend Maximum Security Institute for the use of the law library. He claims that the trial court's denial of the motion violated his constitutional right to access to the courts. This court has previously held that the provision of standby counsel affords a

defendant the legal tools necessary for the preparation of a defense equivalent to access to an adequate law library. *See Kenneth L. Anderson*, 2013 WL 5531703, at *9; *Lawrence Ralph Jr.*, 2012 WL 6645037, at *9. Because appellant had access to advisory counsel throughout the trial process, he was not denied his right to access to the courts.

## B. Denial of Full Evidentiary Hearing

Appellant asserts that the trial court denied him a full evidentiary hearing on his claims that prior counsel were ineffective before concluding that appellant waived and forfeited his right to counsel. This court, however, noted in our opinion regarding appellant's interlocutory appeal that "[t]he trial court gave the defendant ample opportunity to show via argument, documents, and testimony that he was justified in complaining about counsel's performance. Nevertheless, the defendant neither articulated nor established any basis for complaint against any of his attorneys." *Willis*, 301 S.W.3d at 652. Moreover, appellant failed to identify any evidence that he was unable to present to the trial court or explain how the evidence would have demonstrated that he did not abuse the attorney-client relationship. Appellant is not entitled to relief regarding this issue.

## C. Denial of the Opportunity to Consult with Advisory Counsel and Present Evidence of Ineffective Assistance of Appellate Counsel

After this court affirmed the trial court's finding that appellant waived and forfeited counsel, appellant filed a pro se motion in the trial court requesting that he be appointed counsel. Appellant claimed that appellate counsel was ineffective in the interlocutory appeal. During a hearing on March 16, 2010, appellant informed the trial court that he needed to confer with advisory counsel regarding the motion. Instead, the trial court denied the motion, finding that the matter had already been litigated in this court. We have concluded that the trial court correctly denied the motion because appellant's claim was barred by the law of the case doctrine. *See Memphis Publ'g Co.*, 975 S.W.2d at 306. Consultation with advisory counsel would not have changed this result.

Moreover, the trial court did not err in denying appellant the opportunity to present evidence of ineffective assistance of appellate counsel to support his request for appointment of counsel. Appellant correctly states that ineffective assistance of counsel claims can be raised, and evidence on these issues can be heard at the motion for new trial stage. *See Thompson v. State*, 958 S.W.2d 156, 161-62 (Tenn. Crim. App. 1997). However, there is no authority for litigating such claims during pretrial proceedings. Furthermore, we have held that appellant's allegations of ineffective assistance of appellate counsel in his motion for appointment of counsel were insufficient to establish an exception to the law of the case doctrine. *See Memphis Publ'g Co.*, 975 S.W.2d at 306. Appellant is not entitled to relief regarding this issue.

## D. Appointment of Attorney James Bowman as Advisory Counsel

Appellant submits that the trial court erred in appointing attorney James Bowman as advisory counsel when Mr. Bowman was appellant's original counsel and was allowed to withdraw. "'[T]here is no constitutional right to the appointment of advisory counsel where a defendant has knowingly and intelligently waived the right to counsel.'" *State v. Carruthers*, 35 S.W.3d 516, 551 (Tenn. 2000) (quoting *State v. Small*, 988 S.W.2d 671,

675 (Tenn. 1999)). The appointment of advisory counsel is a matter within the trial court's discretion, and the trial court's decision regarding the appointment of advisory counsel will not be overturned on appeal absent an abuse of discretion. *Small*, 988 S.W.2d at 675.

Mr. Bowman filed a motion to withdraw based upon the appellant's failure to cooperate in the investigation and their disagreement regarding the focus of the investigation. *See Willis*, 301 S.W.3d at 646. Appellant also filed a pro se motion to remove counsel and to appoint new counsel. The trial court reviewed the appellant's complaints regarding counsel, found the complaints to be baseless, and denied appellant's motion to remove counsel. The trial court later granted Mr. Bowman's motion to withdraw finding,

> [I]t appears to the court that what [appellant] is doing - he's manipulative. He's looking - he's come within less than a month of a trial date, and he wanted things reheard [on the motion to suppress] he couldn't get heard. He managed to do that through the back door . . . . [T]he courts find in this case that [appellant] has unreasonably requested counsel to withdraw. At this point I don't think the court has any option but to allow [counsels'] motion to be relieved as counsel.

*See id.* at 646-47.

Unlike Mr. Bowman's prior role as lead counsel, advisory counsel is defined as "an attorney who functions in a purely advisory role, without actively participating in the trial." *Small*, 988 S.W.2d at 672 n.1. A pro se defendant who is permitted advisory counsel "may consult counsel for guidance and advice, but otherwise handles the defense of the case on his or her own." *Id.* As a result, the prior disagreements between counsel and appellant regarding the direction of the investigation, which motions should be filed, and the theory of the defense were no longer at issue because those decisions were solely the appellant's responsibility. Appellant had the option of consulting with Mr. Bowman but was not obligated to follow Mr. Bowman's advice regarding the matters.

Appellant acknowledged in the trial court that unlike his previous attorneys, he had not sued Mr. Bowman. Although appellant claimed that Mr. Bowman was ineffective, the trial court found that appellant's claims were baseless and were made in an effort to delay the trial. Under these circumstances, we conclude that the trial court did not abuse its discretion in appointing Mr. Bowman as advisory counsel.

. . .

# X. STATEMENTS DURING CLOSING ARGUMENTS

Appellant contends that the prosecution engaged in misconduct during closing arguments in both phases of the trial. "[A]rgument of counsel is a valuable privilege that should not be unduly restricted." *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). Tennessee courts give great latitude to counsel arguing their cases to the jury. *Id.* Thus, "trial judges have wide discretion in controlling the argument of counsel, and their action will not be reviewed absent abuse of that discretion." *Id.* However, the comments of counsel during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *State v. James Rae Lewter*, No. M2010-01283-CCA-RM-CD, 2011 WL 1197597, at *4 (Tenn. Crim. App. Mar. 31, 2011) (quoting *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007)).

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131 (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). To establish reversible error and succeed on a claim of prosecutorial misconduct, the appellant must show that "the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." *State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). When determining whether the argument affected the jury's verdict, we consider the following five factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

This court has previously recognized five general areas of prosecutorial misconduct:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

Appellant takes issue with the prosecutor's multiple references to his "coldness" following the murders. According to appellant, the following comments by the prosecutor during closing arguments in the guilt phase were improper:

There's one thing he can't explain in this case and this we want you to absolutely pay attention to. He can't explain the coldness in his voice as he talks about these victims.

. . . .

You have the tapes. You can make your own judgment as to his emotions, or attitude as he says the words, I blew their brains out. You can assess whether or not he was cold, or sympathetic towards these victims, especially Adam, when he relates the story to how he cut Adam's head and his hands off and threw them off a bridge that was near--near where those items were found. You can assess the lack of concern that he had as he talks to his mother on different jail calls in that time period. . . . [W]hen [appellant's] mother says they found Adam's head and his hands what reaction does this defendant have. Okay. His coldness does him in. Within two months this defendant had gone from paying for professional portraits where he's standing with his hand on Samantha's shoulder with Adam right there in the picture. It looks like a family portrait. Two months later they're dead and the state submits this defendant doesn't care.

. . . .

No where we submit did he show even the least bit of concern for those young people.

. . . .

How in the world could someone go from shooting somebody to cutting them up unless there are absolutely cool headed and calm, and can reflect? . . . He knows where his head is, and he didn't care to tell the boy's own mother. That is a coldness that is off the charts, Ladies and Gentlemen--off the charts. That's the kind of coldness that it takes to accomplish these types of murders, these types of gruesome and grizzly events that have happened in our community. That's the kind of coldness this defendant has shown.

Appellant also takes issue with the prosecutor's comment during closing arguments in the penalty phase that "[w]ithout being able to see [the photographs] you could not gauge the shocking nature of the defendant's lack of emotion about what happened."

Appellant argues that in characterizing his demeanor as "cold," the prosecutor improperly expressed his personal opinion regarding the evidence. "Expressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment which should separate a lawyer from the cause for which he argues." *Goltz*, 111 S.W.3d at 6-7 (citation omitted). During closing arguments, prosecutors must not interject their personal beliefs or opinions; however, whether a prosecutor's doing so qualifies as misconduct is often dependent upon the specific terminology used. *Gann*, 251 S.W.3d at 460. "For example, argument predicated by the words 'I think' or 'I submit' does not necessarily indicate an expression of personal opinion." *Id.* (citing *United States v. Stulga*, 584 F.2d 142, 147 (6th Cir. 1978)).

We conclude that the prosecutor's comments did not constitute improper personal opinions. Rather, the prosecutor argued that appellant's mental state could be inferred from the evidence, which is permissible. The prosecutor also prefaced some of the comments with qualifying language such as "the state submits" or "we submit." Moreover, after appellant objected to the prosecutor's initial comments, the trial court instructed the jury that the prosecutor's comments were not evidence. Appellant is not entitled to relief regarding this issue.

Appellant asserts that the prosecutor made additional comments that were improper and constituted prosecutorial misconduct. Appellant, however, failed to object to these comments at trial. Therefore, the issues have been waived. Tenn. R. App. P. 36(a). Nonetheless, we will review the issues for plain error.

According to appellant, the prosecutor improperly argued that premeditation for first degree murder may be inferred by appellant's coolness after the killings. Appellant argues that his state of mind after the homicides was not relevant in assessing premeditation. However, calmness immediately after the killing is a circumstance that may be indicative of premeditation. *See State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005) (citation omitted). The prosecutor's argument was not improper.

Appellant submits that by arguing that the sentence "shall be death," the prosecutor suggested that the imposition of death is mandatory when the aggravating circumstances outweigh the mitigating circumstances. The prosecutor, however, was simply repeating the language in Tennessee Code Annotated section 39-13-204(g)(1). The prosecutor also asked the jury to follow the law and to consider the law as instructed by the trial court. The trial court then instructed the jury regarding the applicable law. Accordingly, a clear and unequivocal rule of law was not breached, and the issue does not rise to the level of plain error.

Finally, appellant maintains that the prosecutor sought to inflame the jury's passions to seek death by stating:

> [O]ne thing that makes this [mutilation] aggravator that the state argues should weigh very heavily in your decision, imagine what it sounded like, what it looked like, image that first cut into the dead body of that young man, and experiencing the sight, the smell, the--the sensory impression, the sound of those bones being cut, image the cold callousness that it took to do it again, and again, and again, over and over. It's off the charts. The coldness, the lack of any concern for that young man and what he represented to others is absolutely off the charts, Ladies and Gentlemen. We submit there's only one factor, but it's a big one.

Although the prosecutor's statements may have been inflammatory, we conclude that the issue does not rise to the level of plain error in light of the strong evidence supporting the aggravating circumstances and the lack of evidence supporting the mitigating circumstances.

## XI. JURY INSTRUCTIONS DURING THE GUILT PHASE

Appellant challenges three jury instructions that the trial court provided during the penalty phase as erroneous or inaccurate. Appellant did not object to the instructions at trial but raised the issues in his motion for new trial. "An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). Therefore, we will review each of the issues raised by appellant.

Appellant challenges the "moral certainty" language in the reasonable doubt instruction. He argues that the language understates the level of proof and certainty required by the due process clause of the Fourteenth Amendment and necessary for a reliable determination of guilt of a capital offense under the Eighth Amendment. Our supreme court, however, has upheld the "moral certainty" language. *See State v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008) (citing *State v. Hall*, 976 S.W.2d 121, 159 (Tenn. 1998) (appendix)).

Appellant next challenges the jury instruction on premeditation, which included the phrase "capable of premeditation." The trial court instructed the jury as follows:

> The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Appellant argues that this instruction allowed the jury to convict him of premeditated murder based upon a mere ability to premeditate. This instruction, however, constituted a correct statement of the law. *See* Tenn. Code Ann. § 39-13-202(d) (Supp. 2002). Moreover, this court has suggested that the failure to include this language could be error. *See State v. Brandon Compton*, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992, at *8 (Tenn. Crim. App. Oct. 13, 2006).

Finally, appellant claims that the instruction to render the verdict "as you think justice and truth dictate" allowed the jurors to convict even if they had reasonable doubt regarding appellant's guilt. The trial court instructed the jury as follows:

> You can have no prejudice or sympathy, allow anything but the law and the evidence to have any influence upon your verdict. You must render your verdict with absolute fairness and impartiality as you think justice and truth dictate.

The trial court instructed the jurors to base their decision on the law and the evidence rather than any sympathy or prejudice. Our supreme court has upheld this "no sympathy"

instruction.  *See State v. Cribbs*, 967 S.W.2d 773, 795-96 (Tenn. 1998); *State v. Bigbee*, 885 S.W.2d 797, 814 (Tenn. 1994).

## XII.  FAILURE TO INCLUDE AGGRAVATING CIRCUMSTANCES IN THE INDICTMENT

Appellant maintains that the failure to charge the aggravating circumstances relied upon by the State rendered the indictment constitutionally defective.  The Tennessee Supreme Court has rejected this claim.  *See State v. Berry*, 141 S.W.3d 549, 558-61 (Tenn. 2004).

## XIII.  TRIAL COURT'S REMOVAL OF JURORS WHO WERE NOT "DEATH QUALIFIED"

Appellant asserts that the trial court erred in denying his "Motion to Preclude Removing for Cause Jurors Who Are Not Death Qualified."  The motion sought to preclude the exclusion for cause of any prospective juror who opposed the death penalty.  Appellant specifically challenged the exclusion of jurors who were not "death qualified" and the use of a "death qualified" jury as violating his constitutional rights.  Our state appellate courts have repeatedly rejected state and federal constitutional challenges to the process of "death qualification," including those raised by the appellant in this case.  *See, e.g., State v. Reid*, 91 S.W.3d 247, 289-90 (Tenn. 2002) (rejecting state constitutional challenge to removal for cause of prospective jurors who oppose the imposition of the death penalty because of "sincerely held" religious, moral, or philosophical beliefs); *State v. Hall*, 958 S.W.2d 679, 717 (Tenn. 1997) (appendix) (rejecting claim that the manner of selecting "death qualified" jurors unconstitutionally results in juries that are prone to conviction); *State v. Jones*, 789 S.W.2d 545, 547 (Tenn. 1990) (rejecting claim that "death qualification" of jury violated the Sixth Amendment by depriving the defendant of a fair and impartial jury).

Appellant also asserts that a number of prospective jurors were improperly excused based upon their personal views opposing the death penalty.  He maintains that the following jurors were improperly excused:  Mr. Berry, Ms. Crowe, Mr. McMahan, Mr. Robson, Mr. Arnold, and Ms. Barnett.  Appellant did not raise this issue in his motion for new trial. Accordingly, the issue is waived.  *See* Tenn. R. App. P. 36(a). Nonetheless, we will review the issue for plain error.

In capital cases, potential jurors may not be excluded simply because they express "general objections to the death penalty" or express reservations in its application. *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).  Exclusion is proper only when potential jurors' views will "prevent or substantially impair the performance of their

duties in accordance with their instructions or their oaths." *Wainwright v. Witt*, 469 U.S. 412, 424 n.5 (1985). Accordingly, "the extremes must be eliminated--i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or [those who would] automatically vote to acquit or impose a life sentence." *Morgan v. Illinois*, 504 U.S. 719, 734 n.7 (1992) (quoting *Smith v. Balkcom*, 660 F.2d 573, 578 (5th Cir. 1981)) (internal quotation marks omitted).

A juror's bias regarding the death penalty does not need to be proven with "'unmistakable clarity,'" but "the trial judge must have the 'definite impression' that the potential juror is incapable of following the law." *State v. Sexton*, 368 S.W.3d 371, 392 (Tenn. 2012) (quoting *State v. Austin*, 87 S.W.3d 447, 473 (Tenn. 2002)). A trial court's finding of juror bias based upon views of the death penalty is accorded a presumption of correctness, and the trial court's finding will not be overturned absent "convincing evidence" that the ruling was erroneous. *Austin*, 87 S.W.3d at 473.

When questioned by the State during voir dire, Mr. Berry stated that he was opposed to the death penalty due to his religious views. He said his "gut reaction" would be to vote against the death penalty regardless of the aggravating circumstances. When questioned by appellant, Mr. Berry stated that there were no circumstances where he would consider imposing the death penalty. The trial court granted the State's challenge for cause finding that Mr. Berry's personal views would substantially impair his ability to be faithful to his oath as a juror. The trial court did not err in removing Mr. Berry for cause.

In response to questioning by the State, Ms. Crowe stated that she "could not sign off on" the death penalty and that she lacked the courage to do so. The State challenged Ms. Crowe for cause, and the trial court granted the challenge. The trial judge stated that he observed Ms. Crowe's demeanor and found that her views regarding the death penalty would substantially impair her ability to faithfully perform her oath. The trial court did not err in this regard.

During voir dire, Mr. McMahan affirmed his answers in the juror questionnaire that he believed that death is never an appropriate form of punishment. He stated that he was morally opposed to the death penalty and that he could not imagine any circumstances where he would impose the death penalty. Based upon these answers, the trial court did not err in excluding Mr. McMahan for cause.

Mr. Robson stated that based upon his religious beliefs, he would impose a life sentence rather than a death sentence regardless of the law. Appellant stated that he did not object to Mr. Robson's being excused for cause. The trial court properly excused Mr. Robson for cause.

Mr. Arnold said he would never impose the death penalty regardless of the law. The trial court properly excused Mr. Arnold for cause.

When questioned by the trial court, Ms. Barnett said she did not know that she could impose the death penalty. She affirmed that she had moral dilemmas regarding the death penalty that would likely affect her judgment. She said she could not imagine signing her name to a verdict that imposed the death penalty and that she would not be able to do so. Because Ms. Barnett affirmed that she was not capable of following the law, the trial court did not err in striking her for cause.

Appellant failed to establish that the trial court breached a clear and unequivocal rule of law in removing these prospective jurors for cause. *See Gomez*, 239 S.W.3d at 737. Accordingly, the trial court's rulings do not constitute plain error, and appellant is not entitled to relief regarding these issues.

## XIV. CONSTITUTIONALITY OF TENNESSEE'S CAPITAL SENTENCING STATUTES

Appellant makes the following challenges regarding the constitutionality of Tennessee Code Annotated sections 39-13-204 and 39-13-206:

(1) Tennessee Code Annotated section 39-13-204(c) permits the introduction of unreliable evidence in the State's proof of aggravation or rebuttal on mitigation in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, sections 8, 9, and 16 of the Tennessee Constitution. This claim has been rejected. *See State v. Schmeiderer*, 319 S.W.3d 607, 636 (Tenn. 2010) (appendix)).

(2) Section 39-13-204(c) mandates that a trial court permit a victim's representative to testify before the jury in sentencing and, therefore, is a violation of the separation of powers doctrine in Article II, section 2 of the Tennessee Constitution. This argument has been rejected. *See State v. Thomas*, 158 S.W.3d 361, 408 (Tenn. 2005) (appendix).

(3) Imposition of the death penalty has been imposed discriminatorily on the basis of race, gender, geographic region, and economic and political status. Appellant has presented no evidence of discrimination in his case. This argument has been rejected by our supreme court. *See State v. Hester*,

324 S.W.3d 1, 78 (Tenn. 2010); *Banks*, 271 S.W.3d 90, 155-58 (Tenn. 2008).

(4) The prosecutors' unlimited discretion in determining whether to seek the death penalty violates the state and federal guarantees of equal protection and results in the same "wanton and freakish" imposition of the death penalty that was condemned in *Furman v. Georgia*, 408 U.S. 238 (1972). Our supreme court also has rejected this argument. *See State v. Brimmer*, 876 S.W.2d 75, 86 (Tenn. 1994).

(5) Imposition of a death sentence by electrocution or lethal injection is cruel and unusual punishment. Our supreme court has upheld execution by electrocution and by lethal injection. *See Banks*, 271 S.W.3d at 160; *State v. Black*, 815 S.W.2d 166, 179 (Tenn. 1991) (electrocution).

(6) By prohibiting the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase, section 39-13-204(h) violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, section 16 of the Tennessee Constitution. This argument has been rejected. *See Terry v. State*, 46 S.W.3d 147, 170 (Tenn. 2001); *Brimmer*, 876 S.W.2d at 87.

(7) By requiring the jury to unanimously agree that the aggravating circumstances outweigh the mitigating circumstances, section 39-13-204(f) impinges upon appellant's right to have each juror consider and give effect to his mitigating evidence. This argument has been rejected. *See State v. Nichols,* 877 S.W.2d 722, 735 (Tenn. 1994).

(8) Section 39-13-204 fails to require the jury to make the ultimate determination that death is appropriate. This argument has been rejected by our supreme court. *Hall*, 958 S.W.2d at 718; *Brimmer*, 876 S.W.2d at 87.

(9) Section 39-13-204 fails to require that the jury make findings of fact regarding the presence or absence of mitigating circumstances, thereby preventing effective review on appeal. This argument has also been rejected. *See Sexton*, 368 S.W.3d at 427-28 (Tenn. 2012).

## XV. FAILURE TO ADVISE APPELLANT REGARDING LIMITATION ON CROSS-EXAMINATION

Appellant asserts that the trial court erred in failing to advise him that if he testified during the penalty phase regarding mitigating circumstances, he could not be cross-examined regarding the facts of the murders unless he "opened the door." In *State v. Cazes*, 875 S.W.2d 253, 266 (Tenn. 1994), our supreme court held that

> only in the limited sphere of a death penalty sentencing hearing, a capital defendant's testimony regarding mitigating factors that are wholly collateral to the merits of the charges against him does *not* operate as a complete waiver of the privilege against self-incrimination. Accordingly, a defendant has a right to limited cross-examination if he or she wishes to testify about only collateral mitigating circumstances at the penalty phase of a capital trial. We reiterate, however, that even in such special situations, a defendant may be completely and thoroughly cross-examined about all testimony given or fairly raised by that defendant on direct examination.

(Emphasis in original) (footnote omitted). The failure to explain this evidentiary ruling on the record, however, does not invalidate appellant's waiver of the right to testify. *See Rimmer*, 250 S.W.3d at 29.

## XVI.  WAIVER OF MITIGATION PROOF

Appellant contends that the trial court failed to make an adequate inquiry into his competency to waive his right to present mitigation evidence. After the State rested its case during the penalty phase, appellant told the trial court that he was not going to present any mitigation evidence. The trial court then held a jury-out hearing during which the court questioned appellant and his advisory counsel regarding appellant's decision. The trial court found that appellant knowingly and voluntarily waived his right to present mitigation evidence. Appellant fails to identify in his brief how the trial court's questioning of him was inadequate. Rather, appellant acknowledges that the trial court's line of questioning essentially followed the requirements set forth in *Zagorski v. State*, 983 S.W.2d 654 (Tenn. 1998). Accordingly, appellant is not entitled to relief regarding this issue.

## XVII:  JURY INSTRUCTIONS DURING THE PENALTY PHASE

Appellant submits that the trial court erred in failing to instruct the jury that an individual juror can still vote for a life sentence in the absence of mitigating evidence or if aggravating circumstances outweigh mitigating circumstances. Appellant did not request this instruction at trial and did not raise the issue in his motion for new trial.

- 12 -

Therefore, this issue is waived, and our review is limited to plain error. *See Faulkner*, 154 S.W.3d at 58.

The trial court accurately and correctly instructed the jury regarding its duties, the burden of proof, and the applicable law. "When the instructions given by the trial judge are a correct statement of the law, and the instructions fully and fairly set forth the applicable law, it is not error for a trial judge to refuse to give a special instruction requested by a party." *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987). A substantial right of appellant was not adversely affected, and therefore, appellant failed to establish plain error. *See Gomez*, 239 S.W.3d at 737.

Appellant submits that the trial court's instruction in accordance with Tennessee Code Annotated section 39-13-204(f)(2) required the jury to unanimously agree that mitigating circumstances outweighed the aggravating circumstances in order to return a verdict for life and, therefore, infringed upon appellant's right to have each juror consider and give effect to mitigating evidence. This argument has been rejected by our supreme court. *See Terry*, 46 S.W.3d at 170; *Brimmer*, 876 S.W.2d at 87.

Appellant argues that Tennessee Code Annotated section 39-13-204(h), which prohibits the trial court or counsel from informing the jury about the effect of a deadlock, infringes upon the juror's providence and prevents jurors from learning that they can give effect to their convictions by their individual votes for a life sentence. The constitutionality of section 39-13-204(h) has been upheld. *See State v. Hall*, 958 S.W.2d 679, 718 (Tenn. 1997) (appendix).

Appellant complains that the jury instruction on the "heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague. The trial court instructed the jury on this aggravating circumstances in accordance with Tennessee Code Annotated section 39-13-204(i)(5). Our supreme court has held that this aggravating circumstance is not vague or overbroad. *See State v. Middlebrooks*, 995 S.W.2d 550, 556-57 (Tenn. 1999).

Appellant submits that the trial court's instruction regarding the mutilation aggravating circumstance failed to narrow the class of persons eligible for the death penalty. In order to comply with the Eighth Amendment, aggravating circumstances must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Only if the aggravating circumstance applies to every defendant who has committed the particular crimes does the aggravating circumstance fail to narrow the class of death-eligible defendants. *Arave v. Creech*, 507 U.S. 463, 474 (1993).

The application of aggravating circumstance (i)(13) requires evidence that the defendant knowingly mutilated the victim's body after death. The term "mutilation" is not statutorily defined. Rather, this court has noted the dictionary definition of mutilation as "'to cut up or alter radically so as to make imperfect.'" *State v. Thompson*, 43 S.W.3d 516, 525 (Tenn. Crim. App. 2000) (quoting Webster's Third New International Dictionary, 1493 (1993)); *see State v. Jordan*, 325 S.W.3d 1, 71 (Tenn. 2010). This court also noted that "the legislative intent underlying mutilation as an aggravating circumstance must be 'that the General Assembly . . . meant to discourage corpse desecration.'" *Thompson*, 43 S.W.3d at 525-26 (quoting *State v. Price*, 46 S.W.3d 785, 828 (Tenn. Crim. App. 2000)); *see Jordan*, 325 S.W.3d at 71.

Constitutional narrowing is accomplished because during the penalty phase, the State was required to prove that appellant knowingly mutilated Adam Chrismer after his death. Not every defendant who is guilty of first degree murder mutilated the victim after the victim's death. Therefore, this aggravating circumstance narrows the class of death-eligible defendants. Appellant is not entitled to relief regarding this issue.

Finally, appellant asserts that the victim impact jury instruction was vague and confusing in that it permitted consideration of victim impact evidence but not as an aggravating circumstance. Appellant cites to no applicable authority to support his claim. Moreover, the instruction provided to the jury was recommended by our supreme court in *State v. Nesbit*, 978 S.W.2d 872, 892 (Tenn. 1998), and was again approved in *State v. Reid*, 91 S.W.3d 247, 283 (Tenn. 2002). Appellant is not entitled to relief.

## XVIII. ADMISSION OF VICTIM IMPACT EVIDENCE

Appellant argues that Tennessee Code Annotated section 39-13-204(c), which provides that a trial court "shall" permit a victim's representative to testify before the jury in sentencing, is a violation of the separation of powers doctrine in Article II, section 2 of the Tennessee Constitution. We addressed and rejected this argument earlier in this opinion when appellant advanced the argument in connection with his challenge to the constitutionality of Tennessee's capital sentencing statutes. Appellant also argues that the legislative mandate and the Tennessee Supreme Court's decision in *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998), "renders death sentencing in Tennessee unconstitutional since this factor is rife with discrimination and violates equal protection guarantees of the state and federal constitutions." This argument has been rejected. *See State v. Odom*, 137 S.W.3d 572, 602-03 (Tenn. 2004) (appendix).

. . .

- 14 -

## XX.  CUMULATIVE ERROR

Appellant asserts that the cumulative effect of the errors at trial rendered both the guilt and penalty phases of his trial fundamentally unfair.  We have concluded that one error was committed in each phase of the trial and that each error was harmless beyond a reasonable doubt.  We conclude that the cumulative effect of these errors did not render both phases of the trial fundamentally unfair.

## CONCLUSION

After review of the record and the applicable law, we affirm appellant's judgments.